IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

GLD PARTNERS, L.P., and GLD SPONSOR )
MEMBER LLC,                         )     No. 1:23-cv-01266-RGA
                                    )
            Plaintiffs,             )
                                    )
            v.                      )
                                    )
SAGALIAM ACQUISITION CORP.,         )
                                    )
            Defendant.              )
                                    )

**REPLY DECLARATION OF DANIEL GORDON**

I, Daniel Gordon, pursuant to 28 U.S.C. § 1746, state as follows:

1.     I am the Managing Director of plaintiff GLD Partners, L.P. ("GLD Partners") and the Manager of plaintiff GLD Sponsor LLC ("GLD Sponsor"). I make this reply declaration in further support of the motion of GLD Partners and GLD Sponsor for a temporary restraining order and a preliminary injunction, enjoining defendant Sagaliam Acquisition Corp.("Sagaliam") from proceeding with a special meeting of shareholders that was scheduled for November 21, 2023. Specifically, I address certain factual issues raised in the Affidavit of Kelli Austin, sworn to December 1, 2023 (the "Austin Affidavit"), and the supporting papers filed by Sagaliam in opposition to the motion for injunctive relief. Except where otherwise noted, I have personal knowledge of the facts set forth herein.

2.     GLD Partners and GLD Sponsor are shareholders of Sagaliam.

3.     As I noted in my earlier declaration (Dkt. 9), Section 9.1(b) of the Amended and Restated Certificate of Incorporation (the "Amended and Restated Certificate"), as amended by the First Amendment dated December 22, 2022, establishes firm and hard deadlines as to when

1

Sagaliam must make the monthly payment of $57,380.22 to extend on a monthly basis the Deadline Date. *See* Complaint, Ex. C at 1. That provision does not provide for an extension of the time to make that payment or for any delay in making payment to be waived. As I further noted, once the Deadline Date has lapsed, there is a mandatory obligation to liquidate Sagaliam and to wind down Sagaliam affairs, as well as to distribute all the funds held in the trust account. *See id.*, Ex. B at 3, 8-9, Ex. C at 1.

**Extension of the Deadline Date**

4.      Exhibit A to the Austin Affidavit is a bank statement from a Chase Bank account showing a transfer in the amount of $57,380.22. According to that statement and the emails attached to Ms. Austin's Affidavit as Exhibit B, as well as paragraph 9 of the Austin Affidavit, said payment was for extension of the Deadline Date that expired on August 23, 2023. That payment was received approximately five and one-half weeks after the date required under Section 9.1(b).

5.      Contrary to the practice that Sagaliam employed with the payment of the extension fee in compliance with the instructions for Item 8.01 of for the SEC's Form 8-K, Sagaliam did not file an 8-K to disclose that Sagaliam had made the August 23 extension payment almost six weeks late. *See* Complaint, Ex. D. Nor did Sagaliam disclose that it had made said payment almost six weeks late in the proxy statement.

6.      Further, Ms. Austin has acknowledged that no payments were made to extend the date beyond September 23. Presuming for the sake of argument that the October 2, 2023 payment was effective and extended the date from August 23, 2023 to September 23, 2023, Sagaliam does not disclose in the proxy statement that the payments for the extension dates for those two subsequent months were never made.

7.      Ms. Austin also states that Continental Stock and Transfer Company ("Continental") has taken no action, but the absence of any action by Continental due to the failure to make timely payments to extend the Deadline Date is of no consequence.  The Amended and Restated Certificate does not grant Continental, Sagaliam's transfer agent, any authority to waive the failure to extend the Deadline Date by the specified date or to consent to any extension of time beyond the date set forth specifically in Section 9.1(b) of the Amended and Restated Certificate.

**The Purported Acquisition of Enzolytics Subsidiaries**

8.      Ms. Austin states that Sagaliam acquired the two subsidiaries of Enzolytics Inc. ("Enzolytics") on September 15, 2023.  Sagaliam's proxy statement, however, makes no reference to a closing of a transaction on September 15.  Rather, the proxy statement states that only a business combination agreement was signed on that date and that the purpose of the special shareholders meeting was to extend the Deadline Date to enable Sagaliam to be able to complete a transaction with Enzolytics.  Complaint, Ex. A at 2-3, 7-15.  Specifically, Sagaliam sought to extend the Deadline Date to November 23, 2023 and stated, among other things, on page 3 of the proxy statement that:

> Completion of the business combination is subject to, among other matters, the satisfaction of the conditions precedent negotiated in the Business Combination Agreement and the approval of the transaction by our stockholders.  Our board of directors (the "board") believes that there will not be sufficient time before November 23, 2023 **to consummate the business combination**.  Therefore, our board has determined that it is in the best interest of our stockholders to extend the date by which the company must consummate a business combination to the Extended Deadline Date in order to provide our stockholders with the opportunity to participate in the prospective investment.  While we have entered into the Business Combination Agreement, **there can be no assurance that all of the conditions precedent set forth in the Business Combination Agreement will be satisfied or that the proposed transaction will be consummated**.

(Emphasis added.)

9.      On September 15, 2023, Sagaliam filed an 8-K with the Securities and Exchange Commission.  A copy of that 8-K, as well as the press release filed along with the 8-K, are annexed

3

hereto as Exhibit A.  The September 15 8-K discloses the parties' entry into the Business Combination Agreement, and it also attaches a copy of the Business Combination Agreement. That Business Combination Agreement is annexed as Exhibit E to the Complaint.  The 8-K filed by Sagaliam does not state that there had been a closing under the agreement or that the acquisition of the subsidiaries had occurred.  The press release merely states: "The Company has executed a binding business combination agreement for the purchase of Biogenysis, Inc. ("BGE") and Viogentics Inc. ("VIRO"), operating subsidiaries of Enzolytics Inc. (OTCA PK: ENZL)."  The press release does not state that the acquisition closed.

10.     Annexed hereto as Exhibit B is a copy of the Form 8-K, Current Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934, with instructions, that the SEC maintains on its website.  That form can be found at Form 8-K (sec.gov)

11.     The instructions for Item 2.01, which appear at pages 7 and 8 of the instructions, require disclosure of pertinent information when the acquisition of a significant amount of assets has occurred.  Specifically, the instructions state:

> If the registrant or any of its subsidiaries consolidated has completed the acquisition or disposition of a significant amount of assets, otherwise than in the ordinary course of business, or the acquisition or disposition of a significant amount of assets that constitute a real estate operation as defined in § 210.3-14(a)(2) disclose the following information:
>
> (a) the date of completion of the transaction;
>
> (b) a brief description of the assets involved;
>
> (c) the identity of the person(s) from whom the assets were acquired or to whom they were sold and the nature of any material relationship, other than in respect of the transaction, between such person(s) and the registrant or any of its affiliates, or any director or officer of the registrant, or any associate of any such director or officer;
>
> (d) the nature and amount of consideration given or received for the assets and, if any material relationship is disclosed pursuant to paragraph (c) of this Item 2.01, the formula or principle followed in determining the amount of such consideration;

4

(e) if the transaction being reported is an acquisition and if a material relationship exists between the registrant or any of its affiliates and the source(s) of the funds used in the acquisition, the identity of the source(s) of the funds unless all or any part of the consideration used is a loan made in the ordinary course of business by a bank as defined by Section 3(a)(6) of the Act, in which case the identity of such bank may be omitted provided the registrant:

(1) has made a request for confidentiality pursuant to Section 13(d)(1)(B) of the Act; and

(2) states in the report that the identity of the bank has been so omitted and filed separately with the Commission; and

(f) if the registrant was a shell company, other than a business combination related shell company, as those terms are

defined in Rule 12b-2 under the Exchange Act (17 CFR 240.12b-2), immediately before the transaction, the information that would be required if the registrant were filing a general form for registration of securities on Form 10 under the Exchange Act reflecting all classes of the registrant's securities subject to the reporting requirements of Section 13 (15 U.S.C. 78m) or Section 15(d) (15 U.S.C. 78o(d)) of such Act upon consummation of the transaction. Notwithstanding General Instruction B.3. to Form 8-K, if any disclosure required by this Item 2.01(f) is previously reported, as that term is defined in Rule 12b-2 under the Exchange Act (17 CFR 240.12b-2), the registrant may identify the filing in which that disclosure is included instead of including that disclosure in this report.

12.    The instructions for Item 9.01 on page 22 require disclosure of the financial statements of any businesses that are acquired and must be disclosed in connection with Item 2.01. Specifically, the instruction state in pertinent part:

List below the financial statements, pro forma financial information and exhibits, if any, filed as a part of this report.

(a) *Financial statements of businesses or funds acquired.*

(1) For any business acquisition or fund acquisition required to be described in answer to Item 2.01 of this form, file financial statements and any applicable supplemental information, of the business acquired specified in Rules 3-05 or 3-14 of Regulation S-X (17 CFR 210.3-05 and 210.3-14), or Rules 8-04 or 8-06 of Regulation S-X (17 CFR 210.8-04 and 210.8-06) for smaller reporting companies, or of the fund acquired specified in Rule 6-11 of Regulation S-X (17 CFR 210.6-11).

13.    The instructions for Item 5.01 on pages 14 and 15 require disclosure in the event there is any change of control in the registrant, *i.e.*, the company. Specifically, the instructions provide:

If, to the knowledge of the registrant's board of directors, a committee of the board of directors or authorized officer or officers of the registrant, a change in control of the registrant has occurred, furnish the following information:

(1) the identity of the person(s) who acquired such control;

(2) the date and a description of the transaction(s) which resulted in the change in control;

(3) the basis of the control, including the percentage of voting securities of the registrant now beneficially owned directly or indirectly by the person(s) who acquired control;

(4) the amount of the consideration used by such person(s);

(5) the source(s) of funds used by the person(s), unless all or any part of the consideration used is a loan made in the ordinary course of business by a bank as defined by Section 3(a)(6) of the Act, in which case the identity of such bank may be omitted provided the person who acquired control:

(i) has made a request for confidentiality pursuant to Section 13(d)(1)(B) of the Act; and

(ii) states in the report that the identity of the bank has been so omitted and filed separately with the Commission.

(6) the identity of the person(s) from whom control was assumed;

(7) any arrangements or understandings among members of both the former and new control groups and their associates with respect to election of directors or other matters; and

(8) if the registrant was a shell company, other than a business combination related shell company, as those terms are defined in Rule 12b-2 under the Exchange Act (17 CFR 240.12b-2), immediately before the change in control, the information that would be required if the registrant were filing a general form for registration of securities on Form 10 under the Exchange Act reflecting all classes of the registrant's securities subject to the reporting requirements of Section 13 (15 U.S.C. 78m) or Section 15(d) (15 U.S.C. 78o(d)) of such Act upon consummation of the change in control, with such information reflecting the registrant and its securities upon consummation of the transaction. Notwithstanding General Instruction B.3. to Form 8-K, if any disclosure required by this Item 5.01(a)(8) is previously reported, as that term is defined in Rule 12b-2 under the Exchange Act (17 CFR 240.12b-2), the registrant may identify the filing in which that disclosure is included instead of including that disclosure in this report.

14.    The 8-K that Sagaliam filed on September 15, 2023 did not contain any of the information required by the instructions for items 2.01, 5.01 and 9.01 regarding the purported

closing the acquisition of the two Enzolytics subsidiaries and the purported transfer of shares to Enzolytics, presuming that each had occurred.

15.     Since the filing of the September 15 8-K disclosing, among other things, the Business Combination Agreement with Enzolytics, Sagaliam has made very few filings with the SEC. Annexed hereto as Exhibit C is the company information page on Edgar for Sagaliam. That page shows Sagaliam making only four filings since the September 15 8-K. The first two, on October 11, 2023 and October 20, 2023, are the preliminary and final versions of the proxy statement.

16.     The November 20 8-K disclosed the TRO that was issued by this Court on November 20, 2023.

17.     The November 27 filing is the extremely belated 10-Q filing for the period ending March 31, 2023.

18.     The proxy statement has already been submitted in the record for this case as Exhibit A to the complaint. Annexed hereto as Exhibits D and E, respectively, are the November 20 8-K and the November 27 10-Q. Neither the November 20 nor the November 27 filings make any reference to a closing of a transaction with Enzolytics pursuant to the Business Combination Agreement.

19.     The first announcement that I saw regarding a purported transaction closing was a press release issued by Enzolytics, coincidentally on November 20, 2023, after the Court's oral ruling on the motion for a TRO at the hearing on November 17, 2023 and the entry of the Order granting the TRO on November 20, 2023. A copy of the Enzolytics press release is annexed hereto as Exhibit F. To the best of my knowledge, the press release is the first time that either Enzolytics or anyone else made a disclosure about the purported closing of the transaction.

20.     Further, the Enzolytics press release explicitly states that Sagaliam will be filing an 8-K with respect to the transaction.  However, Sagaliam neither filed an 8-K nor issued a press release with respect to a closing.  Moreover, in the correspondence that Ms. Austin and one of her lawyers sent to the Court during the week of November 13, 2023 seeking to postpone the November 17, 2023 TRO hearing, neither Ms. Austin nor her attorney advised the Court that a closing had already occurred or that there was no need for a TRO because the transaction with Enzolytics had already closed.  Rather, those individuals sought to delay the hearing only because of their personal circumstances. *See* Dkt. 15, 18 & 19.

### Ms. Austin's Ownership of Enzolytics Shares

21.     On November 29, 2023, I received a telephone call from Barry Kostiner, the CEO of Sagaliam, to discuss this action.  In the course of that telephone conference, Mr. Kostiner confirmed to me that Ms. Austin has been a shareholder of Enzolytics.  Enzolytics has also publicly disclosed this fact since this Court's issuance of the TRO.

22.     In addition, I had telephonic discussions with Ms. Austin prior to filing of the September 15 8-K, in which we discussed a potential transaction with Enzolytics.  In those conversations, I recall Ms. Austin mentioning that she as well as her co-trustee Katheen Richardson, each owned Enzolytics shares.[1]

---

[1] Based on Google research of Katheen Richardson and the Sagaliam directors Ronnie and Travis Richardson, GLD Partners and GLD Sponsor have learned that the three of them are apparently siblings who have shared an address, among others, on Eagle Drive, Baytown, Texas, and that Ms. Richardson and Ronnie Richardson have shared post office box in Mont Belvieu, Texas.

**GLD's Injury**

23.     GLD Partners and GLD Sponsor are founder shareholders.  Consequently, they have no right under the Amended and Restated Certificate to participate in any trust fund distribution.  Consequently, neither GLD Partners nor GLD Sponsor has a right to benefit from the purported redemption offer that Sagaliam makes on page three of the proxy statement (which Sagaliam quotes on page 17 of its memorandum of law in opposition to the motion).  Only public shareholders, *i.e.*, shareholders who received their shares via the IPO, have a right to redeem their shares in exchange for funds held in the trust account.

24.     Sagaliam, in concert with Enzolytics (by virtue of Enzolytics' supermajority vote) can dictate that the business combination go forward regardless of the vote by GLD Sponsor and GLD Sponsor and any other shareholders that desire to vote against the transaction.  The material misrepresentations and omissions in the proxy statement, in concert with the super majority vote improperly given to Enzolytics, frustrates and undermines the ability of shareholders (including GLD Partners and GLD Sponsor) to exercise their right vote to reject the proposed amendment and to compel Sagaliam to terminate its operations and liquidate.  As a result, if Sagaliam is not enjoined from proceeding with a shareholders meeting predicated on a proxy statement that contains material misstatements and omissions, GLD Partners and GLD Sponsor will each be injured.  Remedying the proxy statement and voiding the Enzolytics shares will enable GLD Partners and GLD Sponsor, along with other shareholders, to compel a liquidation (if this Court does not otherwise do so), and GLD Partners and GLD Sponsor would be entitled to receive a portion of the proceeds from liquidating Sagaliam's remaining assets.  After the trust proceeds are distributed to the public Class A shareholders, as founder shareholders, GLD Partners and GLD Sponsor have a right to participate in those liquidation proceeds.  Separate and apart from the trust fund, the NASDAQ shell through which Sagaliam operates under has significant value in the

9

marketplace, and its sale in a liquidation would generate several million dollars, as to which GLD

Partners and GLD Sponsor would receive the lion share.

    I declare the foregoing statements to be true under the penalty of perjury.

Dated: December 4, 2023

_____

DANIEL GORDON

# EXHIBIT A

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 8-K

### CURRENT REPORT

### PURSUANT TO SECTION 13 OR 15(d) OF THE
### SECURITIES EXCHANGE ACT OF 1934

Date of Report (Date of earliest event reported): **Sept 15, 2023**

# Sagaliam Acquisition Corp.
### (Exact name of registrant as specified in its charter)

| Delaware | 001-41182 | 86-3006717 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**Barry Kostiner**
**1800 Avenue of the Stars, Suite 1475**
**Los Angeles, CA 90067**
(Address of principal executive offices, including zip code)

Registrant's telephone number, including area code: **(213) 616-0011**

### Not Applicable
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Units, each consisting of one share of Class A common stock, par value $0.0001 per share, and right | SAGAU | The Nasdaq Stock Market LLC |
| Class A common stock included as part of the units | SAGA | The Nasdaq Stock Market LLC |
| Rights included as part of the units | SAGAR | The Nasdaq Stock Market LLC |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☒

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

## Item 1.01 Entry into a Material Definitive Agreement.

### Business Combination Agreement

On September 15, 2023, Sagaliam Acquisition Corp., a Delaware corporation ("Sagaliam"), entered into a Business Combination Agreement (as it may be amended, supplemented or otherwise modified from time to time, the "Business Combination Agreement") by and among Sagaliam Acquisition Corp. ("PubCo"), Enzolytics Inc. (OTC PK: ENZC), Virogentics Inc. ("VGEN"), and Biogenysis Inc. ("BGEN"). (the "Company", and together with VGEN and BGEN, the "Company Entities"). Sagaliam, PubCo, and the Company are each referred to individually as a "Party" and, collectively, the "Parties".

## Item 3.01 Notice of Delisting or Failure to Satisfy a Continued Listing Rule or Standard; Transfer of Listing.

Sagaliam Acquisition Corp. (the "Company") received a delinquency notification letter ("Notice") from the Listing Qualifications staff of the Nasdaq Stock Market LLC ("Nasdaq") on August 23, 2023 due to the Company's non-compliance with Nasdaq Listing Rule 5250(c)(1) (the "Rule") as a result of the Company's failure to timely file its Annual Report on Form 10-Q for the fiscal quarter ended June 30, 2023 (the "Form 10-Q"). The Rule requires listed companies to timely file all required periodic financial reports with the Securities and Exchange Commission (the "SEC").

The Notice states that since Nasdaq has not received the Company's Form 10-Q for the period ended June 30, 2023, and because the Company remains delinquent in filing its Form 10-Q for the period ended March 31, 2023 (the "Initial Delinquent Filing"), the Company does not comply with Nasdaq's Listing Rules (the "Rules") for continued listing. In accordance with Nasdaq's letter dated July 25, 2023, the Company has until September 25, 2023 to submit a plan to regain compliance with respect to these delinquent reports. Please note that any Staff exception to allow the Company to regain compliance, if granted, will be limited to a maximum of 180 calendar days from the due date of the Initial Delinquent Filing, or November 20, 2023.

If Nasdaq does not accept the Company's plan, then the Company will have the opportunity to appeal that decision to a Nasdaq Hearings Panel.

As previously disclosed, the Company requires additional time to prepare, review and finalize its financial statements, and its auditors have not completed their review of the financial statements. The Company is continuing in its efforts to file the Form 10-Q as soon as reasonably practicable.

As required under Nasdaq Listing Rule 5250(b)(2), the Company issued a press release on September 15, 2023, announcing that it had received the Notice. A copy of this press release is attached as Exhibit 99.1 to this Form 8-K.

## Item 7.01. Regulation FD Disclosure

On September 15, 2023, Sagaliam issued a press release announcing the execution of the Business Combination Agreement described in Item 1.01 above. The press release is attached hereto as Exhibit 99.1 and incorporated into this Item 7.01 by reference. Notwithstanding the foregoing, information contained on the websites of Sagaliam, the Company or any of their affiliates referenced in Exhibit 99.1 or linked therein or otherwise connected thereto does not constitute part of nor is it incorporated by reference into this Current Report on Form 8-K.

2

The information in this Item 7.01, including Exhibit 99.1, is furnished and shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or otherwise subject to liabilities under that section, and shall not be deemed to be incorporated by reference into the filings of SPAC under the Securities Act or the Exchange Act, regardless of any general incorporation language in such filings. This Current Report on Form 8-K will not be deemed an admission as to the materiality of any of the information in this Item 7.01, including Exhibit 99.1.

**Important Information and Where to Find It**

This Current Report on Form 8-K relates to a transaction between Sagaliam and the Company. This Current Report on Form 8-K does not constitute an offer to sell or exchange, or the solicitation of an offer to buy or exchange, any securities, nor shall there be any sale of securities in any jurisdiction in which such offer, sale or exchange would be unlawful prior to registration or qualification under the securities laws of any such jurisdiction.

**Non-Solicitation**

This Current Report on Form 8-K is not a proxy statement or solicitation of a proxy, consent or authorization with respect to any securities or in respect of the potential transaction and shall not constitute an offer to sell or a solicitation of an offer to buy the securities of Sagaliam or the Company, nor shall there be any sale of any such securities in any state or jurisdiction in which such offer, solicitation, or sale would be unlawful prior to registration or qualification under the securities laws of such state or jurisdiction. No offer of securities shall be made except by means of a prospectus meeting the requirements of the Securities Act.

**Item 8.01 Other Events**

*Disclaimer*

This Current Report on Form 8-K is for informational purposes only and is neither an offer to purchase, nor a solicitation of an offer to sell, subscribe for or buy any securities or the solicitation of any vote in any jurisdiction pursuant to the proposed transactions or otherwise, nor shall there be any sale, issuance or transfer or securities in any jurisdiction in contravention of applicable law. No offer of securities shall be made except by means of a prospectus meeting the requirements of Section 10 of the Securities Act of 1933, as amended.

INVESTMENT IN ANY SECURITIES DESCRIBED HEREIN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION ("SEC") OR ANY OTHER REGULATORY AUTHORITY NOR HAS ANY AUTHORITY PASSED UPON OR ENDORSED THE MERITS OF THE PROPOSED TRANSACTIONS OR THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

3

*Forward Looking Statements*

The disclosure herein includes certain statements that are not historical facts but are forward-looking statements for purposes of the safe harbor provisions under the U.S. Private Securities Litigation Reform Act of 1995. Forward-looking statements generally are accompanied by words such as "believe," "may," "will," "estimate," "continue," "anticipate," "intend," "expect," "should," "would," "plan," "predict," "potential," "seem," "seek," "future," "outlook," and similar expressions that predict or indicate future events or trends or that are not statements of historical matters. These forward-looking statements include, but are not limited to, statements regarding projections, estimates and forecasts of revenue and other financial and performance metrics and projections of market opportunity and expectations, Company's ability to enter into a definitive business combination agreement and Company's ability to obtain the financing necessary to consummate the potential business combination transaction. These statements are based on various assumptions and on the current expectations of Company's management and are not predictions of actual performance. These forward-looking statements are provided for illustrative purposes only and are not intended to serve as, and must not be relied on by any investor as, a guarantee, an assurance, a prediction or a definitive statement of fact or probability. Actual events and circumstances are difficult or impossible to predict and will differ from assumptions. Many actual events and circumstances are beyond the control of Company. These forward-looking statements are subject to a number of risks and uncertainties, including: Company's ability to enter into a definitive agreement with respect to the proposed business combination or consummate a transaction; the risk that the approval of the stockholders of Company for the potential transaction is not obtained; failure to realize the anticipated benefits of the potential transaction, including as a result of a delay in consummating the potential transaction or difficulty in integrating the businesses of Company; the amount of redemption requests made by Company's stockholders and the amount of funds remaining in Company's trust account after satisfaction of such requests; those factors discussed in Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2022 under the heading "Risk Factors," and other documents of Company filed, or to be filed, with the SEC. If the risks materialize or assumptions prove incorrect, actual results could differ materially from the results implied by these forward-looking statements. There may be additional risks that Company presently does not know or that Company currently believes are immaterial that could also cause actual results to differ from those contained in the forward-looking statements. In addition, forward-looking statements reflect Company's expectations, plans or forecasts of future events and views as of the date hereof. Company anticipates that subsequent events and developments will cause Company's assessments to change. However, while Company may elect to update these forward-looking statements at some point in the future, Company specifically disclaims any obligation to do so. These forward-looking statements should not be relied upon as representing Company's assessments as of any date subsequent to the date of this disclosure statement. Accordingly, undue reliance should not be placed upon the forward-looking statements.

**Item 9.01 Financial Statements and Exhibits.**

(d)      Exhibits

The following exhibit is filed herewith:

| Exhibit No. | Description of Exhibits |
|---|---|
| 99.1 | Company Press Release, dated Sept 15, 2023 |
| 99.2 | Business Combination Agreement |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document) |

4

## SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**Sagaliam Acquisition Corp.**

By:     */s/ Barry Kostiner*

Name: Barry Kostiner
Title:   Chief Executive Officer

Dated: Sept 15, 2023

5

EX-99.1 2 ex99-1.htm

**Exhibit 99.1**

## SAGALIAM ACQUISITION CORP. ANNOUNCES EXECUTION OF DEFINITIVE BUSINESS COMBINATION AGREEMENT AND RECEIPT OF NASDAQ LISTING DELINQUENCY LETTER

New York, NY September 15, 2023 – Sagaliam Acquisition Corp. (NASDAQ: "SAGAU", "SAGA", "SAGAR") ("we", "us", "our", or the "Company") announced today that it received a delinquency notification letter ("Notice") from the Listing Qualifications staff of the Nasdaq Stock Market LLC ("Nasdaq") on July 25, 2023 due to the Company's non-compliance with Nasdaq Listing Rule 5250(c)(1) as a result of the Company's failure to timely file its Quarterly Report on Form 10-Q for the fiscal quarter ended March 31, 2023 (the "Form 10-K"). Nasdaq Listing Rule 5250(c)(1) requires listed companies to timely file all required periodic financial reports with the Securities and Exchange Commission (the "SEC").

The Notice states that the Company has until September 25, 2023 to submit to Nasdaq a plan to regain compliance with the Nasdaq Listing Rules. If Nasdaq accepts the Company's plan, then Nasdaq may grant the Company up to 180 calendar days from the prescribed due date for filing the Form 10-Q or until November 20, 2023 to regain compliance. If Nasdaq does not accept the Company's plan, then the Company will have the opportunity to appeal that decision to a Nasdaq Hearings Panel.

As previously disclosed, the Company requires additional time to prepare, review and finalize its financial statements, and its auditors have not completed their audit of the financial statements. The Company is continuing in its efforts to file the Form 10-Q as soon as reasonably practicable.

The Company has executed a binding business combination agreement for the purchase of Biogenysis, Inc. ("BGEN") and Virogentics Inc. ("VIRO"), operating subsidiaries of Enzolytics Inc. (OTC PK: ENZC). The combined company is expected to trade on NASDAQ.

This announcement is made in compliance with Nasdaq Listing Rule 5250(b)(2).

### About Enzolytics

Enzolytics, Inc. is a drug development company committed to commercializing its proprietary proteins and monoclonal antibodies to treat debilitating infectious diseases. The Company is advancing multiple therapeutics targeting numerous infectious diseases. One patented and clinically tested compound, ITV-1 (Immune Therapeutic Vaccine-1), is a suspension of Inactivated Pepsin Fraction (IPF), covered by U.S. Patent Nos. 8,066,982 and 7,479,538. Studies have shown it to be effective in treating HIV/AIDS. ITV-1 has also been shown to modulate the immune system.

The Company has proprietary technology for producing fully human monoclonal antibodies (mAbs) against infectious diseases which is currently being employed to produce monoclonal antibody therapeutics for treating the CoronaVirus (SARS-CoV-2), HIV-1 and the Feline Leukemia virus. The Company has also identified conserved epitopes on and has plans to produce mAbs targeting many other viruses, including HIV-2, Influenza A and B, H1N1 influenza, Respiratory syncytial virus (RSV), Small-Pox, Ebola Virus, Tetanus, Diphtheria, HTLV-1/2, Rabies, Herpes zoster, Varicella zoster, Anthrax, Mason-Pfizer monkey virus (MPMV) and Visna virus (VISNA). The Company has also analyzed epitopes of animal viruses and plans to produce mAbs for treating these animal viruses.

12/6/23, 9:22 AM
Case 1:23-cv-01266-RGA   Document 34   Filed 12/06/23   Page 19 of 95 PageID #: 828
sec.gov/Archives/edgar/data/1855351/000149315223032803/ex99-1.htm
2/2

## About Sagaliam Acquisition Corp.

We are a blank check company incorporated under the laws of the State of Delaware on March 31, 2021 for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses or entities. Sagaliam intends to continue to pursue the consummation of a business combination with an appropriate target.

## Forward Looking Statements

The disclosure herein includes certain statements that are not historical facts but are forward-looking statements for purposes of the safe harbor provisions under the U.S. Private Securities Litigation Reform Act of 1995. Forward-looking statements generally are accompanied by words such as "believe," "may," "will," "estimate," "continue," "anticipate," "intend," "expect," "should," "would," "plan," "predict," "potential," "seem," "seek," "future," "outlook," and similar expressions that predict or indicate future events or trends or that are not statements of historical matters. These forward-looking statements include, but are not limited to, statements regarding projections, estimates and forecasts of revenue and other financial and performance metrics and projections of market opportunity and expectations, Company's ability to enter into a definitive business combination agreement and Company's ability to obtain the financing necessary to consummate the potential business combination transaction. These statements are based on various assumptions and on the current expectations of Company's management and are not predictions of actual performance. These forward-looking statements are provided for illustrative purposes only and are not intended to serve as, and must not be relied on by any investor as, a guarantee, an assurance, a prediction or a definitive statement of fact or probability. Actual events and circumstances are difficult or impossible to predict and will differ from assumptions. Many actual events and circumstances are beyond the control of Company. These forward-looking statements are subject to a number of risks and uncertainties, including: Company's ability to enter into a definitive agreement with respect to the proposed business combination or consummate a transaction; the risk that the approval of the stockholders of Company for the potential transaction is not obtained; failure to realize the anticipated benefits of the potential transaction, including as a result of a delay in consummating the potential transaction or difficulty in integrating the businesses of Company; the amount of redemption requests made by Company's stockholders and the amount of funds remaining in Company's trust account after satisfaction of such requests; those factors discussed in Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2022 under the heading "Risk Factors," and other documents of Company filed, or to be filed, with the SEC. If the risks materialize or assumptions prove incorrect, actual results could differ materially from the results implied by these forward-looking statements. There may be additional risks that Company presently does not know or that Company currently believes are immaterial that could also cause actual results to differ from those contained in the forward-looking statements. In addition, forward-looking statements reflect Company's expectations, plans or forecasts of future events and views as of the date hereof. Company anticipates that subsequent events and developments will cause Company's assessments to change. However, while Company may elect to update these forward-looking statements at some point in the future, Company specifically disclaims any obligation to do so. These forward-looking statements should not be relied upon as representing Company's assessments as of any date subsequent to the date of this disclosure statement. Accordingly, undue reliance should not be placed upon the forward-looking statements.

## CONTACT INFORMATION

Sagaliam Acquisition Corp.,
Barry Kostiner, Chief Executive Officer
1800 Avenue of the Stars, Suite 1475
Los Angeles, CA 90067
Tel: (213) 616-0011
bkostiner@fintecham.com

1

# EXHIBIT B

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

| OMB APPROVAL |
| --- |
| OMB Number:    3235-0060 |
| Expires:    October 31, 2024 |
| Estimated average burden |
| hours per response........8.41 |

## FORM 8-K

### CURRENT REPORT
**Pursuant to Section 13 OR 15(d) of The Securities Exchange Act of 1934**

Date of Report (Date of earliest event reported) _____

_____

(Exact name of registrant as specified in its charter)

_____

| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |
| --- | --- | --- |

_____

(Address of principal executive offices)                    (Zip Code)

Registrant's telephone number, including area code _____

_____

(Former name or former address, if changed since last report.)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

[ ] Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

[ ] Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

[ ] Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

[ ] Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
| --- | --- | --- |
|  |  |  |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company    ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

## GENERAL INSTRUCTIONS

**A. Rule as to Use of Form 8-K.**

1. Form 8-K shall be used for current reports under Section 13 or 15(d) of the Securities Exchange Act of 1934, filed pursuant to Rule 13a-11 or Rule 15d-11 and for reports of nonpublic information required to be disclosed by Regulation FD (17 CFR 243.100 and 243.101).

2. Form 8-K may be used by a registrant to satisfy its filing obligations pursuant to Rule 425 under the Securities Act, regarding written communications related to business combination transactions, or Rules 14a-12(b) or Rule 14d-2(b) under the Exchange Act, relating to soliciting materials and pre-commencement communications pursuant to tender offers, respectively, provided that the Form 8-K filing satisfies all the substantive requirements of those rules (other than the Rule 425(c) requirement to include certain specified information in any prospectus filed pursuant to such rule). Such filing is also deemed to be filed pursuant to any rule for which the box is checked. A registrant is not required to check the box in connection with Rule 14a-12(b) or Rule 14d-2(b) if the communication is filed pursuant to Rule 425. Communications filed pursuant to Rule 425 are deemed filed under the other applicable sections. See Note 2 to Rule 425, Rule 14a-12(b) and Instruction 2 to Rule 14d-2(b)(2).

**B. Events to be Reported and Time for Filing of Reports.**

1. A report on this form is required to be filed or furnished, as applicable, upon the occurrence of any one or more of the events specified in the items in Sections 1 through 6 and 9 of this form. Unless otherwise specified, a report is to be filed or furnished within four business days after occurrence of the event. If the event occurs on a Saturday, Sunday or holiday on which the Commission is not open for business, then the four business day period shall begin to run on, and include, the first business day thereafter. A registrant either furnishing a report on this form under Item 7.01 (Regulation FD Disclosure) or electing to file a report on this form under Item 8.01 (Other Events) solely to satisfy its obligations under Regulation FD (17 CFR 243.100 and 243.101) must furnish such report or make such filing, as applicable, in accordance with the requirements of Rule 100(a) of Regulation FD (17 CFR 243.100(a)), including the deadline for furnishing or filing such report. A report pursuant to Item 5.08 is to be filed within four business days after the registrant determines the anticipated meeting date. A report pursuant to Item 1.05 is to be filed within four business days after the registrant determines that it has experienced a material cybersecurity incident.

2. The information in a report furnished pursuant to Item 2.02 (Results of Operations and Financial Condition) or Item 7.01 (Regulation FD Disclosure) shall not be deemed to be "filed" for purposes of Section 18 of the Exchange Act or otherwise subject to the liabilities of that section, unless the registrant specifically states that the information is to be considered "filed" under the Exchange Act or incorporates it by reference into a filing under the Securities Act or the Exchange Act. If a report on Form 8-K contains disclosures under Item 2.02 or Item 7.01, whether or not the report contains disclosures regarding other items, all exhibits to such report relating to Item 2.02 or Item 7.01 will be deemed furnished, and not filed, unless the registrant specifies, under Item 9.01 (Financial Statements and Exhibits), which exhibits, or portions of exhibits, are intended to be deemed filed rather than furnished pursuant to this instruction.

3. If the registrant previously has reported substantially the same information as required by this form, the registrant need not make an additional report of the information on this form. To the extent that an item calls for disclosure of developments concerning a previously reported event or transaction, any information required in the new report or amendment about the previously reported event or transaction may be provided by incorporation by reference to the previously filed report. The term previously reported is defined in Rule 12b-2 (17 CFR 240.12b-2).

4. Copies of agreements, amendments or other documents or instruments required to be filed pursuant to Form 8-K are not required to be filed or furnished as exhibits to the Form 8-K unless specifically required to be filed or furnished by the applicable Item. This instruction does not affect the requirement to otherwise file such agreements, amendments or other documents or instruments, including as exhibits to registration statements and periodic reports pursuant to the requirements of Item 601 of Regulation S-K.

5. When considering current reporting on this form, particularly of other events of material importance pursuant to Item 7.01 (Regulation FD Disclosure) and Item 8.01(Other Events), registrants should have due regard for the accuracy, completeness and currency of the information in registration statements filed under the Securities Act which incorporate by reference information in reports filed pursuant to the Exchange Act, including reports on this form.

6. A registrant's report under Item 7.01 (Regulation FD Disclosure) or Item 8.01 (Other Events) will not be deemed an admission as to the materiality of any information in the report that is required to be disclosed solely by Regulation FD.

**C. Application of General Rules and Regulations.**

1.  The General Rules and Regulations under the Act (17 CFR Part 240) contain certain general requirements which are applicable to reports on any form. These general requirements should be carefully read and observed in the preparation and filing of reports on this form.

2.  Particular attention is directed to Regulation 12B (17 CFR 240.12b-1 et seq.) which contains general requirements regarding matters such as the kind and size of paper to be used, the legibility of the report, the information to be given whenever the title of securities is required to be stated, and the filing of the report. The definitions contained in Rule 12b-2 should be especially noted. See also Regulations 13A (17 CFR 240.13a-1 et seq.) and 15D (17 CFR 240.1 5d-1 et seq.).

**D. Preparation of Report.**

This form is not to be used as a blank form to be filled in, but only as a guide in the preparation of the report on paper meeting the requirements of Rule 12b-12 (17 CFR 240.12b-12). The report shall contain the number and caption of the applicable item, but the text of such item may be omitted, provided the answers thereto are prepared in the manner specified in Rule 12b-13 (17 CFR 240.12b-13). To the extent that Item 1.01 and one or more other items of the form are applicable, registrants need not provide the number and caption of Item 1.01 so long as the substantive disclosure required by Item 1.01 is disclosed in the report and the number and caption of the other applicable item(s) are provided. All items that are not required to be answered in a particular report may be omitted and no reference thereto need be made in the report. All instructions should also be omitted.

**E. Signature and Filing of Report.**

Three complete copies of the report, including any financial statements, exhibits or other papers or documents filed as a part thereof, and five additional copies which need not include exhibits, shall be filed with the Commission. At least one complete copy of the report, including any financial statements, exhibits or other papers or documents filed as a part thereof, shall be filed, with each exchange on which any class of securities of the registrant is registered. At least one complete copy of the report filed with the Commission and one such copy filed with each exchange shall be manually signed. Copies not manually signed shall bear typed or printed signatures.

**F. Incorporation by Reference.**

If the registrant makes available to its stockholders or otherwise publishes, within the period prescribed for filing the report, a press release or other document or statement containing information meeting some or all of the requirements of this form, the information called for may be incorporated by reference to such published document or statement, in answer or partial answer to any item or items of this form, provided copies thereof are filed as an exhibit to the report on this form.

**G. Use of this Form by Asset-Backed Issuers.**

The following applies to registrants that are asset-backed issuers. Terms used in this General Instruction G. have the same meaning as in Item 1101 of Regulation AB (17 CFR 229.1101).

1. *Reportable Events That May Be Omitted.*

The registrant need not file a report on this Form upon the occurrence of any one or more of the events specified in the following:

(a) Item 1.05, Cybersecurity Incidents;

(b) Item 2.01, Completion of Acquisition or Disposition of Assets;

(c) Item 2.02, Results of Operations and Financial Condition;

(d) Item 2.03, Creation of a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant;

3

(e) Item 2.05, Costs Associated with Exit or Disposal Activities;

(f) Item 2.06, Material Impairments;

(g) Item 3.01, Notice of Delisting or Failure to Satisfy a Continued Listing Rule or Standard; Transfer of Listing;

(h) Item 3.02, Unregistered Sales of Equity Securities;

(i) Item 4.01, Changes in Registrant's Certifying Accountant;

(j) Item 4.02, Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review;

(k) Item 5.01, Changes in Control of Registrant;

(l) Item 5.02, Departure of Directors or Principal Officers; Election of Directors; Appointment of Principal Officers;

(m) Item 5.04, Temporary Suspension of Trading Under Registrant's Employee Benefit Plans; and

(n) Item 5.05, Amendments to the Registrant's Code of Ethics, or Waiver of a Provision of the Code of Ethics.

2. *Additional Disclosure for the Form 8-K Cover Page.*

Immediately after the name of the issuing entity on the cover page of the Form 8-K, as separate line items, identify the exact name of the depositor as specified in its charter and the exact name of the sponsor as specified in its charter. Include a Central Index Key number for the depositor and the issuing entity, and if available, the sponsor.

3. *Signatures.*

The Form 8-K must be signed by the depositor. In the alternative, the Form 8-K may be signed on behalf of the issuing entity by a duly authorized representative of the servicer. If multiple servicers are involved in servicing the pool assets, a duly authorized representative of the master servicer (or entity performing the equivalent function) must sign if a representative of the servicer is to sign the report on behalf of the issuing entity.

## INFORMATION TO BE INCLUDED IN THE REPORT

### Section 1 - Registrant's Business and Operations

### Item 1.01 Entry into a Material Definitive Agreement.

(a) If the registrant has entered into a material definitive agreement not made in the ordinary course of business of the registrant, or into any amendment of such agreement that is material to the registrant, disclose the following information:

(1) the date on which the agreement was entered into or amended, the identity of the parties to the agreement or amendment and a brief description of any material relationship between the registrant or its affiliates and any of the parties, other than in respect of the material definitive agreement or amendment; and

(2) a brief description of the terms and conditions of the agreement or amendment that are material to the registrant.

(b) For purposes of this Item 1.01, a material definitive agreement means an agreement that provides for obligations that are material to and enforceable against the registrant, or rights that are material to the registrant and enforceable by the registrant against one or more other parties to the agreement, in each case whether or not subject to conditions.

Instructions.

1. Any material definitive agreement of the registrant not made in the ordinary course of the registrant's business must be disclosed under this Item 1.01. An agreement is deemed to be not made in the ordinary course of a registrant's business even if the agreement is such as ordinarily accompanies the kind of business conducted by the registrant if it involves the subject matter identified in Item 601(b)(10)(ii) (A) - (D) of Regulation S-K (17 CFR 229.601(b)(10)(ii)(A) - (D)). An agreement involving the subject matter identified in Item 601(b) (10)(iii)(A) or (B)  need not be disclosed under this Item.

2. A registrant must provide disclosure under this Item 1.01 if the registrant succeeds as a party to the agreement or amendment to the agreement by assumption or assignment (other than in connection with a merger or acquisition or similar transaction).

3. With respect to asset-backed securities, as defined in Item 1101 of Regulation AB (17 CFR 229.1101), disclosure is required under this Item 1.01 regarding the entry into or an amendment to a definitive agreement that is material to the asset-backed securities transaction, even if the registrant is not a party to such agreement (*e.g.*, a servicing agreement with a servicer contemplated by Item 1108(a)(3) of Regulation AB (17 CFR 229.1108(a)(3)).

4. To the extent a material definitive agreement is filed as an exhibit under this Item 1.01, schedules (or similar attachments) to the exhibits are not required to be filed unless they contain information material to an investment or voting decision and that information is not otherwise disclosed in the exhibit or the disclosure document. Each exhibit filed must contain a list briefly identifying the contents of all omitted schedules. Registrants need not prepare a separate list of omitted information if such information is already included within the exhibit in a manner that conveys the subject matter of the omitted schedules and attachments. In addition, the registrant must provide a copy of any omitted schedule to the Commission or its staff upon request.

5. To the extent a material definitive agreement is filed as an exhibit under this Item 1.01, the registrant may redact information from the exhibit if disclosure of such information would constitute a clearly unwarranted invasion of personal privacy (e.g., disclosure of bank account numbers, social security numbers, home addresses and similar information).

6. To the extent a material definitive agreement is filed as an exhibit under this Item 1.01, the registrant may redact provisions or terms of the exhibit if those provisions or terms are both (i) not material and (ii) would likely cause competitive harm to the registrant if publicly disclosed, provided that the registrant intends to incorporate by reference this filing into its future periodic reports or registration statements, as applicable, in satisfaction of Item 601(b)(10) of Regulation S-K. If it chooses to redact information pursuant to this instruction, the registrant should mark the exhibit index to indicate that portions of the exhibit or exhibits have been omitted and include a prominent statement on the first page of the redacted exhibit that certain identified information has been excluded from the exhibit because it is both (i) not material and (ii) would likely cause competitive harm to the registrant if publicly disclosed. The registrant also must indicate by brackets where the information is omitted from the filed version of the exhibit.

    If requested by the Commission or its staff, the registrant must promptly provide an unredacted copy of the exhibit on a supplemental basis. The Commission or its staff also may request the registrant to provide its materiality and competitive harm analyses on a supplemental basis. Upon evaluation of the registrant's supplemental materials, the Commission or its staff may request the registrant to amend its filing to include in the exhibit any previously redacted information that is not adequately supported by the registrant's materiality and competitive harm analyses.

    The registrant may request confidential treatment of the supplemental material submitted under Instruction 6 of this Item pursuant to Rule 83 (§ 200.83 of this chapter) while it is in the possession of the Commission or its staff. After completing its review of the supplemental information, the Commission or its staff will return or destroy it at the request of the registrant, if the registrant complies with the procedures outlined in Rules 418 or 12b-4 (§ 230.418 or 240.12b-4 of this chapter).

**Item 1.02 Termination of a Material Definitive Agreement.**

    (a) If a material definitive agreement which was not made in the ordinary course of business of the registrant and to which the registrant is a party is terminated otherwise than by expiration of the agreement on its stated termination date, or as a result of all parties completing their obligations under such agreement, and such termination of the agreement is material to the registrant, disclose the following information:

    (1) the date of the termination of the material definitive agreement, the identity of the parties to the agreement and a brief description of any material relationship between the registrant or its affiliates and any of the parties other than in respect of the material definitive agreement;

    (2) a brief description of the terms and conditions of the agreement that are material to the registrant;

    (3) a brief description of the material circumstances surrounding the termination; and

    (4) any material early termination penalties incurred by the registrant.

    (b) For purposes of this Item 1.02, the term material definitive agreement shall have the same meaning as set forth in Item 1.01(b).

Instructions.

1. No disclosure is required solely by reason of this Item 1.02 during negotiations or discussions regarding termination of a material definitive agreement unless and until the agreement has been terminated.

2. No disclosure is required solely by reason of this Item 1.02 if the registrant believes in good faith that the material definitive agreement has not been terminated, unless the registrant has received a notice of termination pursuant to the terms of agreement.

3. With respect to asset-backed securities, as defined in Item 1101 of Regulation AB (17 CFR 229.1101), disclosure is required under this Item 1.02 regarding the termination of a definitive agreement that is material to the asset-backed securities transaction (otherwise than by expiration of the agreement on its stated termination date or as a result of all parties completing their obligations under such agreement), even if the registrant is not a party to such agreement (*e.g.*, a servicing agreement with a servicer contemplated by Item 1108(a)(3) of Regulation AB (17 CFR 229.1108(a)(3)).

**Item 1.03 Bankruptcy or Receivership.**

(a) If a receiver, fiscal agent or similar officer has been appointed for a registrant or its parent, in a proceeding under the U.S. Bankruptcy Code or in any other proceeding under state or federal law in which a court or governmental authority has assumed jurisdiction over substantially all of the assets or business of the registrant or its parent, or if such jurisdiction has been assumed by leaving the existing directors and officers in possession but subject to the supervision and orders of a court or governmental authority, disclose the following information:

(1) the name or other identification of the proceeding;

(2) the identity of the court or governmental authority;

(3) the date that jurisdiction was assumed; and

(4) the identity of the receiver, fiscal agent or similar officer and the date of his or her appointment.

(b) If an order confirming a plan of reorganization, arrangement or liquidation has been entered by a court or governmental authority having supervision or jurisdiction over substantially all of the assets or business of the registrant or its parent, disclose the following;

(1) the identity of the court or governmental authority;

(2) the date that the order confirming the plan was entered by the court or governmental authority;

(3) a summary of the material features of the plan and, pursuant to Item 9.01 (Financial Statements and Exhibits), a copy of the plan as confirmed;

(4) the number of shares or other units of the registrant or its parent issued and outstanding, the number reserved for future issuance in respect of claims and interests filed and allowed under the plan, and the aggregate total of such numbers; and

(5) information as to the assets and liabilities of the registrant or its parent as of the date that the order confirming the plan was entered, or a date as close thereto as practicable.

Instructions.

1. The information called for in paragraph (b)(5) of this Item 1.03 may be presented in the form in which it was furnished to the court or governmental authority.

2. With respect to asset-backed securities, disclosure also is required under this Item 1.03 if the depositor (or servicer if the servicer signs the report on Form 10-K (17 CFR 249.310) of the issuing entity) becomes aware of any instances described in paragraph (a) or (b) of this Item with respect to the sponsor, depositor, servicer contemplated by Item 1108(a)(3) of Regulation AB (17 CFR 229.1108(a)(3)), trustee, significant obligor, enhancement or support provider contemplated by Items 1114(b) or 1115 of Regulation AB (17 CFR 229.1114(b) or 229.1115) or other material party contemplated by Item 1101(d)(1) of Regulation AB (17 CFR 1101(d)(1)). Terms used in this Instruction 2 have the same meaning as in Item 1101 of Regulation AB (17 CFR 229.1101).

**Item 1.04 Mine Safety – Reporting of Shutdowns and Patterns of Violations.**
(a) If the registrant or a subsidiary of the registrant has received, with respect to a coal or other mine of which the registrant or a subsidiary of the registrant is an operator
• an imminent danger order issued under section 107(a) of the Federal Mine Safety and Health Act of 1977 (30 U.S.C. 817(a));

• a written notice from the Mine Safety and Health Administration that the coal or other mine has a pattern of violations of mandatory health or safety standards that are of such nature as could have significantly and substantially contributed to the cause and effect of coal or other mine health or safety hazards under section 104(e) of such Act (30 U.S.C. 814(e)); or

• a written notice from the Mine Safety and Health Administration that the coal or other mine has the potential  to have such a pattern, disclose the following information:
(1) The date of receipt by the issuer or a subsidiary of such order or notice.

(2) The category of the order or notice.
(3) The name and location of the mine involved.

*Instructions to Item 1.04.*

1. The term "coal or other mine" means a coal or other mine, as defined in section 3 of the Federal Mine Safety and Health Act of 1977 (30 U.S.C. 802), that is subject to the provisions of such Act (30 U.S.C. 801 et seq).
2. The term "operator" has the meaning given the term in section 3 of the Federal Mine Safety and Health Act of 1977 (30 U.S.C. 802).

**Item 1.05 Material Cybersecurity Incidents.**

(a) If the registrant experiences a cybersecurity incident that is determined by the registrant to be material, describe the material aspects of the nature, scope, and timing of the incident, and the material impact or reasonably likely material impact on the registrant, including its financial condition and results of operations.

(b) A registrant shall provide the information required by this Item in an Interactive Data File in accordance with Rule 405 of Regulation S-T and the EDGAR Filer Manual.

(c) Notwithstanding General Instruction B.1. to Form 8-K, if the United States Attorney General determines that disclosure required by paragraph (a) of this Item 1.05 poses a substantial risk to national security or public safety, and notifies the Commission of such determination in writing, the registrant may delay providing the disclosure required by this Item 1.05 for a time period specified by the Attorney General, up to 30 days following the date when the disclosure required by this Item 1.05 was otherwise required to be provided. Disclosure may be delayed for an additional period of up to 30 days if the Attorney General determines that disclosure continues to pose a substantial risk to national security or public safety and notifies the Commission of such determination in writing. In extraordinary circumstances, disclosure may be delayed for a final additional period of up to 60 days if the Attorney General determines that disclosure continues to pose a substantial risk to national security and notifies the Commission of such determination in writing. Beyond the final 60-day delay under this paragraph, if the Attorney General indicates that further delay is necessary, the Commission will consider additional requests for delay and may grant such relief through Commission exemptive order.

(d) Notwithstanding General Instruction B.1. to Form 8-K, if a registrant that is subject to 47 CFR 64.2011 is required to delay disclosing a data breach pursuant to such rule, it may delay providing the disclosure required by this Item 1.05 for such period that is applicable under 47 CFR 64.2011(b)(1) and in no event for more than seven business days after notification required under such provision has been made, so long as the registrant notifies the Commission in correspondence submitted to the EDGAR system no later than the date when the disclosure required by this Item 1.05 was otherwise required to be provided.

**Instructions to Item 1.05.**

1. A registrant's materiality determination regarding a cybersecurity incident must be made without unreasonable delay after discovery of the incident.

2. To the extent that the information called for in Item 1.05(a) is not determined or is unavailable at the time of the required filing, the registrant shall include a statement to this effect in the filing and then must file an amendment to its Form 8-K filing under this Item 1.05 containing such information within four business days after the registrant, without unreasonable delay, determines such information or within four business days after such information becomes available.

3. The definition of the term "cybersecurity incident" in §229.106(a) [Item 106(a) of Regulation S-K] applies to this Item.

4. A registrant need not disclose specific or technical information about its planned response to the incident or its cybersecurity systems, related networks and devices, or potential system vulnerabilities in such detail as would impede the registrant's response or remediation of the incident.

**Section 2 - Financial Information**

**Item 2.01 Completion of Acquisition or Disposition of Assets.**

If the registrant or any of its subsidiaries consolidated has completed the acquisition or disposition of a significant amount of assets, otherwise than in the ordinary course of business, or the acquisition or disposition of a significant amount of assets that constitute a real

estate operation as defined in § 210.3-14(a)(2) disclose the following information:

(a) the date of completion of the transaction;

(b) a brief description of the assets involved;

(c) the identity of the person(s) from whom the assets were acquired or to whom they were sold and the nature of any material relationship, other than in respect of the transaction, between such person(s) and the registrant or any of its affiliates, or any director or officer of the registrant, or any associate of any such director or officer;

(d) the nature and amount of consideration given or received for the assets and, if any material relationship is disclosed pursuant to paragraph (c) of this Item 2.01, the formula or principle followed in determining the amount of such consideration;

(e) if the transaction being reported is an acquisition and if a material relationship exists between the registrant or any of its affiliates and the source(s) of the funds used in the acquisition, the identity of the source(s) of the funds unless all or any part of the consideration used is a loan made in the ordinary course of business by a bank as defined by Section 3(a)(6) of the Act, in which case the identity of such bank may be omitted provided the registrant:

(1) has made a request for confidentiality pursuant to Section 13(d)(1)(B) of the Act; and

(2) states in the report that the identity of the bank has been so omitted and filed separately with the Commission; and

(f) if the registrant was a shell company, other than a business combination related shell company, as those terms are defined in Rule 12b-2 under the Exchange Act (17 CFR 240.12b-2), immediately before the transaction, the information that would be required if the registrant were filing a general form for registration of securities on Form 10 under the Exchange Act reflecting all classes of the registrant's securities subject to the reporting requirements of Section 13 (15 U.S.C. 78m) or Section 15(d) (15 U.S.C. 78o(d)) of such Act upon consummation of the transaction. Notwithstanding General Instruction B.3. to Form 8-K, if any disclosure required by this Item 2.01(f) is previously reported, as that term is defined in Rule 12b-2 under the Exchange Act (17 CFR 240.12b-2), the registrant may identify the filing in which that disclosure is included instead of including that disclosure in this report.

<u>Instructions</u>.

1. No information need be given as to:

(i) any transaction between any person and any wholly-owned subsidiary of such person;

(ii) any transaction between two or more wholly-owned subsidiaries of any person; or

(iii) the redemption or other acquisition of securities from the public, or the sale or other disposition of securities to the public, by the issuer of such securities or by a wholly-owned subsidiary of that issuer.

2. The term <u>acquisition</u> includes every purchase, acquisition by lease, exchange, merger, consolidation, succession or other acquisition, except that the term does not include the construction or development of property by or for the registrant or its subsidiaries or the acquisition of materials for such purpose. The term <u>disposition</u> includes every sale, disposition by lease, exchange, merger, consolidation, mortgage, assignment or hypothecation of assets, whether for the benefit of creditors or otherwise, abandonment, destruction, or other disposition.

3. The information called for by this Item 2.01 is to be given as to each transaction or series of related transactions of the size indicated. The acquisition or disposition of securities is deemed the indirect acquisition or disposition of the assets represented by such securities if it results in the acquisition or disposition of control of such assets.

4. An acquisition or disposition will be deemed to involve a significant amount of assets:

(i) if the registrant's and its other subsidiaries' equity in the net book value of such assets or the amount paid or received for the assets upon such acquisition or disposition exceeded 10 percent of the total assets of the registrant and its consolidated subsidiaries;

(ii) if it involved a business (see 17 CFR 210.11-01(d)) that is significant (see 17 CFR 210.11-01(b)). The acquisition of a business encompasses the acquisition of an interest in a business accounted for by the registrant under the equity method or, in lieu of the equity method, the fair value option; or

(iii) in the case of a business development company, if the amount paid for such assets exceeded 10 percent of the value of the total investments of the registrant and its consolidated subsidiaries.

The aggregate impact of acquired businesses are not required to be reported pursuant to this Item 2.01 unless they are related businesses

(see 17 CFR 210.3-05(a)(3)), related real estate operations (see 17 CFR 210.3-14(a)(3)), or related funds (see 17 CFR 210.6-11(a)(3)), and are significant in the aggregate.

    5. Attention is directed to the requirements in Item 9.01 (Financial Statements and Exhibits) with respect to the filing of:

        (i) financial statements of businesses or funds acquired;

        (ii) pro forma financial information; and

        (iii) copies of the plans of acquisition or disposition as exhibits to the report.

**Item 2.02 Results of Operations and Financial Condition.**

    (a) If a registrant, or any person acting on its behalf, makes any public announcement or release (including any update of an earlier announcement or release) disclosing material non-public information regarding the registrant's results of operations or financial condition for a completed quarterly or annual fiscal period, the registrant shall disclose the date of the announcement or release, briefly identify the announcement or release and include the text of that announcement or release as an exhibit.

    (b) A Form 8-K is not required to be furnished to the Commission under this Item 2.02 in the case of disclosure of material non-public information that is disclosed orally, telephonically, by webcast, by broadcast, or by similar means if:

    (1) the information is provided as part of a presentation that is complementary to, and initially occurs within 48 hours after, a related, written announcement or release that has been furnished on Form 8-K pursuant to this Item 2.02 prior to the presentation;

    (2) the presentation is broadly accessible to the public by dial-in conference call, by webcast, by broadcast or by similar means;

    (3) the financial and other statistical information contained in the presentation is provided on the registrant's website, together with any information that would be required under 17 CFR 244.100; and

    (4) the presentation was announced by a widely disseminated press release, that included instructions as to when and how to access the presentation and the location on the registrant's website where the information would be available.

Instructions.

1. The requirements of this Item 2.02 are triggered by the disclosure of material non-public information regarding a completed fiscal year or quarter. Release of additional or updated material non-public information regarding a completed fiscal year or quarter would trigger an additional Item 2.02 requirement.

2. The requirements of paragraph (e)(1)(i) of Item 10 of Regulation S-K (17 CFR 229.10(e)(1)(i))  shall apply to disclosures under this Item 2.02.

3. Issuers that make earnings announcements or other disclosures of material non-public information regarding a completed fiscal year or quarter in an interim or annual report to shareholders are permitted to specify which portion of the report contains the information required to be furnished under this Item 2.02.

4. This Item 2.02 does not apply in the case of a disclosure that is made in a quarterly report filed with the Commission on Form 10-Q (17 CFR 249.308a) or an annual report filed with the Commission on Form 10-K (17 CFR 249.310).

**Item 2.03 Creation of a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant.**

(a) If the registrant becomes obligated on a direct financial obligation that is material to the registrant, disclose the following information:

    (1) the date on which the registrant becomes obligated on the direct financial obligation and a brief description of the transaction or agreement creating the obligation;

    (2) the amount of the obligation, including the terms of its payment and, if applicable, a brief description of the material terms under which it may be accelerated or increased and the nature of any recourse provisions that would enable the registrant to recover from third parties; and

(3) a brief description of the other terms and conditions of the transaction or agreement that are material to the registrant.

(b) If the registrant becomes directly or contingently liable for an obligation that is material to the registrant arising out of an off-balance sheet arrangement, disclose the following information:

(1) the date on which the registrant becomes directly or contingently liable on the obligation and a brief description of the transaction or agreement creating the arrangement and obligation;

(2) a brief description of the nature and amount of the obligation of the registrant under the arrangement, including the material terms whereby it may become a direct obligation, if applicable, or may be accelerated or increased and the nature of any recourse provisions that would enable the registrant to recover from third parties;

(3) the maximum potential amount of future payments (undiscounted) that the registrant may be required to make, if different; and

(4) a brief description of the other terms and conditions of the obligation or arrangement that are material to the registrant.

(c) For purposes of this Item 2.03, direct financial obligation means any of the following:

(1) a long-term debt obligation, as defined in Item 303(a)(5)(ii)(A) of Regulation S-K (17 CFR 229.303(a)(5)(ii)(A));

(2) a capital lease obligation, as defined in Item 303(a)(5)(ii)(B) of Regulation S-K (17 CFR 229.303(a)(5)(ii)(B));

(3) an operating lease obligation, as defined in Item 303(a)(5)(ii)(C) of Regulation S-K (17 CFR 229.303(a)(5)(ii)(C)); or

(4) a short-term debt obligation that arises other than in the ordinary course of business.

(d) For purposes of this Item 2.03, off-balance sheet arrangement has the meaning set forth in Item 303(a)(4)(ii) of Regulation S-K (17 CFR 229.303(a)(4)(ii)).

(e) For purposes of this Item 2.03, short-term debt obligation means a payment obligation under a borrowing arrangement that is scheduled to mature within one year, or, for those registrants that use the operating cycle concept of working capital, within a registrant's operating cycle that is longer than one year, as discussed in FASB ASC paragraph 210-10-45-3 (Balance Sheet Topic).

Instructions.

1. A registrant has no obligation to disclose information under this Item 2.03 until the registrant enters into an agreement enforceable against the registrant, whether or not subject to conditions, under which the direct financial obligation will arise or be created or issued. If there is no such agreement, the registrant must provide the disclosure within four business days after the occurrence of the closing or settlement of the transaction or arrangement under which the direct financial obligation arises or is created.

2. A registrant must provide the disclosure required by paragraph (b) of this Item 2.03 whether or not the registrant is also a party to the transaction or agreement creating the contingent obligation arising under the off-balance sheet arrangement. In the event that neither the registrant nor any affiliate of the registrant is also a party to the transaction or agreement creating the contingent obligation arising under the off-balance sheet arrangement in question, the four business day period for reporting the event under this Item 2.03 shall begin on the earlier of (i) the fourth business day after the contingent obligation is created or arises, and (ii) the day on which an executive officer, as defined in 17 CFR 240.3b-7, of the registrant becomes aware of the contingent obligation.

3. In the event that an agreement, transaction or arrangement requiring disclosure under this Item 2.03 comprises a facility, program or similar arrangement that creates or may give rise to direct financial obligations of the registrant in connection with multiple transactions, the registrant shall:

(i) disclose the entering into of the facility, program or similar arrangement if the entering into of the facility is material to the registrant; and

(ii) as direct financial obligations arise or are created under the facility or program, disclose the required information under this Item 2.03 to the extent that the obligations are material to the registrant (including when a series of previously undisclosed individually immaterial obligations become material in the aggregate).

4. For purposes of Item 2.03(b)(3), the maximum amount of future payments shall not be reduced by the effect of any amounts that may possibly be recovered by the registrant under recourse or collateralization provisions in any guarantee agreement, transaction or arrangement.

5. If the obligation required to be disclosed under this Item 2.03 is a security, or a term of a security, that has been or will be sold pursuant to an effective registration statement of the registrant, the registrant is not required to file a Form 8-K pursuant to this Item 2.03, provided

that the prospectus relating to that sale contains the information required by this Item 2.03 and is filed within the required time period under Securities Act Rule 424 (§230.424 of this chapter).

**Item 2.04 Triggering Events That Accelerate or Increase a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement.**

(a) If a triggering event causing the increase or acceleration of a direct financial obligation of the registrant occurs and the consequences of the event, taking into account those described in paragraph (a)(4) of this Item 2.04, are material to the registrant, disclose the following information:

(1) the date of the triggering event and a brief description of the agreement or transaction under which the direct financial obligation was created and is increased or accelerated;

(2) a brief description of the triggering event;

(3) the amount of the direct financial obligation, as increased if applicable, and the terms of payment or acceleration that apply; and

(4) any other material obligations of the registrant that may arise, increase, be accelerated or become direct financial obligations as a result of the triggering event or the increase or acceleration of the direct financial obligation.

(b) If a triggering event occurs causing an obligation of the registrant under an off-balance sheet arrangement to increase or be accelerated, or causing a contingent obligation of the registrant under an off-balance sheet arrangement to become a direct financial obligation of the registrant, and the consequences of the event, taking into account those described in paragraph (b)(4) of this Item 2.04, are material to the registrant, disclose the following information:

(1) the date of the triggering event and a brief description of the off-balance sheet arrangement;

(2) a brief description of the triggering event;

(3) the nature and amount of the obligation, as increased if applicable, and the terms of payment or acceleration that apply; and

(4) any other material obligations of the registrant that may arise, increase, be accelerated or become direct financial obligations as a result of the triggering event or the increase or acceleration of the obligation under the off-balance sheet arrangement or its becoming a direct financial obligation of the registrant.

(c) For purposes of this Item 2.04, the term direct financial obligation has the meaning provided in Item 2.03 of this form, but shall also include an obligation arising out of an off-balance sheet arrangement that is accrued under FASB ASC Section 450-20-25, Contingencies - Loss Contingencies - Recognition.

(d) For purposes of this Item 2.04, the term off-balance sheet arrangement has the meaning provided in Item 2.03 of this form.

(e) For purposes of this Item 2.04, a triggering event is an event, including an event of default, event of acceleration or similar event, as a result of which a direct financial obligation of the registrant or an obligation of the registrant arising under an off-balance sheet arrangement is increased or becomes accelerated or as a result of which a contingent obligation of the registrant arising out of an off-balance sheet arrangement becomes a direct financial obligation of the registrant.

Instructions.

1. Disclosure is required if a triggering event occurs in respect of an obligation of the registrant under an off-balance sheet arrangement and the consequences are material to the registrant, whether or not the registrant is also a party to the transaction or agreement under which the triggering event occurs.

2. No disclosure is required under this Item 2.04 unless and until a triggering event has occurred in accordance with the terms of the relevant agreement, transaction or arrangement, including, if required, the sending to the registrant of notice of the occurrence of a triggering event pursuant to the terms of the agreement, transaction or arrangement and the satisfaction of all conditions to such occurrence, except the passage of time.

3. No disclosure is required solely by reason of this Item 2.04 if the registrant believes in good faith that no triggering event has occurred, unless the registrant has received a notice described in Instruction 2 to this Item 2.04.

4. Where a registrant is subject to an obligation arising out of an off-balance sheet arrangement, whether or not disclosed pursuant to Item 2.03 of this form, if a triggering event occurs as a result of which under that obligation an accrual for a probable loss is required under FASB ASC Section 450-20-25, the obligation arising out of the off-balance sheet arrangement becomes a direct financial obligation as

11

defined in this Item 2.04. In that situation, if the consequences as determined under Item 2.04(b) are material to the registrant, disclosure is required under this Item 2.04.

5. With respect to asset-backed securities, as defined in 17 CFR 229.1101, disclosure also is required under this Item 2.04 if an early amortization, performance trigger or other event, including an event of default, has occurred under the transaction agreements for the asset-backed securities that would materially alter the payment priority or distribution of cash flows regarding the asset-backed securities or the amortization schedule for the asset-backed securities. In providing the disclosure required by this Item, identify the changes to the payment priorities, flow of funds or asset-backed securities as a result. Disclosure is required under this Item whether or not the registrant is a party to the transaction agreement that results in the occurrence identified.

**Item 2.05 Costs Associated with Exit or Disposal Activities.**

If the registrant's board of directors, a committee of the board of directors or the officer or officers of the registrant authorized to take such action if board action is not required, commits the registrant to an exit or disposal plan, or otherwise disposes of a long-lived asset or terminates employees under a plan of termination described in FASB ASC paragraph 420-10-25-4 (Exit or Disposal Cost Obligations Topic), under which material charges will be incurred under generally accepted accounting principles applicable to the registrant, disclose the following information:

(a) the date of the commitment to the course of action and a description of the course of action, including the facts and circumstances leading to the expected action and the expected completion date;

(b) for each major type of cost associated with the course of action (for example, one-time termination benefits, contract termination costs and other associated costs), an estimate of the total amount or range of amounts expected to be incurred in connection with the action;

(c) an estimate of the total amount or range of amounts expected to be incurred in connection with the action; and

(d) the registrant's estimate of the amount or range of amounts of the charge that will result in future cash expenditures, provided, however, that if the registrant determines that at the time of filing it is unable in good faith to make a determination of an estimate required by paragraphs (b), (c) or (d) of this Item 2.05, no disclosure of such estimate shall be required; provided further, however, that in any such event, the registrant shall file an amended report on Form 8-K under this Item 2.05 within four business days after it makes a determination of such an estimate or range of estimates.

**Item 2.06 Material Impairments.**

If the registrant's board of directors, a committee of the board of directors or the officer or officers of the registrant authorized to take such action if board action is not required, concludes that a material charge for impairment to one or more of its assets, including, without limitation, impairments of securities or goodwill, is required under generally accepted accounting principles applicable to the registrant, disclose the following information:

(a) the date of the conclusion that a material charge is required and a description of the impaired asset or assets and the facts and circumstances leading to the conclusion that the charge for impairment is required;

(b) the registrant's estimate of the amount or range of amounts of the impairment charge; and

(c) the registrant's estimate of the amount or range of amounts of the impairment charge that will result in future cash expenditures, provided, however, that if the registrant determines that at the time of filing it is unable in good faith to make a determination of an estimate required by paragraphs (b) or (c) of this Item 2.06, no disclosure of such estimate shall be required; provided further, however, that in any such event, the registrant shall file an amended report on Form 8-K under this Item 2.06 within four business days after it makes a determination of such an estimate or range of estimates.

Instruction.

No filing is required under this Item 2.06 if the conclusion is made in connection with the preparation, review or audit of financial statements required to be included in the next periodic report due to be filed under the Exchange Act, the periodic report is filed on a timely basis and such conclusion is disclosed in the report.

**Section 3 - Securities and Trading Markets**

**Item 3.01 Notice of Delisting or Failure to Satisfy a Continued Listing Rule or Standard; Transfer of Listing.**

(a) If the registrant has received notice from the national securities exchange or national securities association (or a facility thereof) that maintains the principal listing for any class of the registrant's common equity (as defined in Exchange Act Rule 12b-2 (17 CFR 240.12b-2)) that:

- the registrant or such class of the registrant's securities does not satisfy a rule or standard for continued listing on the exchange or association;
- the exchange has submitted an application under Exchange Act Rule 12d2-2 (17 CFR 240.12d2-2) to the Commission to delist such class of the registrant's securities; or
- the association has taken all necessary steps under its rules to delist the security from its automated inter-dealer quotation system,

the registrant must disclose:

(i) the date that the registrant received the notice;

(ii) the a rule or standard for continued listing on the national securities exchange or national securities association that the registrant fails, or has failed to, satisfy; and

(iii) any action or response that, at the time of filing, the registrant has determined to take in response to the notice.

(b) If the registrant has notified the national securities exchange or national securities association (or a facility thereof) that maintains the principal listing for any class of the registrant's common equity (as defined in Exchange Act Rule 12b-2 (17 CFR 240.12b-2) that the registrant is aware of any material noncompliance with a rule or standard for continued listing on the exchange or association, the registrant must disclose:

(i) the date that the registrant provided such notice to the exchange or association;

(ii) the rule or standard for continued listing on the exchange or association that the registrant fails, or has failed, to satisfy; and

(iii) any action or response that, at the time of filing, the registrant has determined to take regarding its noncompliance.

(c) If the national securities exchange or national securities association (or a facility thereof) that maintains the principal listing for any class of the registrant's common equity (as defined in Exchange Act Rule 12b-2 (17 CFR 240.12b-2)), in lieu of suspending trading in or delisting such class of the registrant's securities, issues a public reprimand letter or similar communication indicating that the registrant has violated a rule or standard for continued listing on the exchange or association, the registrant must state the date, and summarize the contents of the letter or communication.

(d) If the registrant's board of directors, a committee of the board of directors or the officer or officers of the registrant authorized to take such action if board action is not required, has taken definitive action to cause the listing of a class of its common equity to be withdrawn from the national securities exchange, or terminated from the automated inter-dealer quotation system of a registered national securities association, where such exchange or association maintains the principal listing for such class of securities, including by reason of a transfer of the listing or quotation to another securities exchange or quotation system, describe the action taken and state the date of the action.

Instructions.

1. The registrant is not required to disclose any information required by paragraph (a) of this Item 3.01 where the delisting is a result of one of the following:

- the entire class of the security has been called for redemption, maturity or retirement; appropriate notice thereof has been given; if required by the terms of the securities, funds sufficient for the payment of all such securities have been deposited with an agency authorized to make such payments; and such funds have been made available to security holders;
- the entire class of the security has been redeemed or paid at maturity or retirement;
- the instruments representing the entire class of securities have come to evidence, by operation of law or otherwise, other securities in substitution therefor and represent no other right, except, if true, the right to receive an immediate cash payment (the right of dissenters to receive the appraised or fair value of their holdings shall not prevent the application of this provision); or
- all rights pertaining to the entire class of the security have been extinguished; _provided_, _however_, that where such an event occurs as the result of an order of a court or other governmental authority, the order shall be final, all applicable appeal periods shall have expired and no appeals shall be pending.

2. A registrant must provide the disclosure required by paragraph (a) or (b) of this Item 3.01, as applicable, regarding any failure to satisfy a rule or standard for continued listing on the national securities exchange or national securities association (or a facility thereof)

13

that maintains the principal listing for any class of the registrant's common equity (as defined in Exchange Act Rule 12b-2 (17 CFR 240.12b-2)) even if the registrant has the benefit of a grace period or similar extension period during which it may cure the deficiency that triggers the disclosure requirement.

3. Notices or other communications subsequent to an initial notice sent to, or by, a registrant under Item 3.01(a), (b) or (c) that continue to indicate that the registrant does not comply with the same rule or standard for continued listing that was the subject of the initial notice are not required to be filed, but may be filed voluntarily.

4. Registrants whose securities are quoted exclusively (i.e., the securities are not otherwise listed on an exchange or association) on automated inter-dealer quotation systems are not subject to this Item 3.01 and such registrants are thus not required to file a Form 8-K pursuant to this Item 3.01 if the securities are no longer quoted on such quotation system. If a security is listed on an exchange or association and is also quoted on an automated inter-dealer quotation system, the registrant is subject to the disclosure obligations of Item 3.01 if any of the events specified in Item 3.01 occur.

### Item 3.02 Unregistered Sales of Equity Securities.

(a) If the registrant sells equity securities in a transaction that is not registered under the Securities Act, furnish the information set forth in paragraphs (a) and (c) through (e) of Item 701 of Regulation S-K (17 CFR 229.701(a) and (c) through (e). For purposes of determining the required filing date for the Form 8-K under this Item 3.02(a), the registrant has no obligation to disclose information under this Item 3.02 until the registrant enters into an agreement enforceable against the registrant, whether or not subject to conditions, under which the equity securities are to be sold. If there is no such agreement, the registrant must provide the disclosure within four business days after the occurrence of the closing or settlement of the transaction or arrangement under which the equity securities are to be sold.

(b) No report need be filed under this Item 3.02 if the equity securities sold, in the aggregate since its last report filed under this Item 3.02 or its last periodic report, whichever is more recent, constitute less than 1% of the number of shares outstanding of the class of equity securities sold. In the case of a smaller reporting company, no report need be filed if the equity securities sold, in the aggregate since its last report filed under this Item 3.02 or its last periodic report, whichever is more recent, constitute less than 5% of the number of shares outstanding of the class of equity securities sold.

Instructions.

1. For purposes of this Item 3.02, "the number of shares outstanding" refers to the actual number of shares of equity securities of the class outstanding and does not include outstanding securities convertible into or exchangeable for such equity securities.

2. A smaller reporting company is defined under Item 10(f)(1) of Regulation S-K (17 CFR 229.10(f)(1)).

### Item 3.03 Material Modification to Rights of Security Holders.

(a) If the constituent instruments defining the rights of the holders of any class of registered securities of the registrant have been materially modified, disclose the date of the modification, the title of the class of securities involved and briefly describe the general effect of such modification upon the rights of holders of such securities.

(b) If the rights evidenced by any class of registered securities have been materially limited or qualified by the issuance or modification of any other class of securities by the registrant, briefly disclose the date of the issuance or modification, the general effect of the issuance or modification of such other class of securities upon the rights of the holders of the registered securities.

Instruction.

Working capital restrictions and other limitations upon the payment of dividends must be reported pursuant to this Item 3.03.

### Section 4 - Matters Related to Accountants and Financial Statements

### Item 4.01 Changes in Registrant's Certifying Accountant.

(a) If an independent accountant who was previously engaged as the principal accountant to audit the registrant's financial statements, or an independent accountant upon whom the principal accountant expressed reliance in its report regarding a significant subsidiary, resigns (or indicates that it declines to stand for re-appointment after completion of the current audit) or is dismissed, disclose the information

required by Item 304(a)(1) of Regulation S-K (17 CFR  229.304(a)(1) of this chapter),  including compliance with Item 304(a)(3) of Regulation S-K (17 CFR  229.304(a)(3) of this chapter) .

(b) If a new independent accountant has been engaged as either the principal accountant to audit the registrant's financial statements or as an independent accountant on whom the principal accountant is expected to express reliance in its report regarding a significant subsidiary, the registrant must disclose the information required by Item 304(a)(2) of Regulation S-K (17 CFR 229.304(a)(2)).

Instruction.

The resignation or dismissal of an independent accountant, or its refusal to stand for re-appointment, is a reportable event separate from the engagement of a new independent accountant. On some occasions, two reports on Form 8-K are required for a single change in accountants, the first on the resignation (or refusal to stand for re-appointment ) or dismissal of the former accountant and the second when the new accountant is engaged. Information required in the second Form 8-K in such situations need not be provided to the extent that it has been reported previously in the first Form 8-K.

**Item 4.02 Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.**

(a) If the registrant's board of directors, a committee of the board of directors or the officer or officers of the registrant authorized to take such action if board action is not required, concludes that any previously issued financial statements, covering one or more years or interim periods for which the registrant is required to provide financial statements under Regulation S-X (17 CFR 210) should no longer be relied upon because of an error in such financial statements as addressed in FASB ASC Topic 250, Accounting Changes and Error Corrections, as may be modified, supplemented or succeeded, disclose the following information:

(1) the date of the conclusion regarding the non-reliance and an identification of the financial statements and years or periods covered that should no longer be relied upon;

(2) a brief description of the facts underlying the conclusion to the extent known to the registrant at the time of filing; and

(3) a statement of whether the audit committee, or the board of directors in the absence of an audit committee, or authorized officer or officers, discussed with the registrant's independent accountant the matters disclosed in the filing pursuant to this Item 4.02(a).

(b) If the registrant is advised by, or receives notice from, its independent accountant that disclosure should be made or action should be taken to prevent future reliance on a previously issued audit report or completed interim review related to previously issued financial statements, disclose the following information:

(1) the date on which the registrant was so advised or notified;

(2) identification of the financial statements that should no longer be relied upon;

(3) a brief description of the information provided by the accountant; and

(4) a statement of whether the audit committee, or the board of directors in the absence of an audit committee, or authorized officer or officers, discussed with the independent accountant the matters disclosed in the filing pursuant to this Item 4.02(b).

(c) If the registrant receives advisement or notice from its independent accountant requiring disclosure under paragraph (b) of this Item 4.02, the registrant must:

(1) provide the independent accountant with a copy of the disclosures it is making in response to this Item 4.02 that the independent accountant shall receive no later than the day that the disclosures are filed with the Commission;

(2) request the independent accountant to furnish to the registrant as promptly as possible a letter addressed to the Commission stating whether the independent accountant agrees with the statements made by the registrant in response to this Item 4.02 and, if not, stating the respects in which it does not agree; and

(3) amend the registrant's previously filed Form 8-K by filing the independent accountant's letter as an exhibit to the filed Form 8-K no later than two business days after the registrant's receipt of the letter.

**Section 5 - Corporate Governance and Management**

**Item 5.01 Changes in Control of Registrant.**

(a) If, to the knowledge of the registrant's board of directors, a committee of the board of directors or authorized officer or officers of the registrant, a change in control of the registrant has occurred, furnish the following information:

(1) the identity of the person(s) who acquired such control;

(2) the date and a description of the transaction(s) which resulted in the change in control;

(3) the basis of the control, including the percentage of voting securities of the registrant now beneficially owned directly or indirectly by the person(s) who acquired control;

(4) the amount of the consideration used by such person(s);

(5) the source(s) of funds used by the person(s), unless all or any part of the consideration used is a loan made in the ordinary course of business by a bank as defined by Section 3(a)(6) of the Act, in which case the identity of such bank may be omitted provided the person who acquired control:

(i) has made a request for confidentiality pursuant to Section 13(d)(1)(B) of the Act; and

(ii) states in the report that the identity of the bank has been so omitted and filed separately with the Commission.

(6) the identity of the person(s) from whom control was assumed;

(7) any arrangements or understandings among members of both the former and new control groups and their associates with respect to election of directors or other matters; and

(8) if the registrant was a shell company, other than a business combination related shell company, as those terms are defined in Rule 12b-2 under the Exchange Act (17 CFR 240.12b-2), immediately before the change in control, the information that would be required if the registrant were filing a general form for registration of securities on Form 10 under the Exchange Act reflecting all classes of the registrant's securities subject to the reporting requirements of Section 13 (15 U.S.C. 78m) or Section 15(d) (15 U.S.C. 78o(d)) of such Act upon consummation of the change in control, with such information reflecting the registrant and its securities upon consummation of the transaction. Notwithstanding General Instruction B.3. to Form 8-K, if any disclosure required by this Item 5.01(a)(8) is previously reported, as that term is defined in Rule 12b-2 under the Exchange Act (17 CFR 240.12b-2), the registrant may identify the filing in which that disclosure is included instead of including that disclosure in this report.

(b) Furnish the information required by Item 403(c) of Regulation S-K (17 CFR 229.403(c)).

**Item 5.02 Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

(a)(1) If a director has resigned or refuses to stand for re-election to the board of directors since the date of the last annual meeting of shareholders because of a disagreement with the registrant, known to an executive officer of the registrant, as defined in 17 CFR 240.3b-7, on any matter relating to the registrant's operations, policies or practices, or if a director has been removed for cause from the board of directors, disclose the following information:

(i) the date of such resignation, refusal to stand for re-election or removal;

(ii) any positions held by the director on any committee of the board of directors at the time of the director's resignation, refusal to stand for re-election or removal; and

(iii) a brief description of the circumstances representing the disagreement that the registrant believes caused, in whole or in part, the director's resignation, refusal to stand for re-election or removal.

(2) If the director has furnished the registrant with any written correspondence concerning the circumstances surrounding his or her resignation, refusal or removal, the registrant shall file a copy of the document as an exhibit to the report on Form 8-K.

(3) The registrant also must:

(i) provide the director with a copy of the disclosures it is making in response to this Item 5.02 no later than the day the registrant file the disclosures with the Commission;

(ii) provide the director with the opportunity to furnish the registrant as promptly as possible with a letter addressed to the registrant stating whether he or she agrees with the statements made by the registrant in response to this Item 5.02 and, if not, stating the respects in which he or she does not agree; and

(iii) file any letter received by the registrant from the director with the Commission as an exhibit by an amendment to the previously filed Form 8-K within two business days after receipt by the registrant.

15

(b) If the registrant's principal executive officer, president, principal financial officer, principal accounting officer, principal operating officer, or any person performing similar functions, or any named executive officer, retires, resigns or is terminated from that position, or if a director retires, resigns, is removed, or refuses to stand for re-election (except in circumstances described in paragraph (a) of this Item 5.02), disclose the fact that the event has occurred and the date of the event.

(c) If the registrant appoints a new principal executive officer, president, principal financial officer, principal accounting officer, principal operating officer, or person performing similar functions, disclose the following information with respect to the newly appointed officer:

(1) the name and position of the newly appointed officer and the date of the appointment;

(2) the information required by Items 401(b), (d), (e) and Item 404(a) of Regulation S-K (17 CFR 229.401(b), (d), (e) and 229.404(a)); and

(3) a brief description of any material plan, contract or arrangement (whether or not written) to which a covered officer is a party or in which he or she participates that is entered into or material amendment in connection with the triggering event or any grant or award to any such covered person or modification thereto, under any such plan, contract or arrangement in connection with any such event.

Instruction to paragraph (c).

If the registrant intends to make a public announcement of the appointment other than by means of a report on Form 8-K, the registrant may delay filing the Form 8-K containing the disclosures required by this Item 5.02(c) until the day on which the registrant otherwise makes public announcement of the appointment of such officer.

(d) If the registrant elects a new director, except by a vote of security holders at an annual meeting or special meeting convened for such purpose, disclose the following information:

(1) the name of the newly elected director and the date of election;

(2) a brief description of any arrangement or understanding between the new director and any other persons, naming such persons, pursuant to which such director was selected as a director;

(3) the committees of the board of directors to which the new director has been, or at the time of this disclosure is expected to be, named; and

(4) the information required by Item 404(a) of Regulation S-K  (17 CFR 229.404(a)).

(5) a brief description of any material plan, contract or arrangement (whether or not written) to which the director is a party or in which he or she participates that is entered into or material amendment in connection with the triggering event or any grant or award to any such covered person or modification thereto, under any such plan, contract or arrangement in connection with any such event.

(e) If the registrant enters into, adopts, or otherwise commences a material compensatory plan, contract or arrangement (whether or not written), as to which the registrant's principal executive officer, principal financial officer, or a named executive officer participates or is a party, or such compensatory plan, contract or arrangement is materially amended or modified, or a material grant or award under any such plan, contract or arrangement to any such person is made or materially modified, then the registrant shall provide a brief description of the terms and conditions of the plan, contract or arrangement and the amounts payable to the officer thereunder.

Instructions to paragraph (e).

1. Disclosure under this Item 5.02(e) shall be required whether or not the specified event is in connection with events otherwise triggering disclosure pursuant to this Item 5.02.

2. Grants or awards (or modifications thereto) made pursuant to a plan, contract or arrangement (whether involving cash or equity), that are materially consistent with the previously disclosed terms of such plan, contract or arrangement, need not be disclosed under this Item 5.02(e), provided the registrant has previously disclosed such terms and the grant, award or modification is disclosed when Item 402 of Regulation S-K (17 CFR 229.402) requires such disclosure.

(f)(1) If the salary or bonus of a named executive officer cannot be calculated as of the most recent practicable date and is omitted from the Summary Compensation Table as specified in Instruction 1 to Item 402(c)(2)(iii) and (iv) of Regulation S-K, disclose the appropriate information under this Item 5.02(f) when there is a payment, grant, award, decision or other occurrence as a result of

which such amounts become calculable in whole or part. Disclosure under this Item 5.02(f) shall include a new total compensation figure for the named executive officer, using the new salary or bonus information to recalculate the information that was previously provided with respect to the named executive officer in the registrant's Summary Compensation Table for which the salary and bonus information was omitted in reliance on Instruction 1 to Item 402(c)(2)(iii) and (iv) of Regulation S-K (17 CFR 229.402(c)(2)(iii) and (iv)).

(2) As specified in Instruction 6 to Item 402(u) of Regulation S-K (17 CFR 229.402(u)), disclosure under this Item 5.02(f) with respect to the salary or bonus of a principal executive officer shall include pay ratio disclosure pursuant to Item 402(u) of Regulation S-K calculated using the new total compensation figure for the principal executive officer. Pay ratio disclosure is not required under this Item 5.02(f) until the omitted salary or bonus amounts for such principal executive officer become calculable in whole.

Instructions to Item 5.02.

1. The disclosure requirements of this Item 5.02 do not apply to a registrant that is a wholly-owned subsidiary of an issuer with a class of securities registered under Section 12 of the Exchange Act (15 U.S.C. 78l), or that is required to file reports under Section 15(d) of the Exchange Act (15 U.S.C. 78o(d)).

2. To the extent that any information called for in Item 5.02(c)(3) or Item 5.02(d)(3) or Item 5.02(d)(4) is not determined or is unavailable at the time of the required filing, the registrant shall include a statement this effect in the filing and then must file an amendment to its Form 8-K filing under this Item 5.02 containing such information within four business days after the information is determined or becomes available.

3. The registrant need not provide information with respect to plans, contracts, and arrangements to the extent they do not discriminate in scope, terms or operation, in favor of executive officers or directors of the registrant and that are available generally to all salaried employees.

4. For purposes of this Item, the term "named executive officer" shall refer to those executive officers for whom disclosure was required in the registrant's most recent filing with the Commission under the Securities Act (15 U.S.C. 77a et seq.) or Exchange Act (15 U.S.C. 78a et seq.) that required disclosure pursuant to Item 402(c) of Regulation S-K (17 CFR 229.402(c)).


**Item 5.03 Amendments to Articles of Incorporation or Bylaws; Change in Fiscal Year.**

(a) If a registrant with a class of equity securities registered under Section 12 of the Exchange Act (15 U.S.C. 78l) amends its articles of incorporation or bylaws and a proposal for the amendment was not disclosed in a proxy statement or information statement filed by the registrant, disclose the following information:

(1) the effective date of the amendment; and

(2) a description of the provision adopted or changed by amendment and, if applicable, the previous provision.

(b) If the registrant determines to change the fiscal year from that used in its most recent filing with the Commission other than by means of:

(1) a submission to a vote of security holders through the solicitation of proxies or otherwise; or

(2) an amendment to its articles of incorporation or bylaws,

disclose the date of such determination, the date of the new fiscal year end and the form (for example, Form 10-K or Form 10-Q) on which the report covering the transition period will be filed.

Instructions to Item 5.03.

1. Refer to Item 601(b)(3) of Regulation S-K (17 CFR 229.601(b)(3) regarding the filing of exhibits to this Item 5.03.

2. With respect to asset-backed securities, as defined in 17 CFR 229.1101, disclosure is required under this Item 5.03 regarding any amendment to the governing documents of the issuing entity, regardless of whether the class of asset-backed securities is reporting under Section 13 or 15(d) of the Exchange Act.

**Item 5.04 Temporary Suspension of Trading Under Registrant's Employee Benefit Plans.**

(a) No later than the fourth business day after which the registrant receives the notice required by section 101(i)(2)(E) of the Employment

Retirement Income Security Act of 1974 (29 U.S.C. 1021(i)(2)(E)), or, if such notice is not received by the registrant, on the same date by which the registrant transmits a timely notice to an affected officer or director within the time period prescribed by Rule 104(b)(2)(i)(B) or 104(b)(2)(ii) of Regulation BTR (17 CFR 245.104(b)(2)(i)(B) or 17 CFR 245.104(b)(2)(ii)), provide the information specified in Rule 104(b) (17 CFR 245.104(b)) and the date the registrant received the notice required by section 101(i)(2)(E) of the Employment Retirement Income Security Act of 1974 (29 U.S.C. 1021(i)(2)(E)), if applicable.

(b) On the same date by which the registrant transmits a timely updated notice to an affected officer or director, as required by the time period under Rule 104(b)(2)(iii) of Regulation BTR (17 CFR 245.104(b)(2)(iii)), provide the information specified in Rule 104(b)(3)(iii) (17 CFR 245.104(b)(2)(iii)).

**Item 5.05 Amendments to the Registrant's Code of Ethics, or Waiver of a Provision of the Code of Ethics.**

(a) Briefly describe the date and nature of any amendment to a provision of the registrant's code of ethics that applies to the registrant's principal executive officer, principal financial officer, principal accounting officer or controller or persons performing similar functions and that relates to any element of the code of ethics definition enumerated in Item 406(b) of Regulations S-K (17 CFR 228.406(b)).

(b) If the registrant has granted a waiver, including an implicit waiver, from a provision of the code of ethics to an officer or person described in paragraph (a) of this Item 5.05, and the waiver relates to one or more of the elements of the code of ethics definition referred to in paragraph (a) of this Item 5.05, briefly describe the nature of the waiver, the name of the person to whom the waiver was granted, and the date of the waiver.

(c) The registrant does not need to provide any information pursuant to this Item 5.05 if it discloses the required information on its Internet website within four business days following the date of the amendment or waiver and the registrant has disclosed in its most recently filed annual report its Internet address and intention to provide disclosure in this manner. If the registrant elects to disclose the information required by this Item 5.05 through its website, such information must remain available on the website for at least a 12-month period. Following the 12-month period, the registrant must retain the information for a period of not less than five years. Upon request, the registrant must furnish to the Commission or its staff a copy of any or all information retained pursuant to this requirement.

Instructions.

1. The registrant does not need to disclose technical, administrative or other non-substantive amendments to its code of ethics.

2. For purposes of this Item 5.05:

(i) The term waiver means the approval by the registrant of a material departure from a provision of the code of ethics; and

(ii) The term implicit waiver means the registrant's failure to take action within a reasonable period of time regarding a material departure from a provision of the code of ethics that has been made known to an executive officer, as defined in Rule 3b-7 (17 CFR 240.3b-7) of the registrant.

**Section 5.06 -Change in Shell Company Status.**

If a registrant that was a shell company, other than a business combination related shell company, as those terms are defined in Rule 12b-2 under the Exchange Act (17 CFR 240.12b-2), has completed a transaction that has the effect of causing it to cease being a shell company, as defined in Rule 12b-2, disclose the material terms of the transaction. Notwithstanding General Instruction B.3. to Form 8-K, if any disclosure required by this Item 5.06 is previously reported, as that term is defined in Rule 12b-2 under the Exchange Act (17 CFR 240.12b-2), the registrant may identify the filing in which that disclosure is included instead of including that disclosure in this report.

**Item 5.07 Submission of Matters to a Vote of Security Holders.**

If any matter was submitted to a vote of security holders, through the solicitation of proxies or otherwise, provide the following information:

(a) The date of the meeting and whether it was an annual or special meeting. This information must be provided only if a meeting of security holders was held.

(b) If the meeting involved the election of directors, the name of each director elected at the meeting, as well as a brief description of each other matter voted upon at the meeting; and state the number of votes cast for, against or withheld, as well as the number of abstentions and broker non-votes as to each such matter, including a separate tabulation with respect to each nominee for office. For the vote on the frequency of shareholder advisory votes on executive compensation required by section 14A(a)(2) of the Securities Exchange Act of 1934 (15 U.S.C. 78n-1) and §240.14a-21(b), state the number of votes cast for each of 1 year, 2 years, and 3 years, as well as the number of abstentions.

(c) A description of the terms of any settlement between the registrant and any other participant (as defined in Instruction 3 to Item 4 of Schedule 14A (17 CFR 240.14a-101)) terminating any solicitation subject to Rule 14a-12(c), including the cost or anticipated cost to the registrant.

(d) No later than one hundred fifty calendar days after the end of the annual or other meeting of shareholders at which shareholders voted on the frequency of shareholder votes on the compensation of executives as required by section 14A(a)(2) of the Securities Exchange Act of 1934 (15 U.S.C. 78n-1), but in no event later than sixty calendar days prior to the deadline for submission of shareholder proposals under §240.14a-8, as disclosed in the registrant's most recent proxy statement for an annual or other meeting of shareholders relating to the election of directors at which shareholders voted on the frequency of shareholder votes on the compensation of executives as required by section 14A(a)(2) of the Securities Exchange Act of 1934 (15 U.S.C. 78n-1(a)(2)), by amendment to the most recent Form 8-K filed pursuant to (b) of this Item, disclose the company's decision in light of such vote as to how frequently the company will include a shareholder vote on the compensation of executives in its proxy materials until the next required vote on the frequency of shareholder votes on the compensation of executives.

Instruction 1 to Item 5.07. The four business day period for reporting the event under this Item 5.07, other than with respect to Item 5.07(d), shall begin to run on the day on which the meeting ended. The registrant shall disclose on Form 8-K under this Item 5.07 the preliminary voting results. The registrant shall file an amended report on Form 8-K under this Item 5.07 to disclose the final voting results within four business days after the final voting results are known. However, no preliminary voting results need be disclosed under this Item 5.07 if the registrant has disclosed final voting results on Form 8-K under this Item.

Instruction 2 to Item 5.07. If any matter has been submitted to a vote of security holders otherwise than at a meeting of such security holders, corresponding information with respect to such submission shall be provided. The solicitation of any authorization or consent (other than a proxy to vote at a stockholders' meeting) with respect to any matter shall be deemed a submission of such matter to a vote of security holders within the meaning of this item.

Instruction 3 to Item 5.07. If the registrant did not solicit proxies and the board of directors as previously reported to the Commission was re-elected in its entirety, a statement to that effect in answer to paragraph (b) will suffice as an answer thereto regarding the election of directors.

Instruction 4 to Item 5.07. If the registrant has furnished to its security holders proxy soliciting material containing the information called for by paragraph (c), the paragraph may be answered by reference to the information contained in such material.

 Instruction 5 to Item 5.07. A registrant may omit the information called for by this Item 5.07 if, on the date of the filing of its report on Form 8-K, the registrant meets the following conditions:

1. All of the registrant's equity securities are owned, either directly or indirectly, by a single person which is a reporting company under the Exchange Act and which has filed all the material required to be filed pursuant to Section 13, 14 or 15(d) thereof, as applicable; and

2. During the preceding thirty-six calendar months and any subsequent period of days, there has not been any material default in the payment of principal, interest, a sinking or purchase fund installment, or any other material default not cured within thirty days, with respect to any indebtedness of the registrant or its subsidiaries, and there has not been any material default in the payment of rentals under material long-term leases.

**Item 5.08 Shareholder Director Nominations**

(a) If the registrant did not hold an annual meeting the previous year, or if the date of this year's annual meeting has been changed by more than 30 calendar days from the date of the previous year's meeting, then the registrant is required to disclose the date by which a nominating shareholder or nominating shareholder group must submit the notice on Schedule 14N (§ 240.14n–101) required pursuant to § 240.14a–11(b)(10), which date shall be a reasonable time before the registrant mails its proxy materials for the meeting. Where a registrant is required to include shareholder director nominees in the registrant's proxy materials pursuant to either an applicable state or foreign law provision, or a provision in the registrant's governing documents, then the registrant is required to disclose the date by which a nominating shareholder or nominating shareholder group must submit the notice on Schedule 14N required pursuant to § 240.14a–18.

(b) If the registrant is a series company as defined in Rule 18f–2(a) under the Investment Company Act of 1940 (§ 270.18f–2 of this chapter), then the registrant is required to disclose in connection with the election of directors at an annual meeting of shareholders (or, in lieu of such an annual meeting, a special meeting of shareholders) the total number of shares of the registrant outstanding and entitled to be voted (or if the votes are to be cast on a basis other than one vote per share, then the total number of votes entitled to be voted and the basis for allocating such votes) on the election of directors at such meeting of shareholders as of the end of the most

recent calendar quarter.

**Section 6 -Asset-Backed Securities**

The Items in this Section 6 apply only to asset-backed securities. Terms used in this Section 6 have the same meaning as in Item 1101 of Regulation AB (17 CFR 229.1101).

**Item 6.01 ABS Informational and Computational Material.**

Report under this Item any ABS informational and computational material filed in, or as an exhibit to, this report.

**Item 6.02 Change of Servicer or Trustee.**

If a servicer contemplated by Item 1108(a)(2) of Regulation AB (17 CFR 229.1108(a)(2)) or a trustee has resigned or has been removed, replaced or substituted, or if a new servicer contemplated by Item 1108(a)(2) of Regulation AB or trustee has been appointed, state the date the event occurred and the circumstances surrounding the change. In addition, provide the disclosure required by Item 1108(d) of Regulation AB (17 CFR 229.1108(c)), as applicable, regarding the servicer or trustee change. If a new servicer contemplated by Item 1108(a)(3) of this Regulation AB or a new trustee has been appointed, provide the information required by Item 1108(b) through (d) of Regulation AB regarding such servicer or Item 1109 of Regulation AB (17 CFR 229.1109) regarding such trustee, as applicable.

*Instruction.*

To the extent that any information called for by this Item regarding such servicer or trustee is not determined or is unavailable at the time of the required filing, the registrant shall include a statement to this effect in the filing and then must file an amendment to its Form 8-K filing under this Item 6.02 containing such information within four business days after the information is determined or becomes available.

**Item 6.03 Change in Credit Enhancement or Other External Support.**

(a) *Loss of existing enhancement or support.* If the depositor (or servicer if the servicer signs the report on Form 10-K (17 CFR 249.310) of the issuing entity) becomes aware that any material enhancement or support specified in Item 1114(a)(1) through (3) of Regulation AB (17 CFR 229.1114(a)(1) through (3)) or Item 1115 of Regulation AB (17 CFR 229.1115) that was previously applicable regarding one or more classes of the asset-backed securities has terminated other than by expiration of the contract on its stated termination date or as a result of all parties completing their obligations under such agreement, then disclose:

    (1) the date of the termination of the enhancement;

    (2) the identity of the parties to the agreement relating to the enhancement or support;

    (3) a brief description of the terms and conditions of the enhancement or support that are material to security holders;

    (4) a brief description of the material circumstances surrounding the termination; and

    (5) any material early termination penalties paid or to be paid out of the cash flows backing the asset-backed securities.

(b) *Addition of new enhancement or support.* If the depositor (or servicer if the servicer signs the report on Form 10-K (17 CFR 249.310) of the issuing entity) becomes aware that any material enhancement specified in Item 1114(a)(1) through (3) of Regulation AB (17 CFR 229.1114(a)(1) through (3)) or Item 1115 of Regulation AB (17 CFR 229.1115) has been added with respect to one or more classes of the asset-backed securities, then provide the date of addition of the new enhancement or support and the disclosure required by Items 1114 or 1115 of Regulation AB, as applicable, with respect to such new enhancement or support.

(c) *Material change to enhancement or support.* If the depositor (or servicer if the servicer signs the report on Form 10-K (17 CFR 249.310) of the issuing entity) becomes aware that any existing material enhancement or support specified in Item 1114(a)(1) through (3) of Regulation AB or Item 1115 of Regulation AB with respect to one or more classes of the asset-backed securities has been materially amended or modified, disclose:

    (1) the date on which the agreement or agreements relating to the enhancement or support was amended or modified;

    (2) the identity of the parties to the agreement or agreements relating to the amendment or modification; and

(3) a brief description of the material terms and conditions of the amendment or modification.

*Instructions.*

1. Disclosure is required under this Item whether or not the registrant is a party to any agreement regarding the enhancement or support if the loss, addition or modification of such enhancement or support materially affects, directly or indirectly, the asset-backed securities, the pool assets or the cash flow underlying the asset-backed securities.

2. To the extent that any information called for by this Item regarding the enhancement or support is not determined or is unavailable at the time of the required filing, the registrant shall include a statement to this effect in the filing and then must file an amendment to its Form 8-K filing under this Item 6.03 containing such information within four business days after the information is determined or becomes available.

3. The instructions to Items 1.01 and 1.02 of this Form apply to this Item.

4. Notwithstanding Items 1.01 and 1.02 of this Form, disclosure regarding changes to material enhancement or support is to be reported under this Item 6.03 in lieu of those Items.

**Item 6.04 Failure to Make a Required Distribution.**

If a required distribution to holders of the asset-backed securities is not made as of the required distribution date under the transaction documents, and such failure is material, identify the failure and state the nature of the failure to make the timely distribution.

**Item 6.05 Securities Act Updating Disclosure.**

Regarding an offering of asset-backed securities registered on Form SF-3 (17 CFR 239.45), if any material pool characteristic of the actual asset pool at the time of issuance of the asset-backed securities differs by 5% or more (other than as a result of the pool assets converting into cash in accordance with their terms) from the description of the asset pool in the prospectus filed for the offering pursuant to Securities Act Rule 424 (17 CFR 230.424), disclose the information required by Items 1111 and 1112 of Regulation AB (17 CFR 229.1111 and 17 CFR 229.1112) regarding the characteristics of the actual asset pool. If applicable, also provide information required by Items 1108 and 1110 of Regulation AB (17 CFR 229.1108 and 17 CFR 229.1110) regarding any new servicers or originators that would be required to be disclosed under those items regarding the pool assets.

*Instruction.*

No report is required under this Item if substantially the same information is provided in a post-effective amendment to the Securities Act registration statement or in a subsequent prospectus filed pursuant to Securities Act Rule 424 (17 CFR 230.424).

**Item 6.06 Static Pool.**

Regarding an offering of asset-backed securities registered on Form SF-1 (17 CFR 239.44) or Form SF-3 (17 CFR 239.45), in lieu of providing the static pool information as required by Item 1105 of Regulation AB (17 CFR 229.1105) in a form of prospectus or prospectus, an issuer may file the required information in this report or as an exhibit to this report. The static pool disclosure must be filed by the time of effectiveness of a registration statement on Form SF-1, by the same date of the filing of a form of prospectus, as required by Rule 424(h) (17 CFR 230.424(h)), and by the same date of the filing of a final prospectus meeting the requirements of section 10(a) of the Securities Act (15 U.S.C. 77j(a)) filed in accordance with Rule 424(b) (17 CFR 230.424(b)).

Instructions.
1. Refer to Item 601(b)(106) of Regulation S-K (17 CFR 229.601(b)(106)) regarding the filing of exhibits to this Item 6.06.
2. Refer to Item 10 of Form SF-1 (17 CFR 239.44) or Item 10 of Form SF-3 (17 CFR 239.45) regarding incorporation by reference.

## Section 7 - Regulation FD

**Item 7.01 Regulation FD Disclosure.**

Unless filed under Item 8.01, disclose under this item only information that the registrant elects to disclose through Form 8-K pursuant to Regulation FD (17 CFR 243.100 through 243.103).

## Section 8 - Other Events

**Item 8.01 Other Events.**

The registrant may, at its option, disclose under this Item 8.01 any events, with respect to which information is not otherwise called for by this form, that the registrant deems of importance to security holders. The registrant may, at its option, file a report under this Item 8.01 disclosing the nonpublic information required to be disclosed by Regulation FD (17 CFR 243.100 through 243.103).

**Section 9 – Financial Statements and Exhibits**

**Item 9.01 Financial Statements and Exhibits.**

List below the financial statements, pro forma financial information and exhibits, if any, filed as a part of this report.

(a) *Financial statements of businesses or funds acquired.*

(1) For any business acquisition or fund acquisition required to be described in answer to Item 2.01 of this form, file financial statements and any applicable supplemental information, of the business acquired specified in Rules 3-05 or 3-14 of Regulation S-X (17 CFR 210.3-05 and 210.3-14), or Rules 8-04 or 8-06 of Regulation S-X (17 CFR 210.8-04 and 210.8-06) for smaller reporting companies, or of the fund acquired specified in Rule 6-11 of Regulation S-X (17 CFR 210.6-11).

(2) The financial statements must be prepared pursuant to Regulation S-X except that supporting schedules need not be filed unless required by Rule 6-11 of Regulation S-X (17 CFR 210.6-11). A manually signed accountant's report should be provided pursuant to Rule 2-02 of Regulation S-X (17 CFR 210.2-02).

(3) Financial statements required by this item may be filed with the initial report, or by amendment not later than 71 calendar days after the date that the initial report on Form 8-K must be filed. If the financial statements are not included in the initial report, the registrant should so indicate in the Form 8-K report and state when the required financial statements will be filed.

The registrant may, at its option, include unaudited financial statements in the initial report on Form 8-K.

(b) *Pro forma financial information.*

(1) For any transaction required to be described in answer to Item 2.01 of this form, file any pro forma financial information that would be required pursuant to Article 11 of Regulation S-X (17 CFR 210) or Rule 8-05 of Regulation S-X (17 CFR 210.8-05) for smaller reporting companies unless it involves the acquisition of a fund subject to Rule 6-11 of Regulation S-X (17 CFR 210.6-11).

(2) The provisions of paragraph (a)(3) of this Item 9.01 must also apply to pro forma financial information relative to the acquired business.

(c) *Shell company transactions.* The provisions of paragraph (a)(3) and (b)(2) of this Item do not apply to the financial statements or pro forma financial information required to be filed under this Item with regard to any transaction required to be described in answer to Item 2.01 of this Form by a registrant that was a shell company, other than a business combination related shell company, as those terms are defined in Rule 12b-2 under the Exchange Act (17 CFR 240.12b-2), immediately before that transaction. Accordingly, with regard to any transaction required to be described in answer to Item 2.01 of this Form by a registrant that was a shell company, other than a business combination related shell company, immediately before that transaction, the financial statements and pro forma financial information required by this Item must be filed in the initial report. Notwithstanding General Instruction B.3. to Form 8-K, if any financial statement or any financial information required to be filed in the initial report by this Item 9.01(c) is previously reported, as that term is defined in Rule 12b-2 under the Exchange Act (17 CFR 240.12b-2), the registrant may identify the filing in which that disclosure is included instead of including that disclosure in the initial report.any financial statement.

(d) *Exhibits*. The exhibits shall be deemed to be filed or furnished, depending on the relevant item requiring such exhibit, in accordance with the provisions of Item 601 of Regulation S-K (17 CFR 229.601)and Instruction B.2 to this form.

<u>Instruction.</u>

During the period after a registrant has reported an acquisition pursuant to Item 2.01 of this form, until the date on which the financial statements specified by this Item 9.01 must be filed, the registrant will be deemed current for purposes of its reporting obligations under Section 13(a) or 15(d) of the Exchange Act (15 U.S.C. 78m or 78o(d)). With respect to filings under the Securities Act, however, registration statements will not be declared effective and post-effective amendments to registration statements will not be declared effective unless financial statements meeting the requirements of Rule 3-05, Rule 3-14, Rule 6-11, Rule 8-04, and Rule 8-06 of Regulation S-X (17 CFR 210.3-05, 210.3-14, 210.6-11, 210.8-04, and 210.8-06), as applicable, are provided. In addition, offerings should not be made pursuant to effective registration statements, or pursuant to Rule 506 of Regulation D (17 CFR 230.506) where any purchasers are not accredited investors under Rule 501(a) of that Regulation, until the audited financial statements required by Rule 3-05, Rule 3-14, Rule 6-11, Rule 8-04, and Rule 8-06 of Regulation S-X (17 CFR 210.3-05, 210.3-14, 210.6-11, 210.8-04, and 210.8-06), as applicable, are filed; provided, however, that the following offerings or sales of securities may proceed notwithstanding that financial statements of the

acquired business have not been filed:

(a) offerings or sales of securities upon the conversion of outstanding convertible securities or upon the exercise of outstanding warrants or rights;

(b) dividend or interest reinvestment plans;

(c) employee benefit plans;

(d) transactions involving secondary offerings; or

(e) sales of securities pursuant to Rule 144 (17 CFR 230.144).

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

_____
(Registrant)

Date _____      _____
(Signature)*

*Print name and title of the signing officer under his signature.

# EXHIBIT C

Home » Company Search

# Sagaliam Acquisition Corp SAGA, SAGAR, SAGAU on Nasdaq

Investor Toolkit: On ▼

## [+] Company Information

## Latest Filings (excluding insider transactions)

- November 27, 2023 - 10-Q: Quarterly report for quarter ending March 31, 2023 Filing
- November 20, 2023 - 8-K: Current report Filing
  - **3.01** - Notice of Delisting or Failure to Satisfy a Continued Listing Rule or Standard; Transfer of Listing (Notice of Delisting or Failure to Satisfy a Continued Lis...
- October 20, 2023 - DEF 14A: Other definitive proxy statements Filing
- October 11, 2023 - PRE 14A: Other preliminary proxy statements Filing
- September 15, 2023 - 8-K: Current report Filing
  - **1.01** - Entry into a Material Definitive Agreement (Entry into a Material Definitive Agreement)
  - **3.01** - Notice of Delisting or Failure to Satisfy a Continued Listing Rule or Standard; Transfer of Listing (Notice of Delisting or Failure to Satisfy a Continued Lis...
  - **7.01** - Regulation FD Disclosure (Regulation FD Disclosure)
  - **8.01** - Other Events (The registrant can use this Item to report events that are not specifically called for by Form 8-K, that the registrant considers to be of im...
  - **9.01** - Financial Statements and Exhibits (Financial Statements and Exhibits)

View filings

## Selected Filings

### [+] 8-K (current reports)

### [+] 10-K (annual reports) and 10-Q (quarterly reports)

### [+] Proxy (annual meeting) and information statements

### [+] Ownership disclosures

## Investor Resources

### How to Use EDGAR

Learn how to use EDGAR to research public filings by public companies, mutual funds, ETFs, some annuities, and more.

### Before you Invest, Investor.gov

Get answers to your investing questions from the SEC's website dedicated to retail investors

# EXHIBIT D

12/6/23, 9:27 AM
Case 1:23-cv-01266-RGA    Document 34    Filed 12/06/23    Page 48 of 95 PageID #: 857
sec.gov/Archives/edgar/data/1855351/000149315223042174/form8-k.htm

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## FORM 8-K

### CURRENT REPORT

### PURSUANT TO SECTION 13 OR 15(d) OF THE
### SECURITIES EXCHANGE ACT OF 1934

Date of Report (Date of earliest event reported): **Nov 20, 2023**

# Sagaliam Acquisition Corp.
(Exact name of registrant as specified in its charter)

| Delaware | 001-41182 | 86-3006717 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**Barry Kostiner**
**1490 N.E. Pine Island Rd., Suite 5-D**
**Cape Coral, FL 33909**
(Address of principal executive offices, including zip code)

Registrant's telephone number, including area code: **(845) 925-4597**

**Not Applicable**
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Units, each consisting of one share of Class A common stock, par value $0.0001 per share, and right | SAGAU | The Nasdaq Stock Market LLC |
| Class A common stock included as part of the units | SAGA | The Nasdaq Stock Market LLC |
| Rights included as part of the units | SAGAR | The Nasdaq Stock Market LLC |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

12/6/23, 9:27 AM
Case 1:23-cv-01266-RGA   Document 34   Filed 12/06/23   Page 49 of 95 PageID #: 858
sec.gov/Archives/edgar/data/1855351/000149315223042174/form8-k.htm

Emerging growth company ☒

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 3.01    Notice of Litigation and Temporary Restraining Order on Extension Proxy**

On November 20, 2023, the US District Court for the District of Delaware issued a Temporary Restraining Order pursuant to Rule 65(b) of the Federal Rules of Civil Procedure. Sagaliam is restrained and enjoined from convening a shareholders meeting on Nov 21, 2023 or any date thereafter to conduct a shareholder vote on a proposal to extend the Deadline Date, until a preliminary injunction is adjudicated in favor of Sagaliam.

A hearing on the portion of the Motion seeking issuance of a Preliminary Injunction is set for Dec 11, 2023 at 10 am.

In *GLD Partners LP and Sponsor Member LLC vs Sagaliam Acquisition Corp*, Case No. 1:99-mc-09999 filed on 7 Nov 23 (US District Court for the District of Delaware) claims are asserted that the transaction with VIRO and BGEN disenfranchises GLD of its voting rights.

In *Supraeon Investments Inc. vs Sagaliam Acquisition Corp*, Case No. N23C-09-131 SKR CCLD filed on 15 Sep 23 (Superior Court of the State of Delaware) claims are asserted that the Company owes a $1,000,000 termination fee in connection with the previously proposed AEC acquisition.

*Disclaimer*

This Current Report on Form 8-K is for informational purposes only and is neither an offer to purchase, nor a solicitation of an offer to sell, subscribe for or buy any securities or the solicitation of any vote in any jurisdiction pursuant to the proposed transactions or otherwise, nor shall there be any sale, issuance or transfer or securities in any jurisdiction in contravention of applicable law. No offer of securities shall be made except by means of a prospectus meeting the requirements of Section 10 of the Securities Act of 1933, as amended.

INVESTMENT IN ANY SECURITIES DESCRIBED HEREIN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION ("SEC") OR ANY OTHER REGULATORY AUTHORITY NOR HAS ANY AUTHORITY PASSED UPON OR ENDORSED THE MERITS OF THE PROPOSED TRANSACTIONS OR THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

*Forward Looking Statements*

The disclosure herein includes certain statements that are not historical facts but are forward-looking statements for purposes of the safe harbor provisions under the U.S. Private Securities Litigation Reform Act of 1995. Forward-looking statements generally are accompanied by words such as "believe," "may," "will," "estimate," "continue," "anticipate," "intend," "expect," "should," "would," "plan," "predict," "potential," "seem," "seek," "future," "outlook," and similar expressions that predict or indicate future events or trends or that are not statements of historical matters. These forward-looking statements include, but are not limited to, statements regarding projections, estimates and forecasts of revenue and other financial and performance metrics and projections of market opportunity and expectations, Company's ability to enter into a definitive business combination agreement and Company's ability to obtain the financing necessary to consummate the potential business combination transaction. These statements are based on various assumptions and on the current expectations of Company's management and are not predictions of actual performance. These forward-looking statements are provided for illustrative purposes only and are not intended to serve as, and must not be relied on by any investor as, a guarantee, an assurance, a prediction or a definitive statement of fact or probability. Actual events and circumstances are difficult or impossible to predict and will differ from assumptions. Many actual events and circumstances are beyond the control of Company. These forward-looking statements are subject to a number of risks and uncertainties, including: Company's ability to enter into a definitive agreement with respect to the proposed business combination or consummate a transaction; the risk that the approval of the stockholders of Company for the potential transaction is not obtained; failure to realize the anticipated benefits of the potential transaction, including as a result of a delay in consummating the potential transaction or difficulty in integrating the businesses of Company; the amount of redemption requests made by Company's stockholders and the amount of funds remaining in Company's trust account after satisfaction of such requests; those factors discussed in Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2022 under the heading "Risk Factors," and other documents of Company filed, or to be filed, with the SEC. If the risks materialize or assumptions prove incorrect, actual results could differ materially from the results implied by these forward-looking statements. There may be additional risks that Company presently does not know or that Company currently believes are immaterial that could also cause actual results to differ from those contained in the forward-looking statements. In addition, forward-looking statements reflect Company's expectations, plans or forecasts of future events and views as of the date hereof. Company anticipates that subsequent events and developments will cause Company's assessments to change. However, while Company may elect to update these forward-looking statements at some point in the future, Company specifically disclaims any obligation to do so. These forward-

Case 1:23-cv-01266-RGA   Document 34   Filed 12/06/23   Page 51 of 95 PageID #: 860

looking statements should not be relied upon as representing Company's assessments as of any date subsequent to the date of this disclosure statement. Accordingly, undue reliance should not be placed upon the forward-looking statements.

| Exhibit No. | Description |
| --- | --- |
| 99.1 | Company Press Release dated November 20, 2023 |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document) |

2

## SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**Sagaliam Acquisition Corp.**

By:    */s/ Barry Kostiner*

Name: Barry Kostiner
Title:  Chief Executive Officer

Dated: Nov 20, 2023

3

# EXHIBIT E

12/6/23, 9:28 AM

Case 1:23-cv-01266-RGA    Document 34    Filed 12/06/23    Page 54 of 95 PageID #: 863
sec.gov/Archives/edgar/data/1855351/000149315223042805/form10-q.htm

10-Q 1 form10-q.htm

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 10-Q

(Mark One)

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended March 31, 2023**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from            to**

**Commission File No. 001-41182**

# Sagaliam Acquisition Corp.

(Exact name of registrant as specified in its charter)

| Delaware | 86-3006717 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**1490 N.E. Pine Island Rd., Suite 5-DCape Coral, FL 33909**
(Address of Principal Executive Offices, including zip code)

**(845) 925-4597**
(Registrant's telephone number, including area code)

N/A
(Former name, former address and former fiscal year, if changed since last report)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Units, each consisting of one share of Class A common stock, and right | SAGAU | The Nasdaq Stock Market LLC |
| Class A common stock included as part of the units | SAGA | The Nasdaq Stock Market LLC |
| Rights included as part of the units | SAGAR | The Nasdaq Stock Market LLC |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

☐ Large accelerated filer             ☐ Accelerated filer

☒ Non-accelerated filer            ☒ Smaller reporting company

                                             ☒ Emerging growth company

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act): Yes ☒ No ☐

As of November 21, 2023, there were 49,346,337 shares of Class A common stock (including 951,801 shares of Class A common stock subject to redemption, 404,536 Units, 46,066,801 Class A common shares and 2,875,000 shares of Class B common stock, $0.0001 par value, issued and outstanding).

Case 1:23-cv-01266-RGA   Document 34   Filed 12/06/23   Page 56 of 95 PageID #: 865

# SAGALIAM ACQUISITION CORP.
## FORM 10-Q FOR THE QUARTER ENDED MARCH 31, 2023

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| **PART I — FINANCIAL INFORMATION** | | |
| Item 1. | **Interim Financial Statements.** | |
| | Condensed Balance Sheets as of March 31, 2023 (unaudited) and December 31, 2022 (audited) | 2 |
| | Condensed Statements of Operations for the Three months Ended March 31, 2023 and 2022 | 3 |
| | Condensed Statements of Changes in Stockholders' Deficit for the Three Ended March 31, 2023 (unaudited) and for three months ended March 31, 2022 | 4 |
| | Condensed Statements of Cash Flows for the Three Months Ended March 31, 2023 and 2022 (unaudited) | 5 |
| | Notes to Condensed Financial Statements (unaudited) | 6 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 19 |
| Item 3. | Quantitative and Qualitative Disclosures about Market Risk | 22 |
| Item 4. | Controls and Procedures | 22 |
| **PART II — OTHER INFORMATION** | | |
| Item 1. | Legal Proceedings | 22 |
| Item 1A. | Risk Factors | 24 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 24 |
| Item 3. | Defaults Upon Senior Securities | 25 |
| Item 4. | Mine Safety Disclosures | 25 |
| Item 5. | Other Information | 25 |
| Item 6. | Exhibits | 26 |
| **SIGNATURES** | | 28 |

1

12/6/23, 9:28 AM
Case 1:23-cv-01266-RGA    Document 34    Filed 12/06/23    Page 57 of 95 PageID #: 866
sec.gov/Archives/edgar/data/1855351/000149315223042805/form10-q.htm

## SAGALIAM ACQUISITION CORP.
## BALANCE SHEET

| | | 31-Mar-23 | | 31-Dec-22 |
| --- | --- | --- | --- | --- |
| | | Unaudited | | Audited |
| **Assets** | | | | |
| Current Assets | | | | |
| Cash | $ | 19 | $ | 3,116 |
| Prepaid Expenses | $ | 198,685 | $ | 198,685 |
| Total Curren Assets | $ | 198,704 | $ | 201,801 |
| | | | | |
| Prepaid Expenses - non-current | | | $ | - |
| Marketable Securities held in Trust Account | $ | 10,109,893 | $ | 9,843,440 |
| Total Assets | $ | 10,308,596 | $ | 10,045,241 |
| | | | | |
| **Liabilities and stockholders' Deficit** | | | | |
| Current Liabilities | | | | |
| Account payable and accrued expenses | $ | 2,445,574 | $ | 2,304,574 |
| Accrued expense termination fee - related party | $ | 1,000,000 | $ | 1,000,000 |
| Accrued administrative fee - related party | $ | 60,000 | $ | 30,000 |
| Franchise tax payable | $ | 200,000 | $ | - |
| Promissory note - related party | $ | 893,641 | $ | 721,500 |
| Total Current Liabilities | $ | 4,599,215 | $ | 4,056,074 |
| Deferred Underwriting fee payable | $ | 3,025,000 | $ | 3,025,000 |
| Total Liabilities | $ | 7,624,215 | $ | 7,081,074 |
| | | | | |
| Commitments and Contingencies | | | | |
| Class A common stock subject to redemption 956,337 shares at redemption value of $10.57 and $10.29 per share at 3-31-2023 and 12-31-2022 respectively | $ | 10,109,893 | $ | 9,843,440 |
| | | | | |
| Stockholders' Deficit | | | | |
| Preferred stock, $.0001 par value; 1,000,000 shares authorized none issued and outstanding | | | $ | - |
| | | | | |
| Class A common stock, .0001 par value, 100,000,000 shares authorized 515,000 shares issued and outstanding at 3-31-2023 and 12-31—2022 respectively | $ | 52 | $ | 52 |
| | | | | |
| Class B common stock, .0001 par value, 10,000,000 shares authorized 2,875,000 shares issued and outstanding at 3-31-2023 and 12-31—2022 respectively | $ | 288 | $ | 288 |
| | | | | |
| Additional Paid-in Capital | | | | |
| | | | | |
| Accumulated deficit | $ | (7,425,851) | $ | (6,879,613) |
| | | | | |
| Total Stockholders deficit | $ | (7,425,511) | $ | (6,879,273) |
| | | | | |
| Total liabilities and stockholders' deficit. | $ | 10,308,596 | $ | 10,045,241 |

*The accompanying notes are an integral part of the unaudited condensed financial statements.*

2

Sagaliam Acquisition Corp.
Statement of Operations

| | For the three months ended March 31, 2023 unaudited | | For the three months ended March 31, 2022 unaudited | |
|---|---|---|---|---|
| Operating cost | $ | 323,453 | $ | 506,110 |
| Administrative service agreement | $ | 117,097 | | |
| Franchise tax Expense | $ | 200,000 | | |
| Loss from operations | $ | (640,550) | $ | (506,110) |
| Other Income/(expense) | | | | |
| Loss on marketable securities | | | $ | (32,250) |
| Interest earned on marketable securities held in Trust Account, net | $ | 94,312 | | |
| Loss before provision for income tax | $ | (546,238) | $ | (538,360) |
| Provision for income taxes | $ | - | $ | - |
| Net Loss | $ | (546,238) | $ | (538,360) |
| | | | | |
| Basic and diluted weighted average shares outstanding Class A common stock subject to possible redemption | | 11,008,925 | | 11,500,000 |
| Basic and diluted net loss per Class A common stock subject to possible redemption | $ | (0.05) | $ | (0.04) |
| Basic and diluted weighted average shares of outstanding of non-redeemable common stock | $ | 3,390,000 | | 3,390,000 |
| Basic and diluted net loss per non-redeemable common stock | $ | (0.03) | $ | (0.04) |

The accompanying notes are an integral part of the unaudited condensed financial statements.

3

# SAGALIAM ACQUISITION CORP.
## CONDENSED STATEMENTS OF CHANGES IN STOCKHOLDERS' DEFICIT
### (UNAUDITED)

| | Class A Common Stock | | Class B Common Stock | | Additional Paid in Capital | Accumulated Deficit | Total Stockholders' Deficit |
|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | |
| Balance — January 1, 2022 | 515,000 | $ 52 | 2,875,000 | $ 288 | 0 | $ (3,180,209) | $ (3,179,869) |
| Reduction in Underwriters deferred fess | | | | | | $ 1,000,000 | $ 1,000,000 |
| Accretion of Investment Income to Trust Accounnt | | | | | | $ (1,509,988) | $ (1,509,988) |
| Cash withdrawal from Trust Account for Taxes | | | | | | $ 278,249 | $ 278,249 |
| Extension fee Paid to Trust Account | | | | | | $ (57,388) | $ (57,388) |
| Net Loss | | | | | | $ (3,410,277) | $ (3,410,277) |
| Balance —- December 31, 2022 | 515,000 | $ 52 | 2,875,000 | $ 288 | $ - | $ (6,879,613) | $ (6,879,273) |
| Accretion of Investment Income to Trust Account | | | | | | $ 172,141 | $ 172,141 |
| Extension fee Paid to Trust Account | | | | | | $ (172,141) | $ (172,141) |
| Net Loss | | | | | | $ (546,238) | $ (546,238) |
| Balance —- March 31, 2023 | $515,000 | $ 52 | $2,875,000 | $ 288 | $ - | $ (7,425,851) | $ (7,425,511) |

| | Class A Common Stock | | Class B Common Stock | | Additional Paid in Capital | Accumulated Deficit | Total Stockholders' Deficit |
|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | |
| Balance March 31, 2021 Inception) | | $ - | | $ - | $ - | $ - | $ - |
| Issuance of class B commonstock to Sponsor | | | 2,875,000 | 288 | 24,712 | | $ 25,000 |
| Issuances of Representative Shares | 115,000 | 12 | | | 1,149,988 | | $ 1,150,000 |
| Net Proceeds from Sale of A Public rights | | | | | 10,233,712 | | $ 10,233,712 |
| Net Proceeds of private placement Class A Units | 400,000 | 40 | | | 2,776,016 | | $ 2,776,056 |
| Sale of Class B Founder's Shares to Anchor Investors | | | | | 1,634,620 | | $ 1,634,620 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Accretion of Class A Ordinary Shares Subject to Possible Redemption | | | | | (15,819,048) | (2,866,422) | $(18,685,470) |
| Net Loss | | | | | | (313,787) | $    (313,787) |
| Balance December 31, 2021 | 515,000 | $    52 | 2,875,000 | $    288 | $    - | $ (3,180,209) | $  (3,179,869) |

The accompanying notes are an integral part of the unaudited condensed financial statements.

4

SAGALIAM ACQUISITION CORP.
STATEMENT OF CASH FLOW

| | For the period ended March 31, 2023 (unaudited) | | For the year ended December 31, 2022 (audited) | |
|---|---|---|---|---|
| **Cash Flow from Operating Activities** | | | | |
| Net Loss | $ | (546,238) | $ | (3,410,277) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | | |
| Interest earned on marketable securities held in Trust Account | $ | (94,312) | $ | (1,509,988) |
| Change in operating assets and liabilities: | | | | |
| Prepaid expenses | | | $ | 103,381 |
| Accrued expenses | $ | 171,000 | $ | 3,258,580 |
| Franchise tax payable | $ | 200,000 | $ | (150,000) |
| Net cash used in operating activities | $ | (269,550) | $ | (1,708,304) |
| | | | | |
| **Cash flows from Investing Activities** | | | | |
| Cash withdrawn from Trust Account for redeeming Class A stockholders | | | $ | 107,595,680 |
| Cash withdrawn from Trust Account for payment of taxes | | | $ | 285,268 |
| Cash deposited in trust account | $ | 94,312 | $ | (57,388) |
| Cash provided by (used in) investing activities | $ | 94,312 | $ | 107,823,560 |
| | | | | |
| **Cash Flows from Financing Activities** | | | | |
| Payment for redeeming Class A stockholders | | | $ | (107,595,680) |
| Proceeds from Promissory note - related party | $ | 172,141 | $ | 721,500 |
| | $ | 172,141 | $ | (106,874,180) |
| | | | | |
| Net Change in Cash | $ | (3,097) | $ | (758,924) |
| Cash - Beginning period | $ | 3,116 | $ | 762,040 |
| Cash - End of period | $ | 19 | $ | 3,116 |
| | | | | |
| | $ | 19 | | |
| | | | | |
| Supplemental Disclosure of non-cash Investing and Financing Activities | | | | |
| Non-Cash Investing and Financing Activities | | | | |
| Reduction in underwriters fee | | | $ | (1,000,000) |
| Accretion of income to Trust Account | | | $ | 1,509,988 |

The accompanying notes are an integral part of the unaudited condensed financial statements.

5

# SAGALIAM ACQUISITION CORP.
## NOTES TO UNAUDITED CONDENSED FINANCIAL STATEMENTS
### MARCH 31, 2023

**Note 1 – Description of Organization and Business Operations and Liquidity**

Sagaliam Acquisition Corp. (the "Company") is a blank check company incorporated in the state of Delaware on March 31, 2021. The Company was formed for the purpose of entering into a merger, share exchange, asset acquisition, share purchase, reorganization or similar Business Combination with one or more businesses (a "Business Combination").

The Company has selected December 31 as its fiscal year end. The Company is not limited to a particular industry or geographic region for purposes of consummating a Business Combination. The Company is an early stage and emerging growth company and, as such, the Company is subject to all of the risks associated with early stage and emerging growth companies.

As of March 31, 2023 and December 31, 2022, the Company had not yet commenced any operations. All activity through March 31, 2023 relates to the Company's formation, initial public offering ("Initial Public Offering") and search for a business combination target. The Company will not generate any operating revenues until its initial business combination. The registration statement for the Company's Initial Public Offering was declared effective on December 20, 2021. On December 23, 2021, the Company consummated the Initial Public Offering of 11,500,000 units (the "Units" and, with respect to the Class A common stock included in the Units sold, the "Public Shares"), at $10.00 per Unit, generating total gross proceeds of $115,000,000, which is described in Note 3.

Simultaneously with the closing of the Initial Public Offering, the Company consummated the sale of 400,000 units (the "Private Placement Units") at a price of $10.00 per Private Placement Unit in a private placement to the Company's Sponsor, Sagaliam Sponsor, LLC (the "Sponsor"), generating gross proceeds of $4,000,000, which is described in Note 4.

Transaction costs amounted to $8,525,729, consisting of $4,025,000 of deferred underwriting fees, $1,150,000 for the fair value of Class A shares issued to underwriter as representative shares (see Note 6), $1,634,620 for the fair value of the Founder Shares in excess of amounts paid by anchor investors (see Note 5), and $566,109 of offering costs. The Company's remaining cash after payment of the offering costs is held outside of the Trust Account for working capital purposes.

Following the closing of the Initial Public Offering on December 23, 2021, an amount of $10.10 per unit or an aggregate of $116,150,000 has been placed in a trust account, (the "Trust Account") and invested in U.S. government securities, within the meaning set forth in Section 2(a)(16) of the Investment Company Act, with a maturity of 185 days or less or in any open-ended investment company that holds itself out as a money market fund meeting the conditions of Rule 2a-7 of the Investment Company Act, as determined by the Company. Except with respect to interest earned on the funds held in the trust account that may be released to the Company to pay its franchise and income tax obligations (less up to $150,000 of interest to pay dissolution expenses), the proceeds from this offering and the sale of the Private Placement Units will not be released from the trust account until the earliest of (a) the completion of the Company's initial business combination, (b) the redemption of any public shares properly submitted in connection with a stockholder vote to amend the Company's amended and restated certificate of incorporation, and (c) the redemption of the Company's public shares if the Company is unable to complete the initial business combination within 12 months (or up to 18 months, as applicable) from the closing of this offering, subject to applicable law. The proceeds deposited in the trust account could become subject to the claims of the Company's creditors, if any, which could have priority over the claims of the Company's public stockholders.

6

## SAGALIAM ACQUISITION CORP.
### NOTES TO UNAUDITED CONDENSED FINANCIAL STATEMENTS
### MARCH 31, 2023

**Note 1 – Description of Organization and Business Operations and Liquidity** (cont.)

The Company will provide its public stockholders with the opportunity to redeem all or a portion of their Public Shares upon the completion of the initial business combination either (i) in connection with a stockholder meeting called to approve the initial business combination or (ii) by means of a tender offer. The decision as to whether the Company will seek a stockholder approval of a proposed initial business combination or conduct a tender offer will be made by the Company, solely in its discretion. The stockholders will be entitled to redeem their shares for a pro rata portion of the amount then on deposit in the Trust Account (initially approximately $10.10 per share, plus any pro rata interest earned on the funds held in the Trust Account and not previously released to the Company to pay its tax obligations).

The shares of Class A common stock subject to redemption are recorded at a redemption value and classified as temporary equity as of the Public Offering, in accordance with Accounting Standards Codification ("ASC") Topic 480 "Distinguishing Liabilities from Equity." In such case, the Company will proceed with a Business Combination if the Company has net tangible assets of at least $5,000,001 upon such consummation of a Business Combination and, if the Company seeks stockholder approval, a majority of the issued and outstanding shares voted are voted in favor of the Business Combination.

The Company has 12 months from the closing of the Public Offering, unless such period is extended. If the Company has executed a definitive agreement and filed a proxy statement for an initial business combination within 12 months from the closing of the Public Offering, the period of time the Company will have to consummate an initial business combination will be automatically extended by an additional four months to an aggregate of 19 months without additional cost. However, if the Company is not able to consummate an initial business combination within 12 months and the Company has not entered into a definitive agreement or filed a proxy statement for an initial business combination by such date, the Company may, by resolution of the board if requested by the sponsor, extend the time available to consummate an initial business combination for an additional three months up to two times (for a total of 18 months to complete a business combination) by paying into the trust account $1,150,000 ($0.10 per share in either case) on or prior to the date of the deadline. The Company will only be able to extend the period of time to consummate a business combination by an additional three months two times (for a total of nine months) (the "Combination Period"). However, if the Company is unable to complete a Business Combination within the Combination Period, the Company will (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible but not more than ten business days thereafter, redeem the public shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account including interest earned on the funds held in the trust account and not previously released to the Company to pay its franchise and income taxes (less up to $150,000 of interest to pay dissolution expenses), divided by the number of then outstanding public shares, which redemption will completely extinguish public stockholders' rights as stockholders (including the right to receive further liquidating distributions, if any), subject to applicable law, and (iii) as promptly as reasonably possible following such redemption, subject to the approval of the Company's remaining stockholders and its board of directors, dissolve and liquidate, subject in each case to its obligations under Delaware law to provide for claims of creditors and the requirements of other applicable law. There will be no redemption rights or liquidating distributions with respect to the Company's Rights, which will expire worthless if the Company fails to complete an initial business combination within the Combination Period.

The Sponsor, officers and directors have agreed to (i) waive their redemption rights with respect to their founder shares, private placement shares and public shares in connection with the completion of the initial business combination, (ii) waive their redemption rights with respect to their founder shares, private placement shares and public shares in connection with a stockholder vote to approve an amendment to the Company's amended and restated certificate of incorporation, and (iii) waive their rights to liquidating distributions from the trust account with respect to their founder shares and private placement shares if the Company fails to complete the initial business combination within the Combination Period.

7

# SAGALIAM ACQUISITION CORP.
## NOTES TO UNAUDITED CONDENSED FINANCIAL STATEMENTS
### MARCH 31, 2023

**Note 1 – Description of Organization and Business Operations and Liquidity** (cont.)

The Company's Sponsor has agreed that it will be liable to the Company if and to the extent any claims by a third party for services rendered or products sold to the Company, or a prospective target business with which the Company has entered into a written letter of intent, confidentiality or similar agreement or business combination agreement, reduce the amount of funds in the trust account to below the lesser of (i) $10.10 per public share and (ii) the actual amount per public share held in the trust account as of the date of the liquidation of the trust account, if less than $10.10 per share due to reductions in the value of the trust assets, less taxes payable, provided that such liability will not apply to any claims by a third party or prospective target business who executed a waiver of any and all rights to the monies held in the trust account (whether or not such waiver is enforceable) nor will it apply to any claims under the Company's indemnity of the underwriters of this offering against certain liabilities, including liabilities under the Securities Act. However, the Company has not asked its Sponsor to reserve for such indemnification obligations, nor has the Company independently verified whether its Sponsor has sufficient funds to satisfy its indemnity obligations and believe that the Company's Sponsor's only assets are securities of the Company. Therefore, the Company cannot assure that its Sponsor would be able to satisfy those obligations.

**Liquidity, Capital Resources, and Going Concern**

As of March 31, 2023 and December 31, 2022, the Company had $19 and $3,116, respectively, in its operating bank accounts, and working capital deficit of $269,550 and $1,708,304, respectively.

Until the consummation of a Business Combination, the Company will be using the funds in operating accounts for identifying and evaluating prospective acquisition candidates, performing due diligence on prospective target businesses, paying for travel expenditures, selecting the target business to acquire, and structuring, negotiating and consummating the Business Combination.

In connection with the Company's assessment of going concern considerations in accordance with Financial Accounting Standard Board's ("FASB") Accounting Standards Update ("ASU") 2014-15, "Disclosures of Uncertainties about an Entity's Ability to Continue as a Going Concern," the Company has until the resolution of the Pending Litigation in the GLD Partners v. SAGA Matter to consummate the proposed Business Combination. It is uncertain that the Company will be able to consummate the proposed Business Combination by this time. If a Business Combination is not consummated by this date, there will be a mandatory liquidation and subsequent dissolution of the Company. Additionally, the Company may not have sufficient liquidity to fund the working capital needs of the Company through one year from the issuance of these financial statements. Management has determined that the liquidity condition and mandatory liquidation, should a Business Combination not occur, and potential subsequent dissolution, raises substantial doubt about the Company's ability to continue as a going concern. No adjustments have been made to the carrying amounts of assets or liabilities should the Company be required to liquidate after December 23, 2022. The Company intends to complete the proposed Business Combination before the mandatory liquidation date. However, there can be no assurance that the Company will be able to consummate any Business Combination by December 23, 2022. In addition, the Company may need to raise additional capital through loans or additional investments from its Sponsor, stockholders, officers, directors or third parties. The Company's officers, directors and Sponsor may, but are not obligated to, loan the Company funds, from time to time or at any time, in whatever amount they deem reasonable in their sole discretion, to meet the Company's working capital needs. Accordingly, the Company may not be able to obtain additional financing. If the Company is unable to raise additional capital, the Company may be required to take additional measures to conserve liquidity, which could include, but not necessarily be limited to, curtailing operations, suspending the pursuit of a potential transaction, and reducing overhead expenses. The Company cannot provide any assurance that new financing will be available to it on commercially acceptable terms, if at all. These conditions raise substantial doubt about the Company's ability to continue as a going concern through the liquidation date of November 21, 2024.

8

# SAGALIAM ACQUISITION CORP.
## NOTES TO UNAUDITED CONDENSED FINANCIAL STATEMENTS
### MARCH 31, 2023

**Note 1 – Description of Organization and Business Operations and Liquidity** (cont.)

**Risks and Uncertainties**

Management continues to evaluate the impact of the COVID-19 pandemic and has concluded that while it is reasonably possible that the virus could have a negative effect on the Company's financial position, results of its operations, and/or search for a target company, the specific impact is not readily determinable as of the date of the financial statement. The financial statement does not include any adjustments that might result from the outcome of this uncertainty.

In February 2022, the Russian Federation and Belarus commenced a military action with the country of Ukraine. As a result of this action, various nations, including the United States, have instituted economic sanctions against the Russian Federation and Belarus. Further, the impact of this action and related sanctions on the world economy are not determinable as of the date of these financial statements and the specific impact on the Company's financial condition, results of operations, and cash flows is also not determinable as of the date of these financial statements.

**Note 2 – Significant Accounting Policies**

The accompanying unaudited condensed financial statements have been prepared in accordance with generally accepted accounting principles for financial information and with the instructions to Form 10-Q. They do not include all information and footnotes required by United States generally accepted accounting principles for complete financial statements. However, except as disclosed herein, there has been no material changes in the information disclosed in the notes to the financial statements for the fiscal year ended December 31, 2022 included in the Company's 10-K filed with the Securities and Exchange Commission. The unaudited condensed financial statements should be read in conjunction with those financial statements included in the Form 10-K. In the opinion of Management, all adjustments considered necessary for a fair presentation, consisting solely of normal recurring adjustments, have been made. Operating results for three and nine months ended March 31, 2023 are not necessarily indicative of the results that may be expected for the year ending December 31, 2023.

The accompanying condensed statements of operations and statements of cash flows do not include comparative information for the one-day period of March 31, 2021, as there were no income/expense or cash transactions on that date.

**Emerging Growth Company**

The Company is an "emerging growth company," as defined in Section 2(a) of the Securities Act, as modified by the Jumpstart our Business Startups Act of 2012 (the "JOBS Act"), and it may take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not emerging growth companies including, but not limited to, not being required to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act, reduced disclosure obligations regarding executive compensation in its periodic reports and proxy statements, and exemptions from the requirements of holding a nonbinding advisory vote on executive compensation and stockholder approval of any golden parachute payments not previously approved.

Further, section 102(b)(1) of the JOBS Act exempts emerging growth companies from being required to comply with new or revised financial accounting standards until private companies (that is, those that have not had a Securities Act registration statement declared effective or do not have a class of securities registered under the Exchange Act) are required to comply with the new or revised financial accounting standards. The JOBS Act provides that an emerging growth company can elect to opt out of the extended transition period and comply with the requirements that apply to non-emerging growth companies but any such election to opt out is irrevocable. The Company has elected not to opt out of such extended transition period which means that when a standard is issued or revised and it has different application dates for public or private companies, the Company, as an emerging growth company, can adopt the new or revised standard at the time private companies adopt the new or revised standard. This may make comparison of the Company's financial statements with another public company which is neither an emerging growth company nor an emerging growth company which has opted out of using the extended transition period difficult or impossible because of the potential differences in accounting standards used.

9

## SAGALIAM ACQUISITION CORP.
## NOTES TO UNAUDITED CONDENSED FINANCIAL STATEMENT
## MARCH 31, 2023

**Note 2 – Significant Accounting Policies** (cont.)

**Use of Estimates**

The preparation of the financial statements in conformity with U.S. GAAP requires the Company's management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements.

Making estimates requires management to exercise significant judgment. It is at least reasonably possible that the estimate of the effect of a condition, situation or set of circumstances that existed at the date of the financial statements, which management considered in formulating its estimate, could change in the near term due to one or more future confirming events. Accordingly, the actual results could differ from those estimates.

**Cash and Cash Equivalents**

The Company considers all short-term investments with an original maturity of three months or less when purchased to be cash equivalents. The Company did not have any cash equivalents as of March 31, 2023 and December 31, 2022.

**Marketable Securities Held in Trust Account**

At March 31, 2023 and December 31, 2022, all of the assets held in the Trust Account were held in U. S. Treasury securities. The Company's investments held in the Trust Account are classified as trading securities. Trading securities are presented on the balance sheet at fair value at the end of each reporting period. Gains and losses resulting from the change in fair value of investments held in Trust Account are included in other income earned on marketable securities held in Trust Account in the accompanying statements of operations. The estimated fair value of investments held in Trust Account are determined using available market information.

As of March 31, 2023 and December 31, 2022, the Company had $10,109,893 and $9,843,440, respectively in marketable securities held in the Trust Account.

**Class A Common Stock Subject to Possible Redemption**

The Company accounts for its common stock subject to possible redemption in accordance with the guidance in ASC 480. Common stock subject to mandatory redemption are classified as a liability instrument and are measured at fair value. Conditionally redeemable common stock (including common stock that feature redemption rights that are either within the control of the holder or subject to redemption upon the occurrence of uncertain events not solely within the Company's control) are classified as temporary equity. At all other times, common stock are classified as stockholders' equity. The Company's common stock feature certain redemption rights that are considered to be outside of the Company's control and subject to the occurrence of uncertain future events. The Company recognizes changes in redemption value immediately as they occur and adjusts the carrying value of redeemable Class A common stock to equal the redemption value at the end of each reporting period. Increases or decreases in the carrying amount of redeemable Class A common stock are affected by charges against additional paid-in capital and accumulated deficit.

10

**SAGALIAM ACQUISITION CORP.**
**NOTES TO UNAUDITED CONDENSED FINANCIAL STATEMENT**
**MARCH 31, 2023**

**Note 2 – Significant Accounting Policies** (cont.)

**Class A Common Stock Subject to Possible Redemption** (cont.)

As of March 31, 2023 and December 31, 2021, 11,500,000 shares of Class A common stock subject to possible redemption are presented at redemption value as temporary equity, outside of the stockholders' deficit section of the Company's balance sheet. The Company recognizes changes in redemption value immediately as they occur and adjusts the carrying value of Class A common stock subject to possible redemption to equal the redemption value at the end of each reporting period (less a provision of $150,000 for the payment of dissolution expenses on any aggregate interest not released by the Company to pay income and franchise taxes).

Immediately upon the closing of the Initial Public Offering, the Company recognized the accretion from initial book value to redemption amount value.

There were no adjustments to the carrying value of Class A common stock subject to possible redemption for the three and nine months ended March 31, 2023.

**Offering Costs Associated with the Initial Public Offering**

The Company complies with the requirements of ASC 340-10-S99-1 and SEC Staff Accounting Bulletin Topic 5A – *Expenses of Offering*. Offering costs consist principally of professional and registration fees incurred through the balance sheet date that are related to the Initial Public Offering. Offering costs directly attributable to the issuance of an equity contract to be classified in equity are recorded as a reduction in equity. Offering costs for equity contracts that are classified as assets and liabilities are expensed immediately. The Company incurred offering costs amounting to $8,525,729 consisting of $1,150,000 of underwriting fees, $4,025,000 of deferred underwriting fees, $1,150,000 for underwriting related costs recognized for representative shares, $1,634,620 for the fair value of the Founder Shares in excess of amounts paid by anchor investors (see Note 5), and $566,109 of other offering costs.

**Income Taxes**

The Company complies with the accounting and reporting requirements of ASC Topic 740, *Income Taxes* ("ASC 740"), which requires an asset and liability approach to financial accounting and reporting for income taxes. Deferred income tax assets and liabilities are computed for differences between the unaudited condensed financial statement and tax bases of assets and liabilities that will result in future taxable or deductible amounts, based on enacted tax laws and rates applicable to the periods in which the differences are expected to affect taxable income. Valuation allowances are established, when necessary, to reduce deferred tax assets to the amount expected to be realized. Under ASC 740-270, tax expense for interim periods should be measured using an estimated annual effective tax rate. Exceptions under ASC 740-270-30-36 and ASC 740-270-25-3 include circumstances where a reliable estimate of ordinary income or loss cannot be made. The Company believes there is not a high degree of uncertainty in estimating annual pretax earnings. Therefore, the Company has used an effective tax rate method to calculate interim income tax expense. ASC 740 prescribes a recognition threshold and a measurement attribute for the unaudited condensed financial statement recognition and measurement of tax positions taken or expected to be taken in a tax return. For those benefits to be recognized, a tax position must be more-likely-than-not to be sustained upon examination by taxing authorities. The Company recognizes accrued interest and penalties related to unrecognized tax benefits, if any, as income tax expense. There were no unrecognized tax benefits and no amounts accrued for interest and penalties as of March 31, 2023 and December 31, 2022. The Company is currently not aware of any issues under review that could result in significant payments, accruals or material deviation from its position. The Company is subject to income tax examinations by major taxing authorities since inception.

11

**SAGALIAM ACQUISITION CORP.**
**NOTES TO UNAUDITED CONDENSED FINANCIAL STATEMENT**
**MARCH 31, 2023**

**Note 2 – Significant Accounting Policies** (cont.)

**Income Taxes** (cont.)

On August 16, 2022, President Biden signed into law the Inflation Reduction Act of 2022, which, among other things, imposes a 1% excise tax on the fair market value of stock repurchased by publicly traded U.S. corporations and certain U.S. subsidiaries of publicly traded non-U.S. corporations beginning in 2023, with certain exceptions and adjustments (the "Excise Tax"). For purposes of calculating the Excise Tax, repurchasing corporations are permitted to net the fair market value of certain new stock issuances against the fair market value of stock repurchases during the same taxable year. Because we are a Delaware corporation and our securities trade on the New York Stock Exchange, we will likely be considered a "covered corporation" within the meaning of the Inflation Reduction Act. While not free from doubt, absent any further guidance from Congress or the U.S. Department of the Treasury, there is significant risk that the Excise Tax will apply to any redemptions of our common stock after December 31, 2022, including redemptions in connection with an initial Business Combination and any amendment to our certificate of incorporation to extend the time to consummate an initial Business Combination, unless an exemption is available. In addition, the Excise Tax may make a transaction with us less appealing to potential business combination targets, and thus, potentially hinder our ability to enter into and consummate an initial Business Combination. Further, the application of the Excise Tax in the event of a liquidation after December 31, 2022 is uncertain, and could impact the per-share amount that would otherwise be received by our stockholders in connection with our liquidation.

The Company's effective tax rate for the three and nine months ended March 31, 2023 was -0-% and -0-% respectively

**Net Loss per Share**

The Company complies with accounting and disclosure requirements of FASB ASC Topic 260, "Earnings Per Share". Income and loses are shared pro rata between Class A common stock subject to possible redemption and non-redeemable common stock. Non-redeemable common stock includes Founder, Private Placement, and Representative Shares as these shares do not have any redemption features. Diluted net loss per share is the same as basic net loss per share for the three months ended March 31, 2023, nine months ended March 31, 2023 and the period March 31, 2021 (inception) through December 31, 2021, respectively.

The calculation of diluted loss per ordinary share does not consider the effect of the rights issued in connection with the (i) Initial Public Offering, and (ii) the private placement that convert into 1,487,500 ordinary shares since the conversion of the rights into ordinary shares is contingent upon the occurrence of future events. As of March 31, 2023 and December 31, 2022, the Company did not have any dilutive securities or other contracts that could potentially, be exercised or converted into ordinary shares and then shares in the earnings of the Company. As a result, diluted net loss per ordinary share is the same as basic net loss per ordinary share for the periods presented.

12

# SAGALIAM ACQUISITION CORP.
## NOTES TO UNAUDITED CONDENSED FINANCIAL STATEMENTS
### MARCH 31, 2023

**Note 2 – Significant Accounting Policies** (cont.)

Financial instruments that potentially subject the Company to concentrations of credit risk consist of a cash account in a financial institution, which, at times, may exceed the Federal Depository Insurance Coverage of $250,000. The Company has not experienced losses on this account and management believes the Company is not exposed to significant risks on such account.

**Fair Value of Financial Instruments**

The fair value of the Company's financial assets and liabilities approximates the carrying amounts represented in the accompanying balance sheet, primarily due to their short-term nature.

**Recent Accounting Standards**

In August 2020, the FASB issued ASU 2020-06, Debt — Debt with Conversion and Other Options (Subtopic 470-20) and Derivatives and Hedging – Contracts in Entity's Own Equity (Subtopic 815-40) ("ASU 2020-06") to simplify accounting for certain financial instruments. ASU 2020-06 eliminates the current models that require separation of beneficial conversion and cash conversion features from convertible instruments and simplifies the derivative scope exception guidance pertaining to equity classification of contracts in an entity's own equity. The new standard also introduces additional disclosures for convertible debt and freestanding instruments that are indexed to and settled in an entity's own equity. ASU 2020-06 amends the diluted earnings per share guidance, including the requirement to use the if-converted method for all convertible instruments. ASU 2020-06 is effective January 1, 2024 and should be applied on a full or modified retrospective basis, with early adoption permitted beginning on January 1, 2021. The Company is currently reviewing what impact, if any, adoption will have on the Company's financial position, results of operations or cash flows.

Management does not believe that any other recently issued, but not yet effective, accounting standards, if currently adopted, would have a material effect on the Company's condensed financial statements.

# SAGALIAM ACQUISITION CORP.
## NOTES TO UNAUDITED CONDENSED FINANCIAL STATEMENTS
### MARCH 31, 2023

**Note 3 – Initial Public Offering**

Pursuant to the Initial Public Offering, the Company sold 11,500,000 Units, at a purchase price of $10.00 per Unit. Each unit consists of one share of Class A common stock, and one right ("Public Right"). Each Public Right will entitle the holder to receive one-eighth of one share of Class A common stock at the closing of a Business Combination.

**Note 4 – Private Placement**

Simultaneously with the closing of the Initial Public Offering, the Sponsor purchased an aggregate of 400,000 Private Placement Units at a price of $10.00 per Private Placement Unit, for an aggregate purchase price of $4,000,000. Each Private Right consists of one share of Class A common stock ("Private Placement Share") and one right ("Private Placement Right"). Each Private Placement Right entitles the holder to receive one-eighth of one share of Class A common stock at the closing of a Business Combination.

The Company's Sponsor, officers and directors have agreed to (i) waive their redemption rights with respect to their Founder Shares, Private Placement Shares and public shares in connection with the completion of the Company's initial business combination, (ii) waive their redemption rights with respect to their Founder Shares, Private Placement Shares and public shares in connection with a stockholder vote to approve an amendment to the Company's amended and restated certificate of incorporation (A) to modify the substance or timing of the Company's obligation to redeem 100% of its public shares if the Company does not complete its initial business combination during the Combination Period or (B) with respect to any other provision relating to stockholders' rights or pre-initial business combination activity and (iii) waive their rights to liquidating distributions from the trust account with respect to their Founder Shares and Private Placement Shares if the Company fails to complete its initial business combination during the Combination Period. In addition, the Company's Sponsor, officers and directors have agreed to vote any Founder Shares and Private Placement Shares held by them and any public shares purchased during or after the Proposed Public Offering (including in open market and privately negotiated transactions) in favor of the Company's initial business combination.

On April 5, 2021, the Company issued 2,875,000 shares of Class B common stock (the "Founder Shares") to the Sponsor for $25,000 in cash, or approximately $0.009 per share, in connection with formation. Thereafter, the Sponsor transferred a total of 225,000 Founder Shares to the Company's officers and director nominees. The transfer of the Founder Shares to the officers and director nominees is within the scope of FASB ASC 718, "Compensation-Stock Compensation" ("ASC 718"). Under ASC 718, stock-based compensation associated with equity-classified awards is measured at fair value upon the grant date and expensed when earned. Shares granted to these individuals are forfeited if their status as officer or director is terminated for any reason prior to the date of the initial business combination, and as such, there has been no stock-based compensation expense recognized in the accompanying financial statements. The Sponsor and the Company's officers and director nominees will collectively own 20% of the Company's issued and outstanding shares after the Public Offering (assuming that none of the Sponsor and the Company's officers and director nominees purchase any Public Shares in the Public Offering and excluding the Private Placement Shares and Representative's Shares (as defined below). All share and per-share amounts have been retroactively restated.

The initial holders of the Founder Shares have agreed not to transfer, assign or sell any of the Founder Shares until the earlier of (i) one year after the date of the consummation of the Company's initial business combination or (ii) the date on which the Company consummates a liquidation, merger, stock exchange or other similar transaction which results in all of its stockholders having the right to exchange their shares of Class A common stock for cash, securities or other property. Notwithstanding the foregoing, if the closing price of the Company's shares of Class A common stock equals or exceeds $12.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period commencing 150 days after the Company's initial business combination, the Founder Shares will no longer be subject to such transfer restrictions.

14

# SAGALIAM ACQUISITION CORP.
## NOTES TO UNAUDITED CONDENSED FINANCIAL STATEMENTS
### MARCH 31, 2023

**Note 4 – Private Placement** (cont.)

**Founder Shares**

A total of ten anchor investors each purchased an allocation of units as determined by the underwriters, in the Initial Public Offering at the offering price of $10.00 per unit. Pursuant to such units, the anchor investors have not been granted any shareholder or other rights in addition to those afforded to the Company's other public shareholders. Further, the anchor investors are not required to (i) hold any units, Class A common stock or rights they may purchase in the Initial Public Offering or thereafter for any amount of time, (ii) vote any Class A common stock they may own at the applicable time in favor of the Business Combination or (iii) refrain from exercising their right to redeem their public shares at the time of the Business Combination. The anchor investors will have the same rights to the funds held in the trust account with respect to the Class A common stock underlying the units purchased in the Initial Public Offering as the rights afforded to the Company's other public shareholders.

Each anchor investor entered into separate investment agreements with the Company and the Sponsor pursuant to which each anchor investor purchased a specified number of Units for an aggregate of 990,000 Units at a purchase price of $10.00 per unit. In addition, the Sponsor sold the ten anchor investors an aggregate of 200,000 of Founder Shares at a purchase price of $0.0029 per share. Pursuant to the investment agreements, the anchor investors have agreed to (a) vote any Founder Shares held by them in favor of the Business Combination and (b) subject any Founder Shares held by them the same lock-up restrictions as the Founder Shares held by the Sponsor.

The Company estimated the fair value of the 200,000 Founder Shares attributable to the anchor investors to be worth approximately $1,635,200 or $8.176 per share. The excess of the fair value of the Founder Shares sold over the purchase price of $580 was determined to be an offering cost in accordance with Staff Accounting Bulletin Topic 5A. Accordingly, the offering cost have been allocated to the separable financial instruments issued in the Initial Public Offering based on a relative fair value basis, compared to total proceeds received.

**Note 5 – Related Party Transactions**

**Line of Credit – Related Party**

On August 23, 2022, Sagaliam Acquisition Corp. (the "Company") issued a convertible promissory note (the "Promissory Note") to Sagaliam Sponsor LLC, the Company's sponsor ("Sponsor"). Pursuant to the Promissory Note, the Sponsor agreed to loan the Company an aggregate principal amount up to $1,500,000. The principal of this Promissory Note may be drawn down from time to time prior to the earlier of: (i) April 30, 2023 or (ii) the date on which the Company consummates an initial business combination with a target business (a "Business Combination"), upon written request from the Company to the Sponsor. The Promissory Note was issued to fund working capital of the Company. The Promissory Note is non-interest bearing and all outstanding amounts under the Promissory Note will be due on the earlier of: (i) April 30, 2023 or (ii) the date on which the Company consummates a Business Combination (the "Maturity Date"). If a Business Combination is not announced prior to December 23, 2022, the unpaid principal balance of the Promissory Note, and all other sums payable with regard to the Promissory Note, shall automatically and immediately become due and payable, in all cases without any action on the part of the Sponsor. All or a portion of the amounts outstanding under the Promissory Note may be converted on the Maturity Date into units at a price of $10.00 per unit at the option of the Sponsor. The units would be identical to the Company's outstanding private placement units that were issued to the Sponsor in a private placement at the time of the Company's initial public offering. The Promissory Note contains customary events of default, including, among others, those relating to the Company's failure to make a payment of principal when due.

15

**SAGALIAM ACQUISITION CORP.**
**NOTES TO UNAUDITED CONDENSED FINANCIAL STATEMENTS**
**MARCH 31, 2023**

**Note 5 – Related Party Transactions** (cont.)

**Line of Credit – Related Party** (cont.)

The Payee has the right, but not the obligation, to convert any outstanding principal amount under this Note, in whole or in part, into units (the "Units") of the Maker, as described in the Prospectus, by providing the Maker with written notice of its intention to convert any outstanding principal amount under this Note at least one business day prior to the closing of a Business Combination. The Units would be identical to the private placement units as described in the Prospectus. The number of Units to be received by the Payee in connection with such conversion shall be an amount determined by dividing (x) the sum of the outstanding principal amount payable to such Payee by (y) $10.00.

The outstanding balance of the Line of Credit as of March 31, 2023 is $175,000.

**Promissory Note – Related Party**

The Sponsor agreed to loan the Company an aggregate of up to $1,500,000 to cover expenses related to the Initial Public Offering pursuant to a promissory note (the "Promissory Note"). This unsecured loan was non-interest bearing and is payable on the earlier of (i) December 31, 2021, or (ii) the consummation of the Initial Public Offering.

The outstanding balance under the Promissory Note was repaid on December 23, 2021, upon the closing of the Initial Public Offering.

**Administrative Support Agreement**

The Company has entered into an agreement with the Sponsor commencing May 1, 2021, to pay a total of 20,000 per month for officer's salaries, office space, secretarial and administrative services. Upon the completion of an initial Business Combination or liquidation, the Company will cease paying these monthly fees. The fees for the three months ended March 31, 2023 and the nine months ended March 31, 2023 were $60,000 and $180,000, respectively. The fees for the period from March 31, 2021 to March 31, 2023 were $40,000. As of March 31, 2023 and December 31, 2021 the outstanding balances were $0 and $20,000, respectively due the Sponsor.

**Related Party Loans**

In addition, in order to fund working capital deficiencies or finance transaction costs in connection with a Business Combination, the Sponsor or an affiliate of the Sponsor, or certain of the Company's officers and directors may, but are not obligated to, loan the Company funds as may be required ("Working Capital Loans"). If the Company Company completes a Business Combination, the Company may repay the Working Capital Loans out of the proceeds of the Trust Account released to the Company. Otherwise, the Working Capital Loans could be repaid only out of funds held outside the Trust Account. In the event that a Business Combination does not close, the Company may use a portion of proceeds held outside the Trust Account to repay the Working Capital Loans but no proceeds held in the Trust Account would be used to repay the Working Capital Loans. The Working Capital Loans would either be repaid upon consummation of a Business Combination or, at the lender's discretion, up to 1,500,000 of such Working Capital Loans may be convertible into Units of the post Business Combination entity at a price of $10.00 per Unit. The Units would be identical to the Private Placement Units. Except for the foregoing, the terms of such Working Capital Loans, if any, have not been determined and no written agreements exist with respect to such loans.

16

## SAGALIAM ACQUISITION CORP.
## NOTES TO UNAUDITED CONDENSED FINANCIAL STATEMENTS
## MARCH 31, 2023

### Note 6 – Commitments and Contingencies

**Registration and Shareholder Rights Agreement**

The holders of the Founder Shares, Private Placement Units and rights may be issued Units upon conversion of Working Capital Loans to Class A common stock issuable upon the exercise of the Private Placement statements.

**Underwriting Agreement**

The underwriters were entitled to a cash underwriting discount of one percent (1%) of the gross proceeds of the Public Offering, or $1,150,000. The Company has also agreed to issue to EF Hutton, the representative of underwriters, and/or its designees, 115,000 shares of the Class A common stock (the "Representative's shares") upon the consummation of the offering, as compensation in connection with the offering. Additionally, the underwriters will be entitled to a deferred underwriting discount of 3.5% of the gross proceeds of the Public Offering upon the completion of the Company's initial business combination. The deferred fee will become payable to the underwriters from the amounts held in the Trust Account solely in the event that the Company completes a Business Combination, subject to the terms of the underwriting agreement.

### Note 7 – Stockholder's Equity

*Class A Common Stock* – The Company is authorized to issue 100,000,000 Class A common stock with a par value of $0.0001 per share. At March 31, 2023 and December 31, 2021, there were 515,000 Class A common stock issued and outstanding, excluding 11,500,000 Class A common stock subject to possible redemption.

*Class B Common Stock* – The Company is authorized to issue 10,000,000 Class B common stock with a par value of $0.0001 per share. At March 31, 2023 and December 31, 2021, there were 2,875,000 Class B common stock issued and outstanding.

The shares of Class B common stock will automatically convert into shares of the Company's Class A common stock at the time of its initial business combination on a one-for-one basis, subject to adjustment for stock splits, stock dividends, reorganizations, recapitalizations and the like, and subject to further adjustment as provided herein. In the case that additional shares of Class A common stock, or equity-linked securities, are issued or deemed issued in excess of the amounts offered in and related to the closing of the initial business combination, the ratio at which shares of Class B common stock shall convert into shares of Class A common stock will be adjusted (unless the holders of a majority of the outstanding shares of Class B common stock agree to waive such adjustment with respect to any such issuance or deemed issuance) so that the number of shares of Class A common stock issuable upon conversion of all shares of Class B common stock will equal, in the aggregate, on an as-converted basis, 20% of the sum of the total number of all shares of common stock outstanding upon the completion of this offering (not including the Private Placement Shares and Representative's Shares) plus all shares of Class A common stock and equity-linked securities issued or deemed issued in connection with the initial business combination (excluding any shares or equity-linked securities issued, or to be issued, to any seller in the initial business combination or any units issued to the Sponsor, its affiliates or certain of officers and directors upon conversion of working capital loans made to the Company).

Holders of the Class A common stock and holders of the Class B common stock will vote together as a single class on all matters submitted to a vote of the Company's stockholders, with each share of common stock entitling the holder to one vote, except as required by law or the Company's amended and restated certificate of incorporation.

*Preferred Shares* – The Company is authorized to issue 1,000,000 shares of preferred shares, par value $0.0001 per share, with such designations, voting and other rights and preferences as may be determined from time to time by the Company's board of directors. At March 31, 2023 and December 31, 2021, there were no preferred shares issued or outstanding.

17

12/6/23, 9:28 AM
Case 1:23-cv-01266-RGA    Document 34    Filed 12/06/23    Page 74 of 95 PageID #: 883
sec.gov/Archives/edgar/data/1855351/000149315223042805/form10-q.htm

## SAGALIAM ACQUISITION CORP.
## NOTES TO UNAUDITED CONDENSED FINANCIAL STATEMENTS
## MARCH 31, 2023

**Note 7 – Stockholder's Equity** (cont.)

*Rights* – Each holder of a right will automatically receive one-eighth (1/8) of one share of Class A common stock upon consummation of a Business Combination, except in cases where we are not the surviving company in a business combination or the registered holder of a certificated right fails to tender their original rights certificate, and even if the holder of such right redeemed all shares of Class A common stock held by it in connection with a Business Combination.

No additional consideration will be required to be paid by a holder of Public Rights in order to receive its additional shares upon consummation of a Business Combination, as the consideration related thereto has been included in the unit purchase price paid for by investors in the Proposed Public Offering.

If the Company enters into a definitive agreement for a Business Combination in which the Company will not be the surviving entity, the definitive agreement will provide for the holders of Public Rights to receive the same per share consideration the holders of shares of Class A common stock will receive in the transaction on an as-exchanged for Class A common stock basis, and each holder of a Public Right will be required to affirmatively exchange its Public Rights in order to receive the 1/8 share underlying each Public Right (without paying any additional consideration) upon consummation of a Business Combination. More specifically, the Public Rights holder will be required to indicate its election to exchange the Public Right for the underlying shares as well as to return the original rights certificates to the Company within a fixed period of time after which period the rights will expire worthless.

Pursuant to the rights agreement, a rights holder may exchange rights only for a whole number of shares of Class A common stock. This means that the Company will not issue fractional shares in connection with an exchange of rights and rights may be exchanged only in multiples of 8 rights (subject to adjustment for stock splits, stock dividends, reorganizations, recapitalizations and the like). Fractional shares will either be rounded down to the nearest whole share or otherwise addressed in accordance with the applicable provisions of the Delaware General Corporation Law.

If the Company is unable to complete a Business Combination within the Combination Period and the Company liquidates the funds held in the Trust Account, holders of Public Rights will not receive any such funds with respect to their Public Rights, nor will they receive any distribution from the Company's assets held outside of the Trust Account with respect to such Public Rights, and the Public Rights will expire worthless. Further, there are no contractual penalties for failure to deliver securities to holders of the Public Rights upon consummation of a Business Combination. Additionally, in no event will the Company be required to net cash settle the rights. Accordingly, the rights may expire worthless.

### Dividends

The Company has not paid any cash dividends on the common stock to date and does not intend to pay cash dividends prior to the completion of the initial Business Combination.

**Note 8 – Subsequent Events**

The Company evaluated subsequent events and transactions that occurred after the balance sheet date up to the date that the financial statement was issued. Based upon this review, the Company did not identify any subsequent events that would have required adjustment or disclosure in the financial statement.

As a result of distributions for taxes, extension payments and interest, the Sagaliam trust account holds approximately $10.3M as of 27 Nov 23, which equates to $10.85/share for each of the 951,801 Sagaliam Common A shares backed by the trust account. Extension payments have been made through the 15 Sept 23 date of the execution of the BCA with Enzolytics for the acquisition of the VIRO and BGEN subsidiaries.

On September 12, 2023 the Company issued a promissory note with Sagaliam Sponsor LLC. Subsequent to the acquisition of the Sagaliam Sponsor LLC the Sponsor Promissory note has been increased to $3,500,000.

On September 15, 2023 the Company executed a binding business combination agreement for the purchase of Biogenysis, Inc. ("BGEN") and Virogentics Inc. ("VIRO"), operating subsidiaries of Enzolytics Inc. (OTC PK: ENZC).

On April 14, 2023, the Company entered into a 12% Convertible Promissory Note agreement with Seacor Capital Inc. ("Seacor Note") The Seacor Note accrues interest at a rate of 12% and is due on or before October 31, 2023. The Seacor Note may be converted at a price equal to a 50% discount to the weighted average share price.

On April 14, 2023, the Company entered into a 12% Convertible Promissory Note agreement with NYF Capital Inc. ("NYF Note") The NYF Note accrues interest at a rate of 12% and is due on or before October 31, 2023. The NYF Note may be converted at a price equal to a 50% discount to the weighted average share price.

On October 3, 2023, the Company entered into a $100 thousand Convertible Note ("LMI Note") to Legacy Metaverse Inc. ("LMI"), an entity controlled by Barry Kostiner, the CEO of the Company. The LMI Note accrues interest at a rate of 10% and is due on October 3, 2024. The LMI Note may be converted at a price equal to a 90% discount to the weighted average share price. Together with each LMI conversion share, a warrant will be issued with the strike price equal to the conversion price per share and an expiration date of 5 years after issuance. Additionally, LMI has the non-exclusive right to market the Company's nutraceutical products for a 50% profit participation. LMI has the right to fund an additional $900,000.

It is expected that the Sponsor, Seacor, NYF and LMI debt obligations will be repaid and restructured upon completion of a PIPE transaction to be fund after approval of the BCA by shareholders.

18

---

## Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations

References in this report (the "Quarterly Report") to "we," "us" or the "Company" refer to Sagaliam Acquisition Corp. References to our "management" or our "management team" refer to our officers and directors, and references to the "Sponsor" refer to Sagaliam Sponsor LLC. The following discussion and analysis of our financial condition and results of operations should be read in conjunction with the financial statements and the notes thereto contained elsewhere in this Quarterly Report. Certain information contained in the discussion and analysis set forth below includes forward-looking statements that involve risks and uncertainties.

## Special Note Regarding Forward-Looking Statements

This Quarterly Report includes "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended (the "Securities Act") and Section 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act") that are not historical facts, and involve risks and uncertainties that could cause actual results to differ materially from those expected and projected. All statements, other than statements of historical fact included in this Quarterly Report including, without limitation, statements in this "Management's Discussion and Analysis of Financial Condition and Results of Operations" regarding our financial position, business strategy and the plans, objectives of management for future operations and the proposed Transactions with TMTG (as described below), are forward-looking statements. Words such as "expect," "believe," "anticipate," "intend," "estimate," "seek" and variations and similar words and expressions are intended to identify such forward-looking statements. Such forward-looking statements relate to future events or future performance, but reflect management's current beliefs, based on information currently available. A number of factors could cause actual events, performance or results to differ materially from the events, performance and results discussed in the forward-looking statements. For information identifying important factors that could cause actual results to differ materially from those anticipated in the forward-looking statements, please refer to the Risk Factors section of our final prospectus filed with the U.S. Securities and Exchange Commission (the "SEC") on December 22, 2021, along with Form 10-K for the period ended December 31, 2021. Our securities filings can be accessed on the EDGAR section of the SEC's website at www.sec.gov. Except as expressly required by applicable securities law, we disclaim any intention or obligation to update or revise any forward-looking statements whether as a result of new information, future events or otherwise.

## Overview

We are a blank check company incorporated in Delaware on March 31, 2021. We were formed for the purpose of effecting a merger, share exchange, asset acquisition, share purchase, reorganization or similar business combination with one or more businesses, or the initial business combination. We are an "emerging growth company," as defined in Section 2(a) of the Securities Act of 1933, as amended, as modified by the Jumpstart Our Business Startups Act of 2012 and, as such, we are subject to all of the risks associated with early stage and emerging growth companies.

We expect to continue to incur significant costs in the pursuit of our acquisition plans. We cannot assure you that our plans to complete a Business Combination will be successful.

## Results of Operations

Our entire activity since inception up to March 31, 2023, was related to our formation and Initial Public Offering. Since the Initial Public Offering, our activity has been limited to the search for a prospective initial business combination target. We will not generate any operating revenues until the consummation of our initial business combination. We expect to incur increased expenses as a result of being a public company (for legal, financial reporting, accounting and auditing compliance), as well as for due diligence expenses.

For the three months from Jan 1, 2023 through March 31, 2023, we had a net loss of $546,238, which consists of $640,550 in operating costs and $94,312 in interest earned from marketable securities held in trust account. For the three months January 1, 2022 to March 31, 2022 we had a net loss of $538,360.

## Liquidity and Capital Resources

On December 23, 2021, we consummated our Initial Public Offering of 11,500,000 units, including 1,500,000 units issued pursuant to the full exercise of the underwriters' over-allotment option. Each unit consists of one share of Class A capital stock, par value $0.0001 and one right, with each right entitling the holder to receive one-eighth (1/8) of one share of Class A common stock. The units were sold at a price of $10.00 per unit, generating gross proceeds of $115.0 million.

19

Simultaneously with the closing of the Initial Public Offering, we consummated the sale of 400,000 units at a price of $10.00 per unit in a private placement to our sponsor, generating gross proceeds of $4.0 million. In connection with the consummation of the Initial Public Offering, we issued to the representative and/or its designees 115,000 representative's shares.

Upon the closing of the Initial Public Offering and the private placement, $116.15 million ($10.10 per unit) of the net proceeds of the Initial Public Offering and certain of the proceeds from the private placement were placed in a trust account located in the United States with Continental Stock Transfer & Trust Company acting as trustee. We incurred $8,525,729 in Initial Public Offering related transaction costs, including $4,025,000 of deferred underwriting fees, 1,150,000 for the fair value of shares of Class A common stock issued to underwriters as representative shares, $1,634,620 for the fair value of the founder shares in excess of amounts paid by anchor investors, and $566,109 of offering costs.

We intend to use substantially all of the funds held in the trust account, including any amounts representing interest earned on the trust account (less deferred underwriting commissions and income taxes payable), to complete our initial business combination. To the extent that our capital stock or debt is used, in whole or in part, as consideration to complete our initial business combination, the remaining proceeds held in the trust account will be used as working capital to finance the operations of the target business or businesses, make other acquisitions and pursue our growth strategies.

As of March 31, 2023 and December 31, 2022, we had $19 and $3,116, respectively, in our operating bank accounts, $10,109,893 and $9,843,440, respectively, in marketable securities held in the Trust Account to be used for a Business Combination or to repurchase or redeem our common stock in connection therewith and a working capital (deficit) of 269,550 and $1,708,304, respectively. Until the consummation of a business combination, we will be using the funds not held in the Trust Account for identifying and evaluating prospective acquisition candidates, performing due diligence on prospective target businesses, paying for travel expenditures, selecting the target business to acquire, and structuring, negotiating and consummating the initial business combination.

In order to fund working capital deficiencies or finance transaction costs in connection with an initial business combination, our sponsor or an affiliate of our sponsor or certain of our officers and directors may, but are not obligated to, loan us funds as may be required. If we complete an initial business combination, we may repay such loaned amounts out of the proceeds of the trust account released to us. In the event that an initial business combination does not close, we may use a portion of the working capital held outside the trust account to repay such loaned amounts.

In connection with the Company's assessment of going concern considerations in accordance with Financial Accounting Standard Board's ("FASB") Accounting Standards Update ("ASU") 2014-15, "Disclosures of Uncertainties about an Entity's Ability to Continue as a Going Concern," the Company has until November 21, 2023 (conditioned upon the shareholder vote scheduled for November 21, 2021) to consummate the proposed Business Combination. It is uncertain that the Company will be able to consummate the proposed Business Combination by this time. If a Business Combination is not consummated by this date, there will be a mandatory liquidation and subsequent dissolution of the Company. Additionally, the Company may not have sufficient liquidity to fund the working capital needs of the Company through one year from the issuance of these financial statements. Management has determined that the liquidity condition and mandatory liquidation, should a Business Combination not occur, and potential subsequent dissolution, raises substantial doubt about the Company's ability to continue as a going concern. No adjustments have been made to the carrying amounts of assets or liabilities should the Company be required to liquidate after November 21, 2024. The Company intends to complete the proposed Business Combination before the mandatory liquidation date. However, there can be no assurance that the Company will be able to consummate any Business Combination by November 21, 2024. In addition, the Company may need to raise additional capital through loans or additional investments from its Sponsor, stockholders, officers, directors or third parties. The Company's officers, directors and Sponsor may, but are not obligated to, loan the Company funds, from time to time or at any time, in whatever amount they deem reasonable in their sole discretion, to meet the Company's working capital needs. Accordingly, the Company may not be able to obtain additional financing. If the Company is unable to raise additional capital, the Company may be required to take additional measures to conserve liquidity, which could include, but not necessarily be limited to, curtailing operations, suspending the pursuit of a potential transaction, and reducing overhead expenses. The Company cannot provide any assurance that new financing will be available to it on commercially acceptable terms, if at all. These conditions raise substantial doubt about the Company's ability to continue as a going concern through the liquidation date of November 21, 2024.

20

## Off-Balance Sheet Arrangements

We did not have any off-balance sheet arrangements as of March 31, 2023.

## Contractual Obligations

We do not have any long-term debt, capital lease obligations, operating lease obligations or long-term liabilities, other than, an agreement to pay our sponsor a monthly fee of $20,000 for cash salary, office space, utilities, secretarial, and administrative support services. We began incurring these fees on May 1, 2021 and will continue to incur these fees monthly for up to 12 months (or up to 18 months as applicable) following our completion of the Initial Public Offering.

The underwriters are entitled to a deferred fee of $0.35 per unit, up to $4,025,000 in the aggregate. The deferred fee will become payable to the underwriters from the amounts held in the Trust Account solely in the event that we complete the initial business combination, subject to the terms of the underwriting agreement.

## Critical Accounting Policies

### Marketable Securities Held in Trust Account

At March 31, 2023, all of the assets held in the Trust Account were invested in U.S. Treasury securities. Our investments held in the Trust Account are classified as trading securities. Trading securities are presented on the balance sheet at fair value at the end of each reporting period. Gains and losses resulting from the change in fair value of investments held in Trust Account are included in other income earned on marketable securities held in Trust Account in the accompanying statement of operations. The estimated fair value of investments held in Trust Account are determined using available market information.

As of March 31, 2023, we had $10,109,891.92 in marketable securities held in the Trust Account.

### Class A Common Stock Subject to Possible Redemption

We account for our common stock subject to possible redemption in accordance with the guidance in ASC 480. Common stock subject to mandatory redemption are classified as a liability instrument and are measured at fair value. Conditionally redeemable common stock (including common stock that feature redemption rights that are either within the control of the holder or subject to redemption upon the occurrence of uncertain events not solely within our control) are classified as temporary equity. At all other times, common stock are classified as stockholders' equity.

Our common stock feature certain redemption rights that are considered to be outside of our control and subject to the occurrence of uncertain future events. We recognize changes in redemption value immediately as they occur and adjusts the carrying value of redeemable class A common stock to equal the redemption value at the end of each reporting period. Increases or decreases in the carrying amount of redeemable class A common stock are affected by charges against additional paid-in capital and accumulated deficit.

As of March 31, 2023, 951,801 shares of class A common stock subject to possible redemption are presented at redemption value as temporary equity, outside of the stockholders' deficit section of our balance sheet.

21

### Item 3. Quantitative and Qualitative Disclosures about Market Risk

Not applicable for smaller reporting companies.

### Item 4. Controls and Procedures

*Evaluation of Disclosure Controls and Procedures*

Disclosure controls and procedures are controls and other procedures that are designed to ensure that information required to be disclosed in our reports filed or submitted under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed in our reports filed or submitted under the Exchange Act is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosure.

As required by Rules 13a-15 and 15d-15 under the Exchange Act, our Chief Executive Officer and Chief Financial Officer carried out an evaluation of the effectiveness of our disclosure controls and procedures as of March 31, 2023. Based upon their evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) were effective.

*Changes in Internal Control Over Financial Reporting*

There was no change in our internal control over financial reporting that occurred during the fiscal quarter ended March 31, 2023 covered by this Quarterly Report that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

## PART II - OTHER INFORMATION

### Item 1. Legal Proceedings.

In *GLD Partners LP and Sponsor Member LLC vs Sagaliam Acquisition Corp*, Case No. 1:99-mc-09999 filed on 7 Nov 23 (US District Court for the District of Delaware) claims are asserted that the transaction with VIRO and BGEN disenfranchises GLD of its voting rights.

The Company intends to vigorously defend the lawsuit and believes that it has no basis in fact or law. In a 13D submitted by GLD Sponsor Member, LLC on April 25, 2023 it is disclosed that GLD Sponsor Member entered into an Insider Letter on December 20, 2022 including the provision to: "vote any shares of Common Stock owned by it in favor of any proposed Business Combination". The extension proxy is a necessary precondition to the Business Combination Agreement, and is thus included in the parameters of the voting agreement included in the Insider Letter.

In *Supraeon Investments Inc. vs Sagaliam Acquisition Corp*, Case No. filed on 15 Sep 23 (Superior Court of the State of Delaware) claims are asserted that the Company owes a $1,000,000 termination fee in connection with the previously proposed AEC acquisition. GLD is the controlling entity of Supraeon.

The Company intends to vigorously defend the lawsuit, and believes that it has no basis in fact or law. In an 8-K submitted by the Company on March 1, 2023 it was noted that "Sagaliam contends that it has no obligation to pay a termination fee." It is the belief of the Company that there is no termination fee owed, and as a result of conflicts amongst multiple entities controlled by GLD, if a termination fee were to be owed, it would be owed by GLD.

Mr. Barry Kostiner, our Chief Executive Officer and one of our Directors, is a named defendant in an ongoing legal proceeding which is described below.

In *Re Argon Credit, LLC, et al., Debtors*, Case No. 16-39654 (U.S. Bankruptcy Court Northern District of Illinois Eastern Division).

22

On December 16, 2016, Argon Credit, LLC and Argon X, LLC (collectively the "Debtors") filed petitions for relief under chapter 11 of title 11 of the United States Code. On January 11, 2017, Debtors' bankruptcy cases were converted to chapter 7 cases. On December 14, 2018, the chapter 7 trustee filed an adversary proceeding as case number 18-ap-00948 (the "Bankruptcy Complaint") against multiple defendants, including Barry Kostiner, asserting claims for aiding and abetting breach of fiduciary duty. As to Mr. Kostiner, the Bankruptcy Complaint alleged that, while an employee of the Debtor, he aided and abetted the former CEO of Argon Credit, Raviv Wolfe, in breaching his fiduciary duties to Argon Credit, by, among other things, knowingly participating in a scheme to funnel assets away from the Debtors and their creditors, double pledging Argon Credit's assets, and knowingly submitting false or misleading financial reports to the Debtors' secured lender to conceal the transfer of Argon Credit's assets. On July 11, 2019, Mr. Kostiner, appearing through counsel, filed an answer denying all allegations against him set forth in the Bankruptcy Complaint.

On August 12, 2021, the trustee filed a Motion for the Entry of an Order Pursuant to Bankruptcy Rule 9019 Approving Settlement with Mr. Kostiner. Under the terms of the proposed settlement, Mr. Kostiner would pay the trustee $35,000 in exchange for dismissal with prejudice from the suit and the exchange of mutual releases (the "Proposed Settlement"). The trustee and Mr. Kostiner each concluded that the Proposed Settlement was in their respective best interests in light of, among other things, the contested nature of the Bankruptcy Complaint, the costs that both parties would incur in connection with the litigation of same, the uncertain likelihood of recovery following protracted litigation and Mr. Kostiner's financial condition. On September 3, 2021, the Bankruptcy Court issued an order approving the settlement, and on November 18, 2021, the Bankruptcy Court issued an order granting the motion to voluntarily dismiss the proceeding against Mr. Kostiner.

*Fund Recovery Services, LLC v. RBC Capital Markets, LLC, et al.*, Case No. 1:20-cv-5730 (U.S. District Court for the Northern District of Illinois Eastern Division.

On September 25, 2020, Fund Recovery Services, LLC ("Fund"), as assignee of Princeton Alterative Income Fund, L.P. ("PAIF") filed a complaint in the above-referenced action asserting a variety of claims against 37 defendants, including Mr. Kostiner. On May 15, 2021, Fund filed an amended complaint against 34 of the defendants, including Mr. Kostiner (the "Amended Complaint"). The claims against Mr. Kostiner in the Amended Complaint include: (i) violation of 18 U.S.C. 1962(2) by the conduct and participation in a RICO enterprise through a pattern of racketeering activity; (ii) violation of 18 U.S.C. 1962(d) by conspiracy to engage in a pattern of racketeering activity; (iii) fraud/intentional misrepresentation; (iv) aiding and abetting fraud/intentional misrepresentation; (v) fraudulent concealment; (vi) aiding and abetting fraudulent concealment; (vii) fraudulent/intentional inducement; (viii) conversion; (ix) aiding and abetting conversion; (x) civil conspiracy; and (xi) tortious interference with contractual relations. The Amended Complaint seeks damages of approximately $240 million jointly and severally against all defendants, together with treble and punitive damages, among other relief.

The Amended Complaint, as it pertains to Mr. Kostiner, covers much of the same conduct that is the subject of the Bankruptcy Complaint described above and stems from a transaction that Argon Credit entered into with Spartan Specialty Finance, LLC ("Spartan"). Argon, a consumer finance platform that made high-interest, unsecured loans to credit-impaired borrowers, financed its loans through a revolving credit facility provided by PAIF. Mr. Kostiner was the sole member of Spartan and was also, for a period of time, the Vice President of Capital Markets at Argon. Argon and Spartan entered into an agreement whereby Spartan agreed to purchase a portfolio of loans from Argon. Spartan financed the acquisition by obtaining a loan from Hamilton Funding ("Hamilton"). The Amended Complaint alleges that PAIF had a perfected security interest in the loans that Argon improperly sold to Spartan (which were financed by Hamilton Funding), and that defendants, including Mr. Kostiner, engaged in a scheme to induce PAIF to initially lend funds, later to increase its credit line, and ultimately convert and deprive PAIF of its property by numerous acts of fraud.

On July 1, 2021, defendants, including Mr. Kostiner, filed a consolidated motion to dismiss the Amended Complaint in its entirety against them, based on the following arguments: (a) the RICO claims (Counts (1)-(2)) are time-barred; (b) Fund lacks standing to bring Counts 1-11; (c) Fund is collaterally estopped from litigating the issues that are the subject of the Amended Complaint; (d) the allegations in the Amended Complaint fail to satisfy the requirements of Rules 8 and 9(b) of the Federal Rules of Civil Procedure; (e) the Amended Complaint failed to allege a duty sufficient to support its allegations in Counts 1-7; (f) Fund failed to adequately plead the elements of a valid RICO claim; and (g) Fund failed to adequately plead the elements of any of its state law claims (Counts 3-13). By Memorandum and Order dated January 17, 2022, the Court found that the Amended Complaint failed to adequately plead the elements of count one (violation of 18 U.S.C. 1962(2) by the conduct and participation in a RICO enterprise through a pattern of racketeering activity) and count two (violation of 18 U.S.C. 1962(d) by conspiracy to engage in a pattern of racketeering activity). The Court accordingly granted Defendants' motion to dismiss those claims, and based on the dismissal of those claims, granted the motion to dismiss the remaining claims based on state law, counts three through six, for lack of subject matter jurisdiction. The Order provides that Plaintiff has until February 8, 2022, to file a motion for leave to amend with a proposed amended complaint that adequately states a claim over which the Court has subject matter jurisdiction, otherwise the Court will issue a final judgment in accordance with its Order.

On February 22, 2022, PAIF filed a Revised Second Amended Complaint ("RSA Complaint") against 25 defendants, including Mr. Kostiner. The RSA Complaint incorporates information from witness statements and journal entries from alleged Argon insiders. The claims against Mr. Kostiner in the RSA Complaint include: (i) fraud/intentional misrepresentation; (ii) aiding and abetting fraud/intentional misrepresentation; (iii) fraudulent concealment; (iv) aiding and abetting fraudulent concealment; (v) fraudulent/intentional inducement; (vi) conversion; (vii) aiding and abetting conversion; (viii) civil conspiracy; and (ix) tortious interference with contractual relations. The Amended Complaint seeks damages of approximately $240 million jointly and severally against all defendants, together with treble and punitive damages, among other relief.

By order dated September 30, 2022, the Court denied Fund's motion to file a second amended complaint for failure to assert a viable RICO claim, and directed the Clerk to enter judgment dismissing Fund's civil RICO claims with prejudice and dismissing the state-law claims for lack of supplemental jurisdiction.

*In re Spartan Specialty Finance I SPV, LLC*, Case No. 16-22881-rdd (U.S. Bankruptcy Court for the Southern District of New York White Plains Division)

On June 29, 2016, Spartan filed a petition for relief under chapter 11 of title 11 of the United States Code. It did so in order to resolve a loan dispute that it had with Hamilton, including Hamilton's alleged right to access cash accounts that Spartan had pledged as collateral. On May 26, 2017, the bankruptcy court approved a Stipulation and Agreement Resolving Debtor's Motion for Use of Cash Collateral and Fixing Amount of Secured Claim, between Hamilton, Spartan, and Mr. Kostiner, in his individual capacity. Spartan's bankruptcy petition was dismissed as part of the Court's approval of the Settlement.

## Item 1A. Risk Factors.

As a smaller reporting company, we are not required to include risk factors in this Quarterly Report. As of the date of this document, there have been no material changes to the risk factors disclosed in our final prospectus dated December 20, 2021 and our form 10-K for the period ending December 31, 2021 filed with the SEC, except we may disclose changes to such factors or disclose additional factors from time to time in our future filings with the SEC. Any of these factors could result in a significant or material adverse effect on our results of operations or financial condition.

## Item 2. Unregistered Sales of Equity Securities and Use of Proceeds.

*Unregistered Sales*

On April 5, 2021, our sponsor purchased 2,875,000 shares of our class B common stock for an aggregate purchase price of $25,000, and later transferred a total of 225,000 shares of class B common stock to our officers and directors. The 2,875,000 shares of class B common stock include 375,000 shares subject to forfeiture if the underwriter's over-allotment option was not exercised in full. As the underwriters exercised the over-allotment option in full, the 375,000 shares of class B common stock were not forfeited.

The initial holders of the class B common stock have agreed not to transfer, assign or sell any of the founder shares until the earlier of (i) one year after the date of the consummation of our initial business combination or (ii) the date on which we consummate a liquidation, merger, stock exchange or other similar transaction which results in all of its stockholders having the right to exchange their shares of Class A common stock for cash, securities or other property. Notwithstanding the foregoing, if the closing price of our shares of Class A common stock equals or exceeds $12.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period commencing 150 days after our initial business combination, the class B common stock will no longer be subject to such transfer restrictions.

24

**Item 2. Unregistered Sales of Equity Securities and Use of Proceeds (cont.)**

Simultaneously with the closing of the Initial Public Offering, our sponsor purchased an aggregate of 400,000 private units in a private placement at a price of $10.00 per unit, for an aggregate purchase price of $4,000,000. The private placement units are identical to the units sold in the IPO, except they and the underlying securities are subject to certain transfer restrictions and entitled to certain registration rights as described in this report.

Ten "qualified institutional buyers" as that term is defined in Rule 144A of the Securities Act or "accredited investors" as that term is defined in Regulation D of the Securities Act (who are not affiliated with any member of our management team), whom we refer to as the anchor investors, have each purchased 9.9% of the units sold in the Initial Public Offering, or 990,000 units, excluding any units sold pursuant to the underwriters' exercise of their over-allotment opinion. As each anchor investor purchased 100% of the units allocated to it, in connection with the closing of the Initial Public Offering, our sponsor sold 20,000 founder shares to each anchor investor, or an aggregate of 200,000 founder shares to all ten anchor investors, at a purchase price of approximately $0.0029 per share.

*Use of Proceeds from Registered Offering*

On December 23, 2021, we consummated our Initial Public Offering of 11,500,000 units, including 1,500,000 units issued to underwriters upon full exercise of their over-allotment option. EF Hutton, division of Benchmark Investments, LLC, acted as the representative of several underwriters for the Initial Public Offering. The securities sold in the Initial Public Offering were registered under the Securities Act on a registration statement on Form S-1 (No. 333-256473). The SEC declared the registration statement effective on December 20, 2021.

In connection with the Initial Public Offering, we incurred offering costs of approximately $8,525,729, including $1,150,000 of underwriting fees, $4,025,000 of deferred underwriting fees, $1,150,000 for the fair value of Class A shares issued to underwriter as representative shares, $1,634,620 for the fair value of the Founder Shares in excess of amounts paid by anchor investors, and $566,109 of other offering costs. Other incurred offering costs consisted principally of preparation fees related to the Initial Public Offering. A total of $116,150,000 of the proceeds from the Initial Public Offering and the sale of the private placement units, was placed in a U.S.-based trust account, maintained by Continental Stock Transfer & Trust Company, acting as trustee.

There has been no material change in the planned use of the proceeds from the Initial Public Offering and private placement as is described in our final prospectus related to the Initial Public Offering.

**Item 3. Defaults Upon Senior Securities.**

None.

**Item 4. Mine Safety Disclosures.**

Not Applicable.

**Item 5. Other Information.**

None.

25

## Item 6. Exhibits

The following exhibits are filed as part of, or incorporated by reference into, this Quarterly Report on Form 10-Q.

| No. | Description of Exhibit |
| --- | --- |
| 1.1 | Underwriting Agreement, dated December 20, 2021, by and between the Registrant and EF Hutton, a division of Benchmark Investments, Inc. (incorporated by reference to Exhibit 1.1 to the Registrant's Current Report on Form 8-K filed with the Commission on December 27, 2021). |
| 3.1† | Amended and Restated Certificate of Incorporation (incorporated by reference to Exhibit 3.1 to the Registrant's Current Report on Form 8-K filed with the Commission on December 27, 2021). |
| 3.3 | Bylaws (incorporated by reference to Exhibit 3.3 to the Registrant's Amendment to Registration Statement on Form S-1 (File No. 333-256473) filed with the Commission on November 22, 2021). |
| 4.1 | Right Agreement, dated December 20, 2021 by and between the Registrant and Continental Stock Transfer & Trust Company, as warrant agent (incorporated by reference to Exhibit 4.1 to the Registrant's Current Report on Form 8-K filed with the Commission on December 27, 2021). |
| 10.1 | Letter Agreement, December 20, 2021, by and among the Registrant, its officers and directors, and Sagaliam Sponsor LLC. (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed December 27, 2021). |
| 10.2 | Investment Management Trust Agreement, dated December 20, 2021, by and between the Registrant and Continental Stock Transfer & Trust Company, as trustee (incorporated by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed with the Commission on December 27, 2021). |
| 10.3 | Registration Rights Agreement, dated December 20, 2021, by and among the Registrant and certain security holders (incorporated by reference to Exhibit 10.3 to the Registrant's Current Report on Form 8-K filed with the Commission on December 27, 2021). |
| 10.4 | Unit Subscription Agreement, dated December 20, 2021, by and between the Registrant and Sagaliam Sponsor LLC. (incorporated by reference to Exhibit 10.4 to the Registrant's Current Report on Form 8-K filed with the Commission on December 27, 2021). |
| 10.5 | Administrative Support Agreement by and between the Registrant and Sagaliam Sponsor LLC (incorporated by reference to Exhibit 10.5 to the Registrant's Current Report on Form 8-K filed with the Commission on December 27, 2021). |
| 10.6 | SAGA Convertible Note - NYF Group |
| 10.7 | SAGA Convertible Note - Seacor Capital |
| 10.8 | SAGA LMI RMF Promissory Note |
| 31.1* | Certification of Chief Executive Officer pursuant to Rule 13a-14(a) under the Securities Exchange Act of 1934, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2* | Certification of Chief Financial Officer pursuant to Rule 13a-14(a) under the Securities Exchange Act of 1934, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1* | Certification of Chief Executive Officer pursuant to Rule 13a-14(b) of the Securities Exchange Act of 1934, as amended, and 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2* | Certification of Chief Financial Officer pursuant to Rule 13a-14(b) of the Securities Exchange Act of 1934, as amended, and 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 101.INS* | Inline XBRL Instance Document |

12/6/23, 9:28 AM
Case 1:23-cv-01266-RGA    Document 34    Filed 12/06/23    Page 84 of 95 PageID #: 893
sec.gov/Archives/edgar/data/1855351/000149315223042805/form10-q.htm

| 101.SCH* | Inline XBRL Taxonomy Extension Schema Document |
| 101.CAL* | Inline XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF* | Inline XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB* | Inline XBRL Taxonomy Extension Labels Linkbase Document |
| 101.PRE* | Inline XBRL Taxonomy Extension Presentation Linkbase Document |
| 104* | Cover Page Interactive Data File. |
| | Business Combination Agreement executed on 15 Sept 23 |
| | LMI Convertible Debt Agreement |
| | Seacor Convertible Debt Agreement |
| | NY Convertible Debt Agreement |
| | BN Holdings Trust Promissory Note |

\*   Filed herewith.

\*\*   Furnished herewith.

† Certain exhibits and schedules to this Exhibit have been omitted in accordance with Regulation S-K Item 601(b) (2). The Registrant agrees to furnish supplementally a copy of any omitted exhibit or schedule to the Commission upon its request.

26

## SIGNATURES

In accordance with the requirements of the Securities Exchange Act of 1934, the registrant caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**SAGALIAM ACQUISITION CORP.**

Date: November 27, 2023

By:    */s/ Barry Kostiner*

Name: Barry Kostiner
Title:  Chief Executive Officer
        (Principal Executive Officer)

Date: November 27, 2023

By:    */s/ Barry Kostiner*

Name: Barry Kostiner
Title:  Chief Executive Officer
        (Principal Financial and Accounting Officer)

27

# EXHIBIT F

☐ ACCESSWIRE

# Enzolytics, Inc. Files Amended December 31, 2022 OTC Report with Audited Financials and Unaudited September 30, 2023 Quarterly Disclosure



f

𝕏

✉



| Quote Lookup | | | ✕ |
|---|---|---|---|

### Related Quotes

| Symbol | Last Price | Change | % Change |
|---|---|---|---|
| ENZC Enzolytics, Inc. | 0.0237 | +0.0002 | +0.90% |
| SAGA Sagaliam Acquisition Corp. | 11.12 | +0.11 | +1.00% |
| SAGAR Sagaliam Acquisition Corp. | 0.1300 | 0.0000 | 0.00% |
| SAGAU Sagaliam Acquisition Corp. | 11.05 | 0.00 | 0.00% |

### Recently Viewed ›

| Symbol | Last Price | Change | % Change |
|---|---|---|---|
| SAGAU Sagaliam Acquisition Corp. | 11.05 | 0.00 | 0.00% |

Enzolytics, Inc.

**Enzolytics, Inc.**
November 20, 2023

**In this article:**

| OTCM +0.37% ☆ | ENZC +0.90% ☆ | SAGA +1.00% ☆ | SAGAR 0.00% ☆ |
|---|---|---|---|

*Provides Updates on SAGA Transaction and on Virogentics, Inc. and Biogenysis, Inc. Progress*

**ALLEN, TX / ACCESSWIRE / November 20, 2023 /** Enzolytics, Inc. (OTC PINK:ENZC) (https://enzolytics.com/"https://enzolytics.com/). Enzolytics, Inc. (the "Company") filed an amended December 31, 2022 OTC Annual Report and its

yahoo/finance
**Want to test drive your new portfolio page?**
See What's New

**Insider Sell Alert: Director James Hawkins Sells Shares of iRadimed Corp (IRMD)**
GuruFocus.com

Annual Report filed today is to include the audited financial statements for December 31, 2022 and 2021. As part of the recently completed sale of the two operating subsidiaries, Virogenetics, Inc. ("VIRO") and Biogenysis, Inc. ("BGEN"), to Sagaliam Acquisition Corp. (NASDAQ:SAGA)("SAGA") post-closing deliverables included the Company providing audited financial statements for inclusion in the regulatory and NASDAQ filings of SAGA.

The Company has received numerous inquiries from various entities and individuals regarding the status of the SAGA transaction and the status of the operations of VIRO and BGEN. With the completed sale of the operating subsidiaries the Company will no longer be the source of news on the progress and developments of VIRO or BGEN. SAGA is a NASDAQ entity and takes a more conservative approach to press releases as they are a SEC reporting entity and SAGA's policy is to report material events in 8-K filings accompanied by a press release.

As a party to the business combination agreement with SAGA the Company can report that the transaction is complete. Prior to SAGA receiving any notice of what the Company believes is a frivolous action, designed and implemented to do nothing but cause harm to ENZC and the SAGA Shareholders, ENZC had voted its shares received as payment from the sale of the operating subsidiaries, VIRO and BGEN. These shares represent a quorum and more than enough votes to ensure passage of the two proposals, rendering the shareholder vote a fait accompli.

The 45 million shares of SAGA stock have been received by the sellers and the Company is in the process of completing the regulatory required paperwork to declare and distribute 36 million shares to the ENZC equity holders on a fully diluted basis. Once the filings are complete, the Company will provide a detailed disclosure of the calculation and a definitive number of SAGA shares to be paid

common and preferred shares. The Company

**India Green Hydrogen Aid Gets Cautious Response From Investors**
Bloomberg

**Which company in Willoughby is offering a 4-day work week?**
WEWS-Cleveland Videos

**With 31% stake, Fennec Pharmaceuticals Inc. (NASDAQ:FENC) seems to have captured hedge funds investors' interest**
Simply Wall St.

**UK watchdog warns companies over AI use and privacy**
Reuters

**Warren Buffett's Financial Plan To Eliminate America's Debt: 'I Can End the Deficit in 5 Minutes'**
GOBankingRates

currently estimates that for each fully diluted share of ENZC stock owned, the ENZC equity holders will receive between .00396 and .00409 SAGA shares for each fully diluted common share. This information is subject to change and should be viewed as a best estimate until the definitive disclosures are made after completing the required paperwork referenced above. As an example, if John Doe owns 100,000 common shares of ENZC, he will receive between 396 to 409 shares of SAGA as a dividend from the Company once it is approved. A more detailed example was filed as Supplemental Information on OTC Markets on July 10, 2023, by ENZC.

In addition, the Company was able to negotiate a "make-whole" provision in the business combination agreement which protects the value of the shares received through the make-whole calculation date. This will allow ENZC shareholders to receive additional SAGA shares in the event that there is a drop in the SAGA share price prior to the completion of the stock dividend. SAGA is working with investors to access capital needed for the business and benefit from the increased access to capital markets of a NASDAQ entity. SAGA will be focused on investor communications and realizing the value and multiple market opportunities associated with the Company's technologies and intellectual property.

Regarding updates on the operations and progress being made by VIRO and BGEN, we can disclose the information we had available when VIRO and BGEN were operating subsidiaries of ENZC at the date of the close of the transaction, September 30, 2023. One of the most important projects that ENZC was in the middle of prior to the sale is the ITV-1 African project. Due to the unstable situation and high political risk that developed in Congo, the parties decided to conduct the clinical trial of ITV-1 in Ethiopia, in collaboration with the Center for Innovative Drug Development and Therapeutic

**With job boom in restaurants 'behind us,' expect slower payroll growth in 2024**
Yahoo Finance

**Google unveils Gemini, its latest AI chatbot**
Yahoo Finance Video

**Zelensky signs law resuming tax audits for businesses**
Kyiv Independent

**'You're being a baby': This 41-year-old man has no job, no savings and relies on his parents for rent — but refuses to work jobs...**
Moneywise

**Kyrie Irving's Agent And Stepmom, Shetellia Riley Irving, Says Once The NBA Star Retires, He Plans To Take Over The Family Business**
AfroTech

Finance Home   Watchlists   My Portfolio   Markets   News   Videos   Yahoo Finance Plus

Try the new yahoo/finance →

**Can You Guess How Many Americans Successfully Retire With $1 Million Saved? The Percentage May Shock You**

Benzinga

Courtesy of Prof. Eyasu Makkonen, deputy head of CDT-Africa, the necessary procedures for conducting the clinical trial were established and have been implemented. A team was appointed under the leadership of Dr. Wondwossen, a professor at Addis Ababa University.

An initial interest has been generated from the progress on the Africa project through VIRO's partner for additional clinical trials in Asia and India. A draft contract had been received prior to close and was being considered by VIRO for both of these markets.

The African clinical trial is expected to conclude with a final report by the end of 2024. We believe that all future progress on this and potential other Clinical Trials will be timely disclosed by SAGA.

Regarding the ongoing European Medicine Agency permitting efforts for ITV-1it has been determined that the trials should be expanded to cover the ability to be classified as an immunomodulator. The Clinical Trials will now include testing on patients with cirrhosis; cancer patients after receiving chemotherapy and radiotherapy treatments, HIV and all diseases in which there is an immune system decline. This is a change in the target group of patients from HIV to immunodeficient on hematological patients.

The previously announced Clinical trials on Diabetes in Bulgaria, designed to investigate the impact of ITV-1 on blood sugar and the most important indicator of Glycosylated Hemoglobin blood glucose level, remain in progress. Shortly after the sale of VIRO to SAGA, Barry Kostiner, CEO of SAGA accompanied Diana and Harry Zhabilov, CEO and CSO respectively of Virogenetics, Inc., to Bulgaria where he toured the manufacturing facilities of ITV-1 and IPF Immune®. He also met with the former Prime Minister of Bulgaria and several of the advisors, service providers and supporters that VIRO has developed over the years.

The expansion of VIRO's nutraceutical product line, by the addition of the exclusive licensing agreement for the US market of the Liver Detox product entered with ELIMUS OOD, is also a significant asset that was sold to SAGA by the transfer of ownership of VIRO. The new product accelerates the functions of the liver (accelerated emission of alcohol dehydrogenase), thereby reducing the harmful effects of alcohol on the body and the central nervous system. This is a new revolutionary nutritional supplement in the form of a drink. This product is currently being successfully marketed in the European and Asian markets. The approval by the FDA was ongoing and VIRO is having the labeling on the packaging approved so that the product can be offered in the US through the distribution channels currently being used for the sale of IPF-Immune.

Additionally, VIRO has developed a new formulation to produce IPF Immune in a pill form while adding a vitamin C component.

Enzolytics believed that these two developments have the potential to increase the market penetration for the nutraceutical line significantly, especially coupled with an aggressive marketing campaign that was being negotiated and developed featuring a former NFL player as spokesperson in IPF's first video presentation and the launch of VIRO's website. The Company has also received a trademark for IPF Immune from the US Patent and Trademark Office (USPTO).

Biogenysis, Inc. has made significant progress in its Patent Cooperation Treaty (PCT) application covering its inventions relating to anti-SARS-CoV-2 Monoclonal Antibodies. The PCT application has now advanced to filing as a U.S. National Stage Application in the U.S. Patent Office and as a formal European Patent Organization (EPO) application. The EPO application makes possible coverage in the 39 contracting countries within the EPO. These countries include all of the countries in

extensive list of 39 member countries throughout

Europe and adjacent regions.
https://www.epo.org/about-
us/foundation/member-states.html.

The discoveries made by the Company have been recognized as novel and inventive by the International Patent Office. As a result, the Company is entitled to apply for patents and claim exclusive rights to these discoveries for 20 years in each member country under the Patent Cooperation Treaty.

The HIV PCT application covering HIV antigens and epitopes has filed national phase applications in Australia, Europe, and India. North America, Europe, India, and Australia have been strategically selected with a strategic focus on asset acquisition and target market. The Company's patent applications claim the use of any identified epitope or any combination of any of the multiple identified epitopes in any of the following ways:

1. For producing a therapeutic monoclonal antibody to treat the infection.

2. For making a vaccine against the virus.

3. For creating related prophylactic/therapeutic methods relating to the epitopes/antigens.

4. For use in any diagnostic test to identify whether a person has the viral infection.

On September 11th, 2023, a Federal Trademark Application was filed in the United States Patent and Trademark Office (USPTO) for registration of the AI platform mark Chandradrishti™. The application has been filed as an "intent to use" application, with the mark's first use in providing services to others in interstate commerce to be identified at a later date.

The Company's Chandradrishti™ AI platform has identified more than 26 conserved, immutable epitope sites on the FeLV virus mentioned in the patent application. The patent covers using any of the discovered Feline Leukemia epitopes conserved

Finance Home    Watchlists    My Portfolio    Markets    News    Videos    Yahoo Finance Plus 📺    ⋯    Try the new yahoo/finance →

using them in diagnostic tests to detect the virus in cats.

After securing these rights, substantial partnerships or licensing of the technology to global pharmaceutical companies in their respective areas of expertise will be pursued. The Company's objective is to capitalize on strengths and expertise to introduce innovative and influential solutions for improved healthcare and significantly impact patients' lives worldwide.

Charles Cotropia, CEO of Enzolytics, said: "Our focus is on our technologies for developing successful therapeutics for treating many infectious diseases. We have full confidence in each therapeutic being developed. We also have full confidence in advancing them under the Business Combination with Sagaliam Acquisition Corp. Our business combination with Sagaliam will ensure the necessary funding for the substantial advancement we know can be achieved. Efforts to thwart those plans are without merit and will be fully addressed as we proceed and in the right forums. While fully addressing these business matters diverts some attention from our main technological goals, it will clearly not prevent our success."

Barry Kostiner commented, "My trip to Bulgaria was inspiring. Meeting members of the VIRO management team and their premier manufacturing and clinical trial vendors deepened my appreciation for the technology and opportunity ahead. An affiliate of GLD, the former sponsor of Sagaliam, recently filed a lawsuit asserting that the transaction with VIRO and BGEN disenfranchises GLD of its voting rights. We intend to vigorously defend Sagaliam against the lawsuit. We are committed to protecting the interests of our shareholders and believe that the lawsuit is without merit, particularly given that no shareholder would benefit from the dissolution of Sagaliam. This transaction benefits all shareholders and will provide a path to the capital needed to commercialization, in addition to benefiting

disadvantaged communities in Africa and around the world that suffer from the high costs and lack of access to existing therapies."

Safe Harbor Statement: This news release contains forward-looking statements that involve risks and uncertainties associated with financial projections, budgets, milestone timelines, clinical development, regulatory approvals, and other risks described by Enzolytics, Inc. from time to time in its periodic reports filed with the SEC.

While Enzolytics, Inc. believes that the forward-looking statements and underlying assumptions contained therein are reasonable, any of the assumptions could be inaccurate, including, but not limited to, the ability of Enzolytics to establish the efficacy of its therapeutics in the treatment of any disease or health condition, the development of studies and strategies leading to commercialization of its therapeutics in the United States, the obtaining of funding required to carry out the development plan, the completion of studies and tests on time or at all, and the successful outcome of such studies or tests. Therefore, there can be no assurance that the forward-looking statements included in this release will prove to be accurate.

Such forward-looking statements are based on current expectations. They involve inherent risks and uncertainties, including factors that could delay, divert or change any of the statements made, and cause actual outcomes and results to differ materially from current expectations. No forward-looking statement can be guaranteed. These forward-looking statements are made as of the date of this press release. The Company expressly disclaims any intention or obligation to update the forward-looking statements or update the reasons why actual results could differ from those projected in the forward-looking statements.

**Company Contact:**

Enzolytics, Inc.

Allen, Texas 75013

www.enzolytics.com

**SOURCE:** Enzolytics, Inc.

View source version on accesswire.com:

https://www.accesswire.com/806987/enzolytics-
inc-files-amended-december-31-2022-otc-report-
with-audited-financials-and-unaudited-september-
30-2023-quarterly-disclosure